# IN THE CIRCUIT COURT OF SALINE COUNTY, ARKANSAS
## THIRD DIVISION

FILED
SALINE COUNTY
CIRCUIT CLERK

2012 DEC 28   PM 12: 32

SANSTON M. FOSTER IV                                             **PLAINTIFF**

BY:

v.                          **No. 63CV-12-898**

LINDSEY MANAGEMENT CO., INC.                      **DEFENDANTS**
FOUNTAIN LAKES, A LIMITED
PARTNERSHIP, and FOUNTAIN LAKES
MANAGEMENT COMPANY, INC.

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, Sanston M. Foster IV, by and through his attorney, Mickey Stevens, and for his First Amended Complaint against Lindsey Management Co., Inc., Fountain Lakes, A Limited Partnership, and Fountain Lakes Management Company, Inc. states and alleges:

1.     This is an action for violations of the Arkansas Deceptive and Unconscionable Trade Practices statute, Arkansas Code Annotated § 4-88-107 *et. seq.*, Breach of Contract, and Fraud.

## PARTIES

2.     Plaintiff, Sanston M. Foster IV, is a natural person who resides in the City of Benton, Saline County, Arkansas.

3.     Defendant Lindsey Management Co., Inc. is, upon information and belief, an Arkansas corporation with its principal place of business located in Fayetteville, Arkansas.

4.     Defendant Fountain Lakes, A Limited Partnership is, upon information and belief, an Arkansas limited partnership.

63CV-12-898        631-63100001504-007
SANSTON M FOSTER IV V LINDS 27 Pages
SALINE CO                12/28/2012 12:32 PM
CIRCUIT COURT                          FI40

5.      Defendant Fountain Lakes Management Company, Inc. is, upon information and belief, an Arkansas Corporation with its principal place of business located in Fayetteville, Arkansas.

## JURISDICTION AND VENUE

6.      Subject-matter jurisdiction of this court arises under Arkansas Code Annotated §§ 4-88-113(f) and 4-88-204 which create a private cause of action for any person damaged or injured as a result of a violation of the Arkansas Deceptive and Unconscionable Trade Practices statute, Arkansas Code Annotated § 4-88-107 *et. seq.*

7.      Subject-matter jurisdiction of this court for Plaintiff's Breach of Contract and Fraud claims arises under Arkansas Code Annotated § 16-13-201 and the Arkansas Constitution.

8.      Because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Saline county, venue is proper pursuant to Arkansas Code Annotated § 16-55-213(1).

## FACTS

9.      Defendant, Lindsey Management Co., Inc. is a property management company that manages the apartment complex known as Fountain Lake Apartment Community located at 3011 Congo Road in Benton, Saline County, Arkansas.

10.      Defendant Fountain Lakes, A Limited Partnership, is the owner of the Fountain Lake Apartments located at 3011 Congo Road in Benton, Saline County, Arkansas.

11.      Defendant Fountain Lakes Management Company, Inc. is, upon information and belief, an entity that is controlled by Lindsey Management Co., Inc. and is related to the management of the Fountain Lakes Apartment Community.

2

12.     The Apartment Manager and other staff of Fountain Lakes Apartment Community are employees of Lindsey Management Co., Inc.

13.     Lindsey Management Co., Inc. advertises Fountain Lakes Apartments, accepts and processes applications from prospective tenants, handles the actual leasing of the apartments, and is responsible for maintaining the property.

14.     Lindsey Management Co., Inc. makes all personnel decisions involving the management of the Fountain Lakes Apartment Community, including hiring and direct supervision of apartment managers, leasing agents, and maintenance technicians.

15.     Lindsey Management Co., Inc. maintains strict policies and procedures and their apartment managers are required to strictly follow these policies and procedures.

16.     Lindsey Management Co., Inc. makes all decisions relating to the maintenance of the apartments in the Fountain Lakes Apartment Community, including approving or denying requests for repairs.

17.     Lindsey Management Co., Inc., Fountain Lakes, A Limited Partnership, and Fountain Lakes Management Company, Inc. have the same mailing address, common shareholders and officers, and are so interwoven that one entity is merely an alter ego of the other.

18.     Lindsey Management Co., Inc., Fountain Lakes, A Limited Partnership, and Fountain Lakes Management Company, Inc. are engaged in a joint venture in the leasing and management of Fountain Lakes Apartments.

19.     Lindsey Management Co., Inc., its shareholders, directors, and officers have established a scheme by which each property is owned by a separate legal entity. This scheme is designed to avoid liability and has been defensively used in multiple lawsuits.

3

20.     Lindsey Management Co., Inc. controls every aspect of the management and leasing of the Fountain Lakes Apartment Community.

21.     Tenants who have complaints are directed to a tenant relations department at Lindsey's corporate offices.

22.     Lindsey has total control and authority over all aspects of the apartment operations.  The partnerships that actually own the properties managed by Lindsey are owned by the same shareholders, share common officers and directors, and are in reality merely an extension of and tools used by Lindsey.

23.     In or around September 2012, Plaintiff contacted the apartment manager at Fountain Lake Apartments, to inquire about renting an apartment.

24.     The apartment manager showed Plaintiff a model apartment and told him that the apartment he would actually be renting was not yet available for showing.

25.     The model apartment shown to Plaintiff was in good condition and had no obvious defects.   The apartment manager represented to Plaintiff that the apartment he would be renting was in the same condition as the model apartment and similar in other features.

26.     At that time, Plaintiff gave the apartment manager a security deposit and was told that his apartment would be ready in a couple of weeks which would have been the last week of September.

27.     During the last week of September, Plaintiff called the apartment manager and learned that his apartment was still not ready.  The apartment manager told Plaintiff he could not see the apartment at that time.  The apartment manager also told Plaintiff that he was required to come by and sign the lease and have the utilities turned on before he could see the apartment.

28.     Plaintiff went to the apartment office and signed a lease on September 26, 2012 and had the utilities turned on.

29.     Upon inspecting, for the first time, the apartment he had leased, Plaintiff discovered that the apartment was in poor condition.   Plaintiff noticed that there was apparent water damage to floors and around the edges of the walls causing the baseboards to warp and detach from the walls.  The kitchen flooring is soft and gives when walked on.  There is mold around the washing machine area.  Cabinets had been repaired with bare plywood.  Areas of the walls had been repaired with spackle but had not been painted.  The dishwasher was not properly installed.  The oven does not heat to more than 350 degrees.  The carpet has a very strong odor of smoke.  The paint appears to have been haphazardly applied with over sprays and drip marks. The apartment is infested with roaches to the point that Plaintiff is unable to store any food in the refrigerator or the cabinets.  There is a hole in the ceiling and the walls appear to have separated from the ceiling in some areas.

30.     Plaintiff noted the above described conditions and other defects on the Statement of Apartment Conditions provided by the apartment manager and returned the form to the apartment manager within forty-eight hours of moving in as required by the terms of the lease. *Exhibit B.*  Defendant failed to correct the defective conditions.

31.     Plaintiff is disabled and has had two kidney transplants.  Plaintiff receives dialysis treatments three times per week for four hours at a time.   Plaintiff takes immunosuppressant drugs which make him more susceptible to illness.  Plaintiff also uses a CPAP machine for sleep apnea and has allergies.  These conditions substantially limit Plaintiff's major life activities.

32.     The insect infestation and other conditions in the apartment significantly worsen Plaintiffs allergies and breathing difficulties and present other risks to his health.

33.     Lindsey Management Co., Inc. has established a policy under which its apartment managers and leasing agents are directed to refuse to allow a prospective tenant to see the actual apartment he will be leasing until the prospective tenant has signed a lease and arranged for utilities to be turned on.   Prospective tenants are shown a model apartment that is in good condition and are lead to believe that the apartment they will be leasing is in similar condition when, in fact, the apartment the tenant is leasing is likely in very poor condition.

34.     Lindsey Management Co., Inc. has established a policy under which its maintenance staff are not permitted to make necessary repairs and serious problems are merely covered up allowing conditions to remain that endanger the health and safety of tenants.

## COUNT I

### VIOLATIONS OF THE ARKANSAS DECEPTIVE AND UNCONSCIONABLE TRADE PRACTICES STATUTE
### Arkansas Code Annotated § 4-88-107 *et. seq.*

35.     Plaintiff incorporates and realleges herein each and every allegation set forth above in the preceding paragraphs.

36.     Defendants violated Arkansas Code Annotated § 4-88-107(a)(1) & §§ 4-88-108(1)&(2) by knowingly making the false representation that the apartment Plaintiff was renting was similar in condition to the model apartment he was shown.

37.     Defendants violated Arkansas Code Annotated § 4-88-107(a)(6) & § 4-88-108(2) by knowingly failing to identify water or other damage to the apartment that Plaintiff was leasing.

38.     Defendants violated Arkansas Code Annotated § 4-88-107(a)(10) & § 4-88-108(2) by refusing to allow Plaintiff to inspect the apartment he was leasing until after he signed the lease and turned on the utilities.

6

39.     Defendants further violated Arkansas Code Annotated § 4-88-107(a)(10) by failing to make repairs to the apartment and allowing the insect infestation and other conditions to continue to endanger Plaintiff's health.

40.     Defendants further violated Arkansas Code Annotated § 4-88-108 by engaging in deception and fraud in the leasing of the apartment to Plaintiff and the concealment and omission of material facts relating to the condition of the apartment with the intent to induce Plaintiff to rely on the concealments and omissions by entering into the lease agreement.

41.     As a result of Defendants' violations of the Arkansas Deceptive and Unconscionable Trade Practices Statute, Plaintiff is entitled to actual damages, punitive damages, and reasonable attorney's fees pursuant to Arkansas Code Annotated § 4-88-204.

## COUNT II

## BREACH OF CONTRACT

42.     Plaintiff incorporates and realleges herein each and every allegation set forth above in the preceding paragraphs.

43.     Plaintiff and Defendants entered into a lease agreement on September 26, 2012 for the lease of an apartment. *Exhibit A.*

44.     Paragraph 10 of the lease agreement indicates that both conditions affecting health or safety of ordinary persons and those items identified by the tenant on the Statement of Apartment Condition will be repaired.

45.     At the time Plaintiff moved into the apartment, conditions that would affect the health or safety of ordinary persons, including but not limited to, water damaged flooring, mold, and insect infestation, existed.

46.     Plaintiff completed the Statement of Apartment Condition as required by the terms of the lease agreement.  Defendants failed to repair the identified conditions and defects.

47.     By failing to repair conditions that affect the health and safety of ordinary persons and failing to repair the conditions and defects identified by Plaintiff on the Statement of Apartment Condition, Defendants materially breached the lease agreement.

48.     Plaintiff is entitled to special, general, compensatory and reliance damages related to Defendants' material breach of the lease agreement.

49.     Pursuant to Arkansas Code Annotated § 16-22-308, Defendants are liable for the Plaintiff's attorneys' fees and costs.

## COUNT III

## FRAUD

50.     Plaintiff incorporates and realleges herein each and every allegation set forth above in the preceding paragraphs.

51.     Defendants falsely represented that the apartment that Plaintiff was leasing was in the same condition as the model he was shown.

52.     Defendants knew that the apartment Plaintiff was leasing was not in the same condition as the model he was shown.

53.     Defendants intended that Plaintiff would rely on the misrepresentation of the apartment's condition.  Defendants intended to induce Plaintiff to lease an apartment that Defendants knew to be in significantly inferior condition than the model apartment.

54.     Plaintiff justifiably relied on the Defendants' misrepresentations regarding the apartment conditions when he signed the lease.   Based on Defendants' misrepresentations,

Plaintiff justifiably believed that the apartment he was leasing was in the same condition as the model apartment.

55.     Based on Defendants' misrepresentations, Plaintiff entered into a lease agreement for, and is living in, an apartment that is in poor condition and that presents a risk to his health and safety.

56.     Defendants are liable to Plaintiff for damages and Plaintiff is entitled to rescind the lease agreement.

**COUNT IV**

**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

57.     Plaintiff incorporates and realleges herein each and every allegation set forth above in the preceding paragraphs.

58.     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

59.     Defendants breached the duty of good faith and fair dealing required by the lease agreement in inducing Plaintiff to enter the agreement through fraud and deception.

60.     Defendants breached the duty of good faith and fair dealing required by the lease by failing fulfill their obligation to correct deficiencies in the apartment that endanger Plaintiff's health and safety.

61.     Defendants breached the duty of good faith and fair dealing required by the lease by failing to fulfill their obligation to repair the items listed by Plaintiff on the condition checklist.

## COUNT V

## CIVIL CONSPIRACY

62.     Plaintiff incorporates and realleges herein each and every allegation set forth above in the preceding paragraphs.

63.     Lindsey Management Co., Inc., Fountain Lakes, A  Limited Partnership, and Fountain Lakes Management Company, Inc. conspired to develop and implement policies that require their employees to engage in business practices that violate the Arkansas Deceptive and Unconscionable Trade Practices Act.

64.     Lindsey Management Co., Inc., Fountain Lakes, A  Limited Partnership, and Fountain Lakes Management Company, Inc. conspired to develop policies that lead to the breach of their contract with Plaintiff.

65.     Lindsey Management Co., Inc., Fountain Lakes, A  Limited Partnership, and Fountain Lakes Management Company, Inc. conspired to breach the duty of good faith and fair dealing required by the lease agreement.

49.     Lindsey Management Co., Inc. Fountain Lakes, A  Limited Partnership, and Fountain Lakes Management Company, Inc., conspired to develop policies that a require their employees to engage in fraudulent business practices.

50.     Plaintiff has been damaged by acts committed by both entities pursuant to this conspiracy and Defendants are liable to Plaintiff for those damages.

## PRAYER FOR RELIEF

WHEREFORE, Sanston Foster IV prays for judgment against Lindsey Management Co, Inc. Fountain Lakes, A  Limited Partnership, and Fountain Lakes Management Company, Inc. for the following:

a.  actual damages in an amount to be determined at trial, punitive damages, costs and reasonable attorneys fees, incurred as a result of Defendants' violation of the Arkansas Deceptive and Unconscionable Trade Practices Act;

b.  special, general, compensatory, and reliance damages, and attorneys fees incurred as a result of Defendants' Breach of Contract;

c.  special, general, compensatory, and reliance damages, and attorneys fees incurred as a result of Defendants' breach of their duty of good faith and fair dealing required by the lease agreement;

d.  damages incurred as a result of Defendants' fraudulent misrepresentations;

e.  damages incurred as a result of acts committed by Defendants in further of a civil conspiracy;

f.  rescission of the lease agreement; and

g.  for such other and further relief as may be just and proper.

Plaintiff demands a jury trial on all claims.

Respectfully submitted,

Mickey Stevens
Ark. Bar # 2012141
Attorney for Plaintiff
P.O. Box 2165
Benton, AR 72018
501-776-2224
Fax: 501-778-6186
stevens_mickey@yahoo.com

11

## CERTIFICATE OF SERVICE

I, Mickey Stevens, do hereby certify that a copy of the foregoing has been forwarded, via Facsimile and/or U.S. Mail, to the following:

Sara E. Heck
1200 East Joyce Boulevard
P.O. Box 13000
Fayetteville, AR 72703

on this 28ᵗʰ day of December, 2012.

Mickey Stevens

# EXHIBIT

# A



# Apartment Lease Contract (Arkansas)

Date __9/26/2012__
(When form is filled out)

1. **PARTIES.** This lease is between _____ Sanston Foster _____ (Resident), and _____ , (Owner),

| Fountain Lakes, a Limited Partnership |

on Apartment No. __1410__ , at __3011 Congo Road__ , in __Benton__ , Arkansas, for use as a private residence only.   The term "Resident" in this lease refers to all Residents listed above, unless otherwise stated.   The term "Owner" will include Owner's authorized representatives.

**OCCUPANTS.** The apartment will be occupied by Resident and:  (list all other adults and minors) _____ N/A _____ .   No other occupants are permitted, other than occasional guests.   A guest will be considered an unauthorized occupant, rather than an occasional guest, if (a) the guest has been evicted by Owner or asked to leave the premises due to a violation of Owner's Rules and Regulations; (b) the guest is on the premises for any five (5) consecutive days or any eight (8) nonconsecutive days in any calendar month unless Resident has received prior written approval from Owner's representative; or, (c) the guest has been convicted of a crime involving violence, sexual abuse or theft of property.

**OCCUPANCY STANDARDS.** Occupancy is limited to no more than two persons per bedroom.   Children under age two at the time the lease (or extension or renewal) is executed will not be counted toward this limit.   Three adults may occupy an apartment only if all three are related to each other by blood or marriage.   Occupancy by more than three adults is not permitted.

**OWNER'S RIGHT TO MODIFY APARTMENT.** Owner reserves the right during the lease term and any extension or renewal thereof to make such modifications to the apartment and common areas as may be necessary to comply with requirements of the Fair Housing Act and Americans With Disabilities Act.

**NO SUBLETTING.** Subletting, assignment, replacements, or change of Residents or occupants will be allowed only upon Owner's prior written consent.   In such event, Resident remains fully liable hereunder but shall receive credit for all rentals paid by succeeding Residents.

2. **LEASE TERM.** The initial term of the lease shall commence on the __26__ day of __September__ , __2012__ and end the __26th__ day of __September__ , __2013__ .

3. **MOVE-OUT NOTICE AND EARLY MOVE-OUT.** At least 30 days' written notice of intent to move out must be given to Owner's representative.   Verbal move out notice is not sufficient under any circumstances.   Owner's form for written move-out notice should be used.   If Owner's move-out form is not used, Resident shall be responsible for obtaining written acknowledgment from Owner's representative that move-out notice has been received.   Resident's written move-out notice must terminate the lease on the last day of the month following the next rental due date after the notice.   If no 30-day written notice is given to Owner's representative, Resident will forfeit the security deposit.   If Resident moves out before fulfilling the terms of the lease including having paid rent in full for the entire lease term and any renewal or extension period, Resident will forfeit the security deposit and be liable under paragraph 19 for liquidated damages, and for unpaid rent or late charges which accrue during any month in which Resident occupies the apartment, for property damage caused by the Resident, and for cleaning and painting charges.

In no event may Resident's written move-out notice terminate the lease sooner than the end of the lease term or renewal or extension period.

4. **HOLD-OVER AND AUTOMATIC RENEWAL.** Resident agrees to give Owner thirty (30) days' written notice prior to the termination of the initial lease term stating that Resident does not desire to renew this lease.   In the event that a timely notice is not given by Resident within the period prescribed or, after having given notice, Resident shall remain or continue to be in possession of the leased premises or any part thereof after the end of the lease term or any extension thereof, Owner may at its option: (a) treat such holding over as a renewal of the lease for a term equivalent to the immediately preceding lease term at a rental equal to the prevailing rental charges of the Owner for substantially the same type of apartment, subject to each of the covenants and conditions of this lease which shall continue in full force and effect; or (b) refuse to renew the lease, in which event Owner shall give Resident three (3) days' notice to vacate the premises.   Owner may proceed to let the premises to another resident and charge Resident for any damages resulting from Resident's failure to deliver possession on the date of termination, in addition to any other rights accruing to Owner hereunder.   Resident shall be liable to pay rents for the holdover period and to indemnify Owner and prospective residents for damages (including lost rentals, lodging expenses, and attorney's fees).   Holdover rents shall be immediately due on a daily basis and delinquent without notice or demand.

5. **SECURITY DEPOSIT.** Resident agrees that the security deposit(s) will be the total sum of $ __250.00__ payable on or before signing of this lease.   Refunds shall be made in accordance with this lease.   Resident may not apply any portion of the security deposit(s) to rent and is prohibited by statute from applying security deposit(s) to rent.   The full monthly rent shall be paid on or before the due date of each month, including the last month of occupancy.

6. **RENT.** Resident will pay $ __6,083.00__ rental for the lease term, payable in the following manner: (a) prorated rent from commencement date to the first of next month in the amount of $ __83.00__ ; and (b) __12__ installments of $ __500.00__ in advance and without demand at the apartment manager's office with the first monthly installment due on the __1st__ day of __October__ , __2012__ , and __11__ additional installments of the same amount due on the first (1st) day of each month thereafter until paid in full. Rent unpaid after the due date is delinquent and will authorize all remedies in this lease, particularly paragraph 19.   If all rent is not paid on or before the third (3rd) day of the month (the late charge date), Resident agrees to pay a late charge of $10.00  per day until paid in full.   Daily late charges shall not exceed 60 days for any single month's rent.   Resident agrees to pay a $20.00 charge for each returned check, plus daily late charges from the late charge date until Owner receives acceptable payment.   Pet charges for violating the pet restrictions contained in paragraph 18 of this lease shall be  $50.00 for the first day and $10 for each additional day.   Resident's right to possession and all of Owner's obligations are expressly contingent on prompt payment of rent, and use of the premises by Resident is obtained only on the condition that rent is paid on time.   PAYMENT OF RENT SHALL BE AN INDEPENDENT COVENANT, and all monies received by Owner shall be applied first to non-rent obligations of Resident, then to rent, regardless of notations on checks.   At Owner's option, Owner may at any time require that all rent and other sums be paid in either certified check, cashier's check, money order, or one monthly check rather than multiple checks.   CASH WILL NOT BE ACCEPTED. The above rental figure is for a ☐ furnished ☑ unfurnished apartment.

7. **SPECIAL PROVISIONS.** The following special provisions and any addendum shall control over any conflicting provisions of this printed lease form:

_____ Rent is collected through automatic bank draft only. _____

Owner's Representative _[signature]_ __ of 5

Resident (s) _[signature]_

PM-110.AR—06.28.10

8. **UTILITIES AND SERVICES.** Resident will be responsible for scheduling the hookup and paying of deposits to the electric, water, gas, telephone and TV cable companies. Resident will at all times keep electric, water (and gas, if applicable) service to Resident's apartment. If such service is discontinued for any reason, Owner may reinstate such service and charge the cost of such reinstatement and utility service to Resident. Resident hereby agrees to place waste and garbage inside a plastic bag before placing it in the dumpster located on the property. If permitted by law, Owner shall have the right at any time and from time to time to contract for service to the apartment community, including Resident's apartment, from companies providing electricity, gas, water, sewer, sanitation, telephone or cable television service. Owner shall in no way be liable or responsible for any loss, damage, or expense that Resident may sustain by reason of any change, failure, interference, disruption or defect in the supply or character of such utility service.

9. **RULES AND REGULATIONS.** Resident, Resident's guests, and occupants shall comply with all written rules and regulations, which shall be considered part of this lease. Owner may make reasonable rule changes. Resident agrees that the conduct of Resident and Resident's guests and occupants shall not be disorderly, boisterous, or unlawful, and shall not disturb the rights, comforts, or conveniences of other persons in the apartment community. Resident shall be liable to Owner for damages caused by Resident or Resident's guests or occupants. Sidewalks, steps, entrance halls, walkways, and stairs shall not be obstructed or used for any purpose other than ingress or egress. Resident shall keep the apartment clean and sanitaryand shall dispose of garbage at least weekly, only in appropriate receptacles. Any swimming pools, saunas, hot tubs, exercise rooms, storerooms, laundry rooms, and other improvements are to be used wholly at the risk of the person using them. Owner may regulate the manner, time and place of all parking. Owner may regulate, limit or prohibit from the apartment or apartment community, the following: motorcycles, bicycles, tricycles, skateboards, recreational vehicles, boats, trailers, grills, patio furniture, furniture movers, deliverymen, solicitors, and guests who in the Owner's reasonable judgment have been disturbing the peace, disturbing other residents, or violating this lease or apartment rules and regulations. All vehicles parked on the premises must be operable and have valid current license plates. "Operable" means the vehicle must have inflated tires, have all major components intact, including windows and windshields, and be reasonably clean. Any violation of the foregoing will subject the vehicle to being towed at the expense of the vehicle owner or operator. Flashlights (and not candles or kerosene lamps) shall be used if electricity is interrupted or terminated. No business or childcare services may be operated in or from the apartment. Upon payment of a reasonable charge, Resident may require Owner to change (or re-key) a door lock. A Resident who moves out prior to the end of the lease term or renewal or extension period is no longer entitled to occupancy or keys. Keys may not be duplicated without Owner's written consent. All written rules may be enforced through Owner's representatives or agents, and Resident shall hold same harmless from reasonable enforcement.

10. **CONDITION OF THE PREMISES ON MOVING IN AND MOVING OUT.** Resident accepts the apartment, fixtures, and any furnishings as is, except for conditions materially affecting health or safety of ordinary persons. Owner makes no implied warranties. A Statement of Unit Condition and Security Deposit Return form will be provided to Resident upon move-in. Within 48 hours after move-in, Resident shall note any defects or damages on the form and return it to Owner's representative; otherwise, everything will be deemed to be in clean and good condition. Resident shall use reasonable diligence in care of the apartment. Resident may not make any alterations or improvements to Owner's property without Owner's prior written consent. No holes or stickers shall be put anywhere inside or outside the apartment, except a reasonable number of small nail holes for picture hanging will be permitted in sheetrock walls and in grooves of wood-paneled walls. Alternative picture hanging methods (in lieu of small nails) may be required by Owner's rules and regulations. No antenna or satellite receiver installation, additional phone or cable TV outlets, or lock changes (including re-keying or additions of locks) will be permitted except by Owner's prior written consent. Resident will not remove Owner's fixtures or furniture from the apartment for any purpose. When Resident moves in, Owner shall furnish light bulbs of prescribed wattage for apartment fixtures and any lamps furnished by Owner; thereafter, light bulbs will be replaced at Resident's expense. When moving out, Resident agrees to surrender the apartment in good, clean condition, as determined by Owner.

11. **CLASSIFICATIONS OF PROPERTY.** (1) APARTMENT: Subject to the provisions of paragraph 17 herein, the interior of the apartment shall be under the exclusive control of Resident. (2) COMMON AREAS: The balconies, stairways, grounds, parking lots, driveways, and amenities (including, but not limited to club room, fitness center, pool, playground, tennis court, basketball court, volleyball court and similar facilities) are common areas for the nonexclusive use and benefit of Owner and all residents. (3) RESTRICTED AREAS: Use and occupancy of the attics, exterior walls, roofs and ledges are restricted to Owner and any use or occupancy by Resident is prohibited.

12. **LIABILITY.** Owner will not be liable to Resident or Resident's guests or occupants for any damages or losses to person or property caused by other persons, including theft, burglary, assault, vandalism, or other crimes. Owner will not be liable to Resident or Resident's guests or occupants for personal injury or for damage to or loss of their personal property (furniture, jewelry, clothing, etc.) from fire, flood, water leak, rain, hail, ice, snow, smoke, lightning, wind, explosion, interruption of utilities, or other occurrences. Owner strongly recommends that Resident secure insurance to protect against all of the above occurrences. Resident agrees that existing locks and latches are safe and acceptable, subject to Owner's duty to make needed repairs of same upon written request by Resident. Owner shall have no duty to furnish smoke detectors, security guards, or additional locks and latches, except as required by statute. When smoke detectors are furnished, Owner shall test same and initially provide working batteries at lease commencement as required by statute; thereafter, Resident shall pay for and replace smoke detector batteries, if any, as needed. Resident agrees to test the smoke alarm monthly and report any malfunctioning alarm to Owner. If Owner's employees are requested to render services not contemplated in this lease, Resident agrees to hold Owner harmless from all liability regarding same. Residents on premises adjoining or in proximity to golf courses assume the risk of damage to personal property and personal injury caused by golf balls and agree to hold Owner harmless for any such damage or injury.

13. **MOLD AND MILDEW.** Resident agrees to regularly inspect the Apartment for water leaks, moisture, mold and mildew. Potential sources of water or moisture include roof leaks, humidifiers, plumbing leaks, steam from cooking, watering houseplants, baths and showers. Leaks may occur around water heaters, toilets, sinks, tubs, showers, windows and doors. Discolored areas on walls and ceilings and moisture in carpets may indicate roof leaks or clogged air conditioner drains. Resident agrees to immediately notify Owner in writing if Resident detects leaks, mold or mildew within the apartment. Resident agrees to clean and remove mold and mildew in accordance with cleaning instructions available at the apartment manager's office. If Resident discovers mold and mildew in areas not accessible to Resident for cleaning, Resident agrees to inform Owner so that Owner can remove mold and mildew from those areas.

14. **DELIVERY OF NOTICES AND REQUESTS.** Any notices and requests, including those for repairs, installations, security-related services or other services, must be delivered by Resident signed and in writing to Owner's designated representative (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or other equally dire emergency). Resident will notify Owner of emergencies immediately, by the fastest available means. Owner shall have the right to temporarily turn off equipment and interrupt utilities to avoid damage to property or to perform repairs or maintenance, which require such interruption. In case of malfunction of air conditioning or other equipment, Resident shall notify Owner's representative as soon as possible on a business day. Owner shall act with reasonable diligence in making repairs; and the lease shall continue and the rent shall not abate during such periods. If damage to the premises from fire or other catastrophe is substantial in the reasonable judgment of Owner, Owner may terminate this lease within a reasonable time by giving written notice to Resident. If the lease is so terminated, rent shall be prorated and the balance refunded along with all deposit(s), less lawful deductions.

Owner's Representative _Megan Vaul_ ___ of 5
Resident(s) _____

PM-110.AR—06.28.10

caused in the apartment or community by negligence or improper use by Resident, or Resident's guests or occupants. Owner will not be liable for and Resident shall pay for the following if it occurs during the lease term or renewal or extension period: (a) damage to doors, windows, or screens unless due to negligence of Owner, and (b) repair costs and damage from plumbing stoppages in lines exclusively serving Resident's apartment, and (c) damage from windows or doors left open. Owner's failure or delay in demanding damage reimbursement, late-payment charges, returned check charges, pet charges or other sums due by Resident shall not be deemed a waiver, and Owner may require payment of same at any time, including deduction from security deposit. Owner may require advance payment of repairs for which Resident is liable.

16. **NO PETS (ANIMALS).** No pets (animals including mammals, rodents, reptiles, birds, fish, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless Owner has so authorized in writing. No unauthorized pets, stray animals or wild animals may be fed from the apartment or any part of the apartment community. These prohibitions apply to non-pet animals used in a trade or profession. An animal deposit is considered a general security deposit. Owner will authorize a support animal for a disabled person, but may require a written statement from a qualified professional verifying the need for the support animal. Violation of the foregoing by Resident or Resident's guests or occupants, with or without Resident's knowledge or permission, will subject Resident to the charges, damages, and eviction provisions of this lease.

17. **CONSENT TO REASONABLE ENTRY.** Resident consents, when Resident or Resident's guest or occupant is present, to entry of the apartment at reasonable times for reasonable business purposes, by Owner, Owner's representatives, repair persons, or service persons. If no one is in the apartment, repair persons, service persons, Owner or Owner's representatives are hereby given consent to enter at reasonable times by duplicate or master key (or other means if locks have been changed in violation of this lease) if such entry is for responding to Resident's request; repairs, estimating repair or refurbishing costs; extermination; preventive maintenance; filter changes; inspections; retrieving unreturned tools or appliances; emergency safety or fire inspections; avoiding property damage; preventing waste of utilities; exercising contractual lien; leaving notices; removing or re-keying unauthorized locks or latches; removing unauthorized window coverings; retrieving property owned or leased by previous Residents; showing apartment to prospective Residents (after move-out or vacate notice has been given); or showing apartment to government inspectors, fire marshals, lenders, appraisers, prospective purchasers, or insurance agents. During and in anticipation of sub-freezing temperatures, Owner or Owner's representatives are hereby given consent to enter the apartment and turn on heating units to a setting that will keep water pipes from freezing, and allow water to drip from the faucets to avoid property damage.

18. **DEFAULT BY OWNER.** Owner agrees to act with customary diligence to: (a) keep common areas reasonably clean, (b) maintain fixtures, furniture, hot water, heating and air conditioning equipment, (c) remain in substantial compliance with applicable federal, state and local laws regarding safety and sanitation, and (d) make all reasonable repairs, subject to Resident's obligation to pay for damages caused by Resident or Resident's guests or occupants. If Owner violates the foregoing, Resident may terminate this lease only when the following procedures are followed: (1) Resident shall make written request for repair or remedy of the condition, and all rents must be current at such time, (2) after receipt of such request, Owner shall have reasonable time to repair, considering the nature of the problem and the reasonable availability of materials, labor, and utilities, (3) if such reasonable time has lapsed and if Owner has not made a diligent effort to repair, Resident shall then give Owner written notice of intent to terminate the lease unless the repair is made within 7 days, and (4) if repair has not been made within such 7-day period, Resident may terminate this lease. Then the security deposit(s) and prorate rent will be refunded as required by law.

19. **DEFAULT BY RESIDENT.** If Resident fails to pay rent or other amounts owed by Resident under this lease; or if Resident or Resident's guests or occupants violate this lease or Owner's rules and regulations or applicable federal, state, and local laws, including any violation of criminal laws regardless of whether such violation occurs on or off the premises; if Resident gives any false or incorrect answers in a rental application; if Resident, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government; or if Resident abandons the apartment, then Owner's representative may (with or without demand for performance) terminate Resident's right of occupancy by giving Resident three (3) days' written notice to vacate, and Owner shall be entitled to possession by eviction suit or any other lawful means. Notice may be mailed or personally delivered to Resident or left in a conspicuous place. Termination of possession rights or subsequent reletting by Owner shall not release Resident from liability for future rentals under this lease. After Owner gives notice to vacate or after Owner files eviction suit, Owner may still accept rent or other sums due; and such notice, filing, or acceptance shall not waive or diminish Owner's right of eviction or any other contractual or statutory right. Acceptance of monies at any time will not waive Owner's right of property damages, past or future rent, or other sums due. If Resident's rent is delinquent and if three (3) days' prior written notice is personally delivered to Resident, Owner may terminate utilities furnished and paid for by Owner. Owner may report unpaid rental or unpaid damages to local credit agencies for recordation in Resident's credit record.

**FALSE INFORMATION.** Resident understands that the information provided to Owner in connection with qualification guidelines for Residents of this apartment community are relied upon by Owner in entering into the lease. Should the information provided prove to be false, Resident understands that same shall be considered as a material breach of the lease entitling Owner to evict Resident upon three (3) days' written notice.

**ACCELERATION.** All monthly rentals for the remainder of the lease term of renewal or extension period shall be accelerated automatically without notice or demand (either before or after acceleration) and shall be immediately due and delinquent if, without Owner's written consent: (1) Resident moves out, removes property in contemplation of moving out, or gives verbal or written notice (in person or by co-occupant) of intent to move out prior to the end of the lease term or renewal or extension period, and (2) rentals for the entire lease term and renewal or extension period have not been paid in full. Remaining rents shall likewise be accelerated if Resident is evicted. Such right of acceleration is in lieu of having rental for the entire lease term payable at the beginning of the lease.

**LIQUIDATED DAMAGES.** Owner and Resident have contemplated and agree that Owner will suffer damages in the event Resident vacates the apartment without having paid rent for the entire lease term, and any extensions thereof, and that the amount of damages will be difficult to ascertain. Owner and Resident agree that, in such event, Owner shall be entitled to recover as liquidated damages an amount equal to one-half of the rent calculated from the first day of the month following the date on which Resident vacates the apartment through the end of the lease term; but in no event shall the amount of liquidated damages exceed an amount equal to three months' periodic rent as provided in the lease. Owner and Resident agree that the amount of liquidated damages is in reasonable proportion to the damages the parties contemplate will be incurred by Owner should Resident fail to perform this lease. The agreed liquidated damages are specifically intended to be reasonable compensation for unpaid rent for the remainder of the lease term, and any extensions thereof, and do not include damages for unpaid rent or late charges which accrue during any month in which Resident occupies the apartment, property damage caused by Resident, cleaning charges, and painting charges.

20. **ABANDONMENT/LIEN.** Pursuant to Arkansas Code Ann. Section 18-16-108, upon the voluntary or involuntary termination of any lease agreement, all property left in and about the premises by the Resident or any occupant shall be considered abandoned, and may be disposed of by the Owner as the Owner shall see fit without recourse by the Resident or any occupant. All property placed on the premises by the Resident or any occupant is subjected to a lien in favor of the Owner for the payment of all sums agreed to be paid by the Resident. Resident agrees that Owner may consider Resident to have abandoned the premises if (1) the electricity or water in Resident's apartment has been disconnected either at the request of Resident or for nonpayment, and (2) Owner posts a notice in or on Resident's apartment and Resident fails to respond to such notice within three (3) days.

Owner's Representative _____ 5

Resident (s) _____

PM-110.AR—06.28.10

representative and with the U.S. Postal Service.

## DEDUCTIONS FROM TOTAL SECURITY DEPOSIT

22.   **CLEANING.** The apartment, including furniture, bathrooms, and kitchen appliances, must be cleaned thoroughly. MOVE-OUT CLEANING INSTRUCTIONS (available in apartment manager's office) shall be followed. If Resident fails to clean in accordance with the move-out cleaning instructions, reasonable charges to complete such cleaning shall be deducted. This includes charges for cleaning carpets, window coverings, furniture, painting walls, etc., plus any utility expenses incurred because of such cleaning. It is understood by Resident that Owner has cleaned the carpets and painted the apartment in advance to Resident occupying the apartment. It is also understood by Resident that Owner will clean the carpets and paint the apartment when Resident moves out. This charge will be deducted from Resident's security deposit.

23.   **FIXED CLEANING CHARGE.** The following minimum charge will be deducted in any event for cleaning which Owner requires to be done commercially or by Owner's employees: $_____150.00_____. This charge does not relieve Resident from the cleaning provisions of paragraph 22 above.

24.   **OTHER DEDUCTIONS.** Resident shall be liable for and appropriate charges will be deducted for any unpaid sums due under the lease; unpaid rent; unpaid utilities; unreimbursed service charges; damages or repairs to the apartment or its contents (beyond reasonable wear); utilities for repairs; trips to let in company representatives to remove Resident's telephone or TV cable services or rental items (if Resident requests same or has moved out); trips to open apartment when Resident has lost or forgotten key; key duplicates; unreturned keys; insufficient light bulbs; stickers, scratches, burns, stains, or unapproved holes; removing or re-keying unauthorized locks or latches; agreed costs-of-reletting; packing, removing or storing property removed or stored pursuant to paragraph 20; removing illegally parked vehicles; late payment and returned check charges; attorney's fees, court costs, and Owner's or Owner's representative's time and inconvenience in any valid eviction proceeding against Resident; and other lawful deductions. If keys are not returned or if rent has been accelerated under paragraph 19 or if Resident is evicted, charges may be made for change of door locks and new keys. Security deposits will be first applied to non-rent items, then to unpaid rent.

If for any reason Resident is evicted, fails to complete the lease term or fails to give notice as required under paragraph 3, there will be no refund of Resident's security deposit.

25.   **INSPECTION UPON MOVE-OUT.** Resident is urged to make an appointment with Owner's representative for move-out inspection of the apartment, using MOVE-IN and MOVE-OUT inventory and condition forms. Estimates or commitments by Owner's representative regarding amount or deductibility of repairs, damages, or charges are subject to subsequent correction, modification or disapproval by Owner before final refunding or accounting.

26.   **RETURN OF DEPOSIT.** After lawful deductions have been made, the balance of all security deposits and an itemized accounting of any deductions will be mailed to Resident no later than 30 days after surrender except where otherwise provided by statute. For purposes of 'determining relinquishment of possession, damages, clean-up charges and other deductions, "surrender" shall occur on the latest of the following dates: (a) when all keys have been turned in, (b) when move-out date has expired and all Residents live elsewhere, or (c) when it reasonably appears that all Residents have permanently moved out.

## MISCELLANEOUS

27.   **MULTIPLE RESIDENTS OR OCCUPANTS.** Each Resident and each Resident's share of the total security deposit is jointly and severally liable for all obligations and sums due under the lease. Violation of the lease by Resident or Resident's guests or occupants shall be considered a violation by all Residents. Notice by Owner's representative to one Resident constitutes notice to all Residents. Entry permission or service request from any Resident, occupant, or guest shall be deemed to be from all Residents. The balance of all security deposits may be refunded in one check jointly payable to all Residents; and such joint refund check and/or itemization of deductions may be mailed to one Resident only.

28.   **DELAY OF OCCUPANCY.** If occupancy is or will be delayed because of construction or prior resident's holding over, Owner shall not be liable to Resident for such delay, and the lease shall remain in force subject to (1) abatement of rentals on a daily basis during delay, and (2) Resident's right to terminate as set forth below. Notice of such termination must be in writing. After such termination, Resident shall be entitled only to refund of deposit(s) and any rentals paid. Resident's above right of rent abatement or lease termination shall not apply if delay is due to cleaning or repairs which do not prevent occupancy by Resident.

**NOTICE OF ANTICIPATED DELAY.** If Owner gives written notice to any one of the Residents listed in paragraph 1 before lease commencement date and if such notice states that construction delay is anticipated and the apartment will be ready for occupancy on a specific date, Resident may terminate the lease within 7 days after any one of such Residents receives such written notice, but not thereafter.

**NOTICE OF ACTUAL DELAY.** If Owner gives written notice to any one of the Residents listed in paragraph 1 on or after lease commencement date and if such notice states that occupancy has been delayed because of construction or a prior resident's holding over and the apartment will be ready for occupancy on a specific date, Resident may terminate the lease within 3 days after any one of such Residents receives such written notice, but not thereafter.

**NEW COMMENCEMENT DATE.** A readiness date given by Owner to Resident in writing shall be considered the new lease commencement date for all purposes, including the right of Resident to terminate under this paragraph if the apartment is not ready on such new commencement date. Such new commencement date may never be moved to an earlier date except by mutual agreement of Owner and Resident.

**NO NOTICE OF DELAY.** If holdover or construction delay actually occurs and if Owner has not given notice of delay under one of the above paragraphs, Resident may terminate up to the date the apartment is ready for occupancy, but not thereafter.

29.   **RELEASE OF RESIDENT.** Except as provided under the military clause below, Resident will not be released on grounds of voluntary or involuntary school withdrawal or transfer, voluntary or involuntary business transfer, marriage, divorce, reconciliation, loss of co-Residents, bad health, death, voluntary enlistment in the armed services or any other reason, unless otherwise agreed in paragraph 7. However, if Resident secures a replacement satisfactory to Owner's representative, Resident's liability for future rentals will be reduced by the amount of rentals actually received from such replacement. If Resident is or becomes a member of the Armed Forces on extended active duty and receives change-of-station orders to permanently depart the local area, or is relieved from such active duty, then Resident may terminate this lease by giving written notice of such termination and a copy of the Resident servicemember's military orders to Owner or Owner's representative. Such notice shall effectively terminate the lease on the last day of the month following the month in which the notice is delivered. Military permission for base housing does not constitute a permanent change-of-station order. After move-out, such Resident shall be entitled to return of security deposit(s), less lawful deductions.

Owner's Representative _____ 4 of 5

Resident (s) _____

PM-110.AR—06.28.10

periodic rent increases.  Resident will receive a written 30-day notice of rent increase.  No rent increases s'
lease term.

31.   COPIES.  Resident acknowledges receipt of a copy of this Apartment Lease Contract.  A copy o
any, will be furnished when Resident moves in, or earlier if desired.  When a Statement of Unit Con'
form is completed after Resident moves in, both Resident and Owner should retain a copy.

32.   PEST CONTROL.  Although Owner will periodically treat the premises for pests, Resident a
the premises free of infestation by roaches, water bugs, rodents, moths, and other pests, and a
therefrom, and Owner shall not be liable or responsible for damages or injury to furnishings, wear...
of the Residents or other occupants of the premises from such sources.

33.   INSPECTION.  Owner reserves the right to make an inspection of the apartment every three months or any ou.
may reasonably deem necessary.

34.   SUBORDINATION.  This lease shall be subject and subordinate to any mortgage or other lien that is now on or affects the lease.
premises or its contents or that any Owner of the premises may hereafter at any time elect to place on such premises, and to all
advances already made or that may be hereafter made on account of any such mortgage, to the full extent of the principal sums
secured thereby, interest thereon and fees.  Furthermore, Resident shall on request hereafter execute any documents that Owner's
counsel may deem necessary to accomplish such subordination of Resident's interest in this lease, in default of which Owner is
hereby appointed as Resident's attorney in fact to execute such documents in the name of Resident, and this authority is hereby
declared to be coupled with an interest and irrevocable.

35.   WAIVER.  Failure by Owner to exercise any option herein contained upon breach by Resident shall not constitute a waiver of
Owner's right to exercise such option upon any further breach.

36.   HANDICAPPED ACCESSIBILITY.  Owner will provide a handicapped accessible or adaptable apartment in the apartment
community or in another Lindsay apartment community for Residents who require them.  If it is not feasible for structural reasons to
provide an accessible or adaptable apartment, Owner will make such adaptations as are reasonable to improve the accessibility of the
apartment.

37.   COMPLETE AGREEMENT.  It is agreed that neither party hereto is relying upon any oral or written information or representation
of the other party and that this lease constitutes the entire agreement between the parties and shall not be hereafter amended or
modified except by written agreement signed by Resident and Owner.

38.   SEVERABILITY.  In the event any provision of this lease is declared to be invalid for any reason, it shall not affect the validity of
any other provision of this lease.

39.   GOVERNING LAW.  This lease shall be governed by the laws of the State of Arkansas.

40.   BINDING AGREEMENT.  Resident hereby acknowledges that all terms, conditions, covenants, agreements and representations
herein are binding upon and shall inure to the benefit of the parties hereto, jointly and severally, their respective heirs and
assigns.

**NO SECURITY DEPOSIT WILL BE REFUNDED UNLESS A 30-DAY WRITTEN NOTICE IS
GIVEN BY RESIDENT AND RESIDENT HAS FULFILLED THE TERMS OF THE LEASE.**

**THIS IS A BINDING LEGAL DOCUMENT -- READ CAREFULLY BEFORE SIGNING.**

Resident Signature & Social Security No.                                    Owner or Owner's Representative
(All Residents must sign here)

_Samm M. _____  SSN: ▓▓▓▓▓▓▓▓          _Megan Vau____

_____  SSN: _____

_____  SSN: _____

Owner's Representative _Megan Vau____   5 of 5          PM-110.AR—06.28.10
Resident (s) _Samm M. ____

# EXHIBIT

# B

# STATEMENT OF APARTMENT CONDITION

Apartment Community: *Fountain Lakes*    Apt. No.: *1410*    1 BR ___  2 BR: ✓

Resident: *Samson Foster*    Move-In Date: *9-26-12*

| ITEMS | CONDITION | | | | | | Cost to Correct |
|---|---|---|---|---|---|---|---|
| | MOVE-IN | | Date Completed | MOVE-OUT | | | |
| | OK | Repair/Replacement Needs | | OK | Repair/Replacement Needs | | |
| **Safety Features:** | | | | | | | |
| Entry Door and Door Viewer | | Door Does not seal | | | | | |
| Entry Lock and Dead Bolt | | Deadbolt doesn't lock | | | | | |
| Windows and Window Locks | | Paint on Windows | | | | | |
| Smoke Alarm | | | | | | | |
| Intrusion Alarm (if so equipped)* | | | | | | | |
| **Electrical:** | | | | | | | |
| Switches | | | | | | | |
| Outlets | | Missing 3 outlet covers | | | | | |
| Light Fixtures | | Missing sink lamp cover | | | | | |
| Circuit Breakers | | | | | | | |
| **Plumbing:** | | * NO Shower * | | | | | |
| Sinks and Lavatories | | Poor Flow | | | | | |
| Tubs and Showers | ✓ | " | | | | | |
| Faucets | ✓ | " " | | | | | |
| Toilets | " | " " " | | | | | |
| Hot Water (115°-125° setting) | | | | | | | |
| Washer Hoses (no leaks or bulges) | | | | | | | |
| Mold or Mildew (check all areas) | | on dishwasher / rotted panel + wall by DW | | | | | |
| **Floor Coverings and Window Coverings:** | | | | | | | |
| Carpet | | | | | | | |
| Vinyl | | | | | | | |
| Blinds | | | | | | | |
| **Walls and Ceilings:** | | Both access panels in disrepair | | | | | |
| Walls | | Poor Paint Job | | | | | |
| Ceilings | | Poor Paint Job | | | | | |
| **Appliances:** | | | | | | | |
| Refrigerator | | Dirty | | | | | |
| Range and Vent Hood | | | | | | | |
| Disposal | | | | | | | |
| Washer and Dryer | | | | | | | |
| Dishwasher | | Mold around front | | | | | |
| Microwave Oven | | NONE | | | | | |
| **Other:** | | | | | | | |
| Closet Door and Rods | | Covered w/ some powder | | | | | |
| Bedroom and Bath Doors and Locks | | Missing knobset | | | | | |
| Bar Stools ( 2 ) | | Beyond repair | | | | | |
| **TOTAL** | | | | | | | |

*Intrusion alarms are not monitored at all locations where provided. Residents whose apartments are equipped with unmonitored intrusion alarms must contract directly with a service provider if they desire monitoring service.*

ADDITIONAL COMMENTS: Base molding/door molding falling off every where in apt. Bedrm door missing knobset; doors + counts covered w/ spot; both water and ceiling access panels in disrepair + Paint splaters everywhere; Living told apt was ready to move into.

Resident's Signature: *Samson M. Foster*    Date: *9-28-12   18:21 PM*

MARKET READY FINAL INSPECTION Performed by:: _____    Date: _____

Move-Out Inspection Performed by: _____    Date: _____

Lindsey Management Co., Inc. – Fayetteville, AR                                          MT.201 – 01.24.1

# EXHIBIT

# C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHAD LOCHRIDGE, HEATHER LOCHRIDGE,                    **PLAINTIFFS**
EVERETTE LOCHRIDGE, TWYLA LOCHRIDGE,
KEVIN KORNEGAY, LINDA DANFORTH, PATRICIA
LEACH, DEBRA McKEE, BRIAN McKEE, PATSY
PICKEL, STEVEN PICKEL, CARLIS SMITH, LYDIA
SMITH, REBECCA SMITH, JUDY KATHRYN HALE,
SHERRY JENKINS, PEARSON JENKINS, and
RYAN AGEE, Each Individually and on Behalf
of All Persons Similarly Situated

vs.                                   No. 5:12-cv-05047

LINDSEY MANAGEMENT CO., INC.,
and JAMES E. LINDSEY                                   **DEFENDANTS**

### DECLARATION OF STEVEN PICKEL

I, Steve Pickel, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.      My name is Steve Pickel and I am over the age of eighteen (18) and duly qualified to execute this declaration.

2.      I am currently a resident of the State of Arkansas. The contents of this affidavit come from my own personal knowledge, which is based on my personal experiences and observations over a long period of time. I do not herein relate hearsay, conjecture or speculation, but only those things that I myself know to be true.

3.      My wife—Patsy Pickel—and I worked as Resident Managers for Lindsey Management Co., Inc. ("Lindsey Management") within the three (3) years prior to the filing of the Complaint in this case, although sometimes they would call us Community Directors instead. I filed signed a written Consent to Join this case.

4.      Specifically, I began my employment with Lindsey Management as an assistant manager at Salem Park, owned and operated by Lindsey Management, in 1998. In May of 2004, I became a Resident Manager or Community Director for Fountain Lakes. I worked as a Resident Manager/Community Director for Lindsey Management at the Fountain Lakes in Benton, Arkansas, from that point until March of

2011 when my work ended. It doesn't really matter what you call us—Resident Managers and Community Directors do the same job, but the former is paid hourly and the latter is paid on salary.

5.      I was paid on an hourly basis—generally I was paid minimum wage for forty (40) hours and time and a half for the next fifteen (15) hours per week, plus bonuses. The bonuses that I received were not discretionary in nature but were instead essentially automatic based on certain performance and financial metrics that were set by Defendants. I was never paid more than $100,000.00 in any calendar year by Defendants while in their employ. Pursuant to Defendants' directives, I always clocked in for about 55 hours per week, even though I almost always worked more hours than that, though I was never compensated for these hours.

6.      As a Resident Manager, I was not charged with the management of any division or recognized department of Lindsey Management. Likewise, it was not my primary duty—or any duty at all—to customarily or regularly direct the work of two or more full-time employees. I never had the authority to hire and/or fire Defendants' employees. I wasn't involved in that aspect of Defendants' business at all: I didn't promote, demote, or change the status of anyone, and no one ever asked for my input on any of those issues.

7.      Defendants rent residential apartment units to individuals, families and groups of people. While I was a Resident Manager, I was involved directly, on a daily basis, in the provision of those services. However, I was not primarily tasked with "back office"-type work such as accounting, insurance, environmental compliance, taxes, advertising, marketing, research, budgeting, finance, auditing, quality control, purchasing, procurement, safety and health, personnel management, human resources, employee benefits, labor relations, public relations, government relations, computer network, internet and database administration, legal and regularly compliance or any similar activities.

8.      I was not encouraged, allowed or permitted to utilize or exercise discretion or independent judgment with respect to matters of significance. On the contrary, Defendants would not suffer me or anyone in a situation similar to mine to deviate from the painstakingly detailed roadmap of how the job of Community Director was executed. Defendants went out of their way to remove all meaningful discretion or judgment from me in the performance of my assigned tasks.

9.      I am not a professional. I do not have a terminal degree in an area of study that relates to or enhances the "skills" necessary to be a Community Director or Resident Manager. To be honest, I am not sure that such a degree exists. There was no advanced learning or training which was primarily intellectual in character which was a perquisite for completing the tasks assigned to me.

10.     I lived in an apartment unit in at the facility where I served as Resident Manager; however, I paid rent via auto-deduction on each paycheck that I received.

11.   As a Resident Manager, per company policy for Lindsey Management, I was actually required to live on site at the apartment complex so I would be on-call and available to Lindsey Management to perform work at those apartments, 24 hours a day, 7 days a week.

12.   My primary job duties included maintenance and cleaning of the apartments' common areas, including the fitness center and the restrooms, maintenance, repair and cleaning of the apartment units themselves and trash pick up and removal. The vast majority of the duties that I performed were manual labor. I also did what I would describe as low-level clerical jobs as well.

13.   As part of those duties, I submitted purchase orders to Lindsey Management for approval of the purchase of supplies involved in the repair and maintenance of the apartment complex and the apartments themselves. I was not able to purchase any items without company approval, pursuant to Lindsey Management's written policies, which were uniformly applied to all community directors. I also did not have the ability to contract with vendors.

14.   Even though Lindsey Management required Community Directors like me to live at the apartment complex, I still was required to clock in and out every day. Pursuant to company policy, my daily, weekly and monthly schedules were set for me, in advance, by the corporate office. Per Jim Lindsey himself, the chairman of Lindsey Management, all Resident Managers and Community Directors, including myself, were expected, to work fifty (50) hours to sixty-five (65) hours a week, but we were told not to track out hours after that threshold.

15.   It was made clear to me verbally and in writing, by directives from Defendants, that, in addition to my scheduled hours, due to the nature and needs of Lindsey Management's business, I was expected to be available to respond to the physical/repair needs of the property at all times, whether I was on-the-clock or not. As such, due to maintenance issues and issues with tenants, I was required to work many hours over and above the hours in which I was clocked in.

16.   Lindsey Management dictated uniform written rules applicable to residents of all of Lindsey Management's apartment communities. Part of my job was to enforce these rules and monitor the complex where I worked for compliance with these rules. I did not have any discretion to permit residents to violate the rules dictated by Lindsey Management.

17.   If advertising was required to fill vacancies in the apartment complex, Lindsey Management was in charge of determining when, if, how, and in what format the advertising or promotional materials were to be.

18.   Similarly, if an employment position needed to be filled, Lindsey Management would arrange for advertisement of that position in whatever manner or

method they determined was cheapest. Often, this meant that positions might remain unfilled. I was not permitted to arrange for advertising for employment positions.

19.    I had no authority to set rental rates, deposit rates, pet deposit rates, late fees, or any other charges related to residing in Lindsey Management's apartment complexes. Instead, these were dictated to me by Lindsey Management.

20.    I had no authority to permit a resident to stay in an apartment without paying rent after a certain date each month. If a resident failed to pay rent by a date set each month by Lindsey Management, I was required to begin the eviction process, even if I wanted to or had good reason to allow the resident to stay. In proceeding with the eviction process, I was required to contact Lindsey Management's legal team who provided the necessary forms and gave me explicit instructions regarding how to proceed with the eviction.

21.    I have had the opportunity to view job descriptions for various Community Director positions and they describe the duties of the Community Director consistently with only slight variations for amenities that may differ among apartment communities. The same is true for job descriptions for Resident Managers and Assistant Managers.

22.    When a resident moves out, among other duties, I am required to have the apartment cleaned and painted. I am not allowed to choose a paint color, but rather Lindsey Management has selected a specific paint color that must be used to pain the apartments. Nor am I permitted to select carpet if the carpet needs replacing, but rather Lindsey Management has specific carpet selected that must be used in the apartments.

23.    All Lindsey Management apartment complexes have pools. Lindsey Management has uniform and detailed instructions regarding how to manage the pool, including how often to check and clean the pool, how and when to test the chemical levels of the pool, the rules for the pool, and the hours of operation for the pool. Similarly, Lindsey Management has uniform and detailed instructions regarding how to operate and manage the on-site fitness centers, including how often to wipe down equipment and what the fitness center rules are. Similarly, Lindsey Management has uniform and detailed instructions on how to operate and manage the on-site GOLF COURSE, GRILL, ETC.

24.    Lindsey Management required me to be "on call" 24/7. During times that I was "on all," Lindsey Management dictated that I had to remain moments away from the apartment complex where I worked. In addition, Lindsey Management required that I be available to answer phone calls twenty-four (24) hours per day. Patsy—my wife—and I split the phone calls, but if a resident needed a maintenance or repair as a result of that call in the middle of the night, I was the one to go do it. Such work would almost inevitably be off-the-clock, because it was in the middle of the night when the office was closed, and the resident needed action quickly.

25.    I did not report all of these off-the-clock phone calls, especially the calls that lasted less than ten minutes, for time-keeping purposes because I was informed by the Community Director at the property where I worked that I should be keeping my overtime at a minimum. I was warned numerous times to "watch" my overtime. The clear message from these warnings was that I would be reprimanded or perhaps even fired if I reported excessive overtime.

26.    Every single aspect of my job I have described herein was not singular or unique to me.  On the contrary, Defendants ran their business in an excruciatingly systemized manner.  Everything that I have said about my job duties as Resident Manager is true about and accurately describes the job of any Resident Manager or Community Director anywhere and everywhere in the company; we were subjects of a unified and uniform policy that was evenly and intentionally applied across the board, universally, to each person in the same position at any property managed and/or owned by Defendants.  Until this particular fact is understood, one cannot fully appreciate the degree to which all Resident Managers and Community Directors were in fact managers and directors of nothing.

27.    As a Resident Manager, my work duties, work schedule, the requirement of clocking in and out, the dictated time off, and Defendants' 24/7 on-call requirement were all pursuant to the common practice and universal written policies of Lindsey Management for all Resident Manager, Community Directors, and Assistant Managers. Pursuant to Defendants' policies, I received and was required to follow the "Nuts & Bolts" of Property Management handbook containing specific instructions and checklists for every moment of my time, including when to bathe and use antiperspirants, on which ring to answer the phone, what to do when the front door opened, just to name a few examples. The handbook contains numerous daily, weekly, monthly and quarterly checklists that I and other Resident Managers/Community Directors were required to complete.

28.    I witnessed first-hand, experienced and communicated with Defendants and with other Resident Manager and Community Directors regarding these common practices and universal policies of Lindsey Management and their implementation evenly throughout the United States. Lindsey Management's policies were uniformly applied to all Community Directors and were set out in writing.

29.    As a Resident Manager, the necessity of corporate approval on all purchases and contracts with vendors was all pursuant to the common practice and universal written policy of Lindsey Management for all Community Directors.

30.    Other Resident Manager and Community Directors for Lindsey Management expressed to me their dissatisfaction with the way the Lindsey Management's policies consistently resulted in work weeks beyond forty (40) hours for which we were not compensated.  These statements were consistent with the company-wide uniform policies that governed all of our positions, even down to mundane minutiae—such as how to answer the telephone.

31.    Based on my experience and conversations with other Community Directors for Lindsey Management, I am certain that other Resident Manager and Community Directors would be interested in participating in this lawsuit.  In fact I know this is true because others that I know have joined this suit, attempted to opt-in to this suit and even filed their own identical suits in the same Court.

32.    Defendants have at least ninety (90) apartment complexes that have Community Directors who perform the same functions as me and are similarly situated. Based upon the turnover rates that I observed in the position of Community Director, I estimate there are at least five hundred (500) potential members of this proposed collective action case.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY

UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE

FOREGOING IS TRUE AND CORRECT.

Executed on this _14_ day of December, 2012.

_Steven 2 Pickel_