IN THE CIRCUIT COURT OF SALINE COUNTY, ARKANSAS
THIRD DIVISION

FILED
SALINE COUNTY
CLERK

2013 JUN 21  PM 3: 22

BY_____ PLAINTIFF

63CV-12-898       631-63100002059-015
SANSTON M FOSTER IV V LINDSEY 1 Page
SALINE CO       06/21/2013 03:22 PM
CIRCUIT COURT                 FI40A

SANSTON M. FOSTER IV,
SANDRA "KITTY" SMITH,
HEATHER NELMS, and
ANGELA COURTNEY,
**Individually and on Behalf
of all Others Similarly Situated**

v.                        No. 63CV-12-898

LINDSEY MANAGEMENT CO., INC.                    **DEFENDANTS**
FOUNTAIN LAKES, A LIMITED
PARTNERSHIP, and FOUNTAIN LAKES
MANAGEMENT COMPANY, INC.

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiffs,  by and through their attorney, Mickey Stevens, and for their

Second Amended Complaint against Lindsey Management Co., Inc.,  Fountain Lakes, A Limited

Partnership, and Fountain Lakes Management Company, Inc. states and alleges:

1.        This is an action for violations of the Arkansas Deceptive and Unconscionable

Trade Practices statute, Arkansas Code Annotated § 4-88-107 *et. seq.*, Breach of Contract, and

Fraud.

2.        Plaintiffs incorporate all factual allegations and claims stated in the prior

Amended Complaint as if fully restated herein.

### PARTIES

3.        Plaintiff, Sanston M. Foster IV, is a natural person who resides in the City of

Benton, Saline County, Arkansas and is a resident of the Fountain Lakes Apartments managed

by Defendant Lindsey Management Co., Inc..

4.        Plaintiff, Sandra "Kitty" Smith, is a natural person who resides in the City of

1

Springdale, Arkansas and is a former resident of the Vantage Point Apartments managed by Defendant Lindsey Management Co., Inc.

5.    Plaintiff Heather Nelms is a natural person who resides in the City of Little Rock, Arkansas and is a former resident of The Fairways at Hurricane Creek managed by Defendant Lindsey Management Co., Inc.

6.    Plaintiff Angela Courtney is a natural person who resides in the City of Dermott, Arkansas and is a former resident of The Links at Sherwood managed by Defendant Lindsey Management Co., Inc.

7.    Defendant Lindsey Management Co., Inc. is, upon information and belief, an Arkansas corporation with its principal place of business located in Fayetteville, Arkansas.

8.    Defendant Fountain Lakes, A Limited Partnership is, upon information and belief, an Arkansas limited partnership.

9.    Defendant Fountain Lakes Management Company, Inc. is, upon information and belief, an Arkansas Corporation with its principal place of business located in Fayetteville, Arkansas.

## JURISDICTION AND VENUE

10.    Subject-matter jurisdiction of this court arises under Arkansas Code Annotated §§ 4-88-113(f) and 4-88-204 which create a private cause of action for any person damaged or injured as a result of a violation of the Arkansas Deceptive and Unconscionable Trade Practices statute, Arkansas Code Annotated § 4-88-107 *et. seq.*

11.    Subject-matter jurisdiction of this court for Plaintiffs' Breach of Contract and Fraud claims arises under Arkansas Code Annotated § 16-13-201 and the Arkansas Constitution.

12.    Venue is proper pursuant to Arkansas Code Annotated § 16-55-213 (b)(1).

2

## CLASS ACTION ALLEGATIONS

13.     Plaintiffs bring this action pursuant to Arkansas Rule of Civil Procedure 24 on their own behalf and on behalf of all persons similarly situated.

14.     The class that plaintiff represents is comprised of the following persons:  All persons who have resided in apartments located in the State of Arkansas and managed by Defendant Lindsey Management Co., Inc. in the last five years and who have been a victim of the deceptive and unconscionable trade practices, fraud, or breaches of contract described herein.

15.     The persons in this class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

16.     There are questions of law and fact common to all members of the class and these questions predominate over any questions affecting only individual members.

17.     The claims or defenses of the representative party are typical of the claims or defenses of the class.

18.     The representative parties and their counsel will fairly and adequately protect the interests of the class.

## GENERAL FACTUAL ALLEGATIONS

19.     Defendant, Lindsey Management Co., Inc. is a property management company that "owns and operates" more than 2500 apartment units (*Exhibit A, Letter from James E. Lindsey to the OCC, Board of Governors of the Fed. Reserve, FDIC, and OTS*) in complexes located in Arkansas, Oklahoma, Missouri, Nebraska, Mississippi, and Alabama.

20.     Defendant Fountain Lakes, A Limited Partnership, is the alleged record owner of the Fountain Lake Apartments located at 3011 Congo Road in Benton, Saline County, Arkansas.

21.   Defendant Fountain Lakes Management Company, Inc. is, upon information and belief, an entity that is controlled by Lindsey Management Co., Inc. and is related to the management of the Fountain Lakes Apartment Community.

22.   The Apartment Managers and other staff of the apartment complexes managed by Lindsey are employees of Lindsey Management Co., Inc. *See Exhibit D, Dec. of Steven Pickel, par. 4, Filed in Lochridge, et. al v Lindsey Management Co. Inc., et. al.* No. 5:12-cv-05047 (W.D. Ark). *Exhibit R, Defendants' Response Brief in Opposition to Plaintiffs' Amended Motion for Certification of Collective Action . . .,* also filed in Lochridge as Doc. 53 (Describing Lindsey's operations, management positions and structure and personnel policies).

23.   Lindsey Management Co., Inc. advertises the apartment complexes that it manages, accepts and processes applications from prospective tenants, handles the actual leasing of the apartments, and is responsible for maintaining the property.

24.   Lindsey Management Co., Inc. makes all personnel decisions involving the management of the  apartment complexes that it manages, including hiring and direct supervision of apartment managers, leasing agents, and maintenance technicians. *Exhibit D, par. 6, 18.*

25.   Lindsey Management Co., Inc. maintains strict policies and procedures and their apartment managers are required to strictly follow these policies and procedures. *Exhibit D, pars. 8, 13, 16, 19, 20, 26, 27.*

26.   Lindsey Management Co., Inc. makes all decisions relating to the maintenance of the apartments in the complexes that it manages, including approving or denying requests for repairs. *Exhibit D, par. 13.*

27.   Lindsey Management Co., Inc., is engaged in joint ventures with the partnerships that purport to own the apartment complexes that it manages in the leasing and management of

4

the apartments.

28.    Lindsey Management Co., Inc., its shareholders, directors, and officers have established a scheme in which title to each property is held by a separate legal entity.  This scheme is designed to avoid liability and has been defensively used in multiple lawsuits. However, these entities are merely shams or alter egos of Lindsey and Lindsey is the true owner of the properties.

29.    The official mailing addresses of the entities that are the alleged record owners is Lindsey's corporate office and Lindsey shares common shareholders and officers with these entities.

30.    Lindsey Management Co., Inc. controls and directs every aspect of the management and leasing of the apartment complexes that it manages.

31.    Tenants who have complaints are directed to a tenant relations department at Lindsey's corporate offices.

32.    Lindsey has total control and authority over all aspects of the apartment operations.  The partnerships or other entities that actually own the properties managed by Lindsey are owned by the same shareholders, share common officers and directors, and are in reality merely an extension of and tools used by Lindsey.

33.    Plaintiffs have obtained records of 83 complaints made to the Better Business Bureau in Little Rock in years 2010, 2011, and 2012 regarding Lindsey Management.  Many contain the same or very similar allegations as alleged herein.  (Plaintiff has attached a representative sample of these complaints as exhibits as referenced herein).

34.    Lindsey has established a policy whereby apartment managers and leasing staff show potential tenants a model apartment that is in good condition knowing that the apartment

the potential tenant will be leasing is in poor condition.   Pursuant to this policy, potential tenants are not permitted to see the apartment they will be leasing until they have signed a lease. Tenants who refuse to sign a lease without seeing the apartment are denied the return of their security deposit. *Exhibits B-5; B-12; B-20; B-24; B-29; C-1 pgs. 1- 4; C-2 pgs 3-4; C-3 pg 2.*

35.     Lindsey Management Co., Inc. has established a policy under which its apartment managers and leasing agents are directed to refuse to allow a prospective tenant to see the actual apartment he or she will be leasing until the prospective tenant has signed a lease and arranged for utilities to be turned on.  Prospective tenants are shown a model apartment that is in good condition and are led to believe that the apartment they will be leasing is in similar condition when, in fact, the apartment the tenant is leasing is likely in very poor condition.  *Exhibits B-5, B-12, B-20, C-2 pgs 3-4; C-3 pg 2.*

36.   Lindsey often accepts deposits for apartments when either no apartment is available or none meeting the prospective tenants specified criteria (size, location, etc) is available. Lindsey refuses to refund security deposits when apartments are not available as promised. *Exhibits B-4, B-9, B-11, B-17, B-19, B-20, B-24, B-25, B-26.*

37.     Lindsey Management Co., Inc. has established a policy under which its maintenance staff are not permitted to make necessary repairs and serious problems are merely covered up allowing conditions to remain that endanger the health and safety of tenants. *Exhibits B-1, B-2, B-3, B-4, B-8, B-15, B-18, B-20, B-22, B-27, B-28, B-29; C-1 pg 2.*  Lindsey further does not allow its apartment managers to spend more than $40 or $45 cleaning and painting an apartment after a tenant moves out.  *Exhibit E, Dec. of Patricia Diane Leach, par. 22, Filed in Lochridge, et. al v Lindsey Management Co. Inc., et. al.* No. 5:12-cv-05047 (W.D. Ark).  Because of these low wages, the work often doesn't get done.

6

38.     Residents at various Lindsey managed properties have reported frequent problems with mold around window sills.   *Exhibits B-2, B-8.*   Many of the properties managed by Lindsey were constructed by Lindsey Construction Co., Inc.  Many are poorly constructed  and structural defects are common.

39.     Lindsey often applies charges to a tenant's security deposit for repairs that are not done and sometimes even bills the tenant extra charges over and above the security deposit for repairs that are not needed, are not done, or are due to defects that are not the tenants' fault. *Exhibits B-6, B-10, B-14, B-27.*

40.     Lindsey deducts charges for cleaning from tenants' deposits when they move out even though the tenants thoroughly cleaned the apartment.   Many tenants report that the apartments are dirty when they move in.  It is apparent that the cleaning for which tenants are being billed is not being done.  *Exhibits B-7, B-13, B-14, B-16, B-23, B-29.*

41.     Apartments managed by Lindsey are frequently infested with roaches, rodents and other pests and Lindsey fails to take appropriate measures to address the problem.  Tenants are often told that pest control is their responsibility.  *Exhibits B-8, B-18, B-21, B-22, C-1 pg 4.*

42.     Many tenants have reported personal belongings missing from their apartments and staff inappropriately entering their apartments.  *Exhibits B-27; C-1 pg 6; C-3 pg 2.*

## INDIVIDUALIZED FACTUAL ALLEGATIONS

### Sanston Foster

43.     In or around September 2012, Mr. Foster contacted the apartment manager at Fountain Lake Apartments, to inquire about renting an apartment.

44.     The apartment manager showed Mr. Foster a model apartment and told him that the apartment he would actually be renting was not yet available for showing.

7

45.     The model apartment shown to Mr. Foster was in good condition and had no obvious defects.  The apartment manager represented to Mr. Foster that the apartment he would be renting was in the same condition as the model apartment and similar in other features.

46.     At that time, Mr. Foster gave the apartment manager a security deposit and was told that his apartment would be ready in a couple of weeks which would have been the last week of September.

47.     During the last week of September, Mr. Foster called the apartment manager and learned that his apartment was still not ready.  The apartment manager told Mr. Foster he could not see the apartment at that time.  The apartment manager also told Mr. Foster that he was required to come by and sign the lease and have the utilities turned on before he could see the apartment.

48.     Mr. Foster went to the apartment office and signed a lease on September 26, 2012 and had the utilities turned on.  *Exhibit F, Lease Agreement.*

49.     Upon inspecting, for the first time, the apartment he had leased, Mr. Foster discovered that the apartment was in poor condition.  Mr. Foster noticed that there was apparent water damage to floors and around the edges of the walls causing the baseboards to warp and detach from the walls.  The kitchen flooring is soft and gives when walked on.  There is mold around the washing machine area.  Cabinets had been repaired with bare plywood.  Areas of the walls had been repaired with spackle but had not been painted.  The dishwasher was not properly installed.  The oven does not heat to more than 350 degrees.  The carpet has a very strong odor of smoke.  The paint appears to have been haphazardly applied with over sprays and drip marks. The apartment is infested with roaches to the point that Mr. Foster is unable to store any food in the refrigerator or the cabinets.  There is a hole in the ceiling and the walls appear to have

separated from the ceiling in some areas.

50.    Mr. Foster noted the above described conditions and other defects on the Statement of Apartment Conditions provided by the apartment manager and returned the form to the apartment manager within forty-eight hours of moving in as required by the terms of the lease. *Exhibit G.* Defendant failed to correct the defective conditions.

51.    Mr. Foster is disabled and has had two kidney transplants. Mr. Foster receives dialysis treatments three times per week for four hours at a time. Mr. Foster takes immunosuppressant drugs which make him more susceptible to illness. Mr. Foster also uses a CPAP machine for sleep apnea and has allergies. These conditions substantially limit Mr. Foster's major life activities.

52.    The insect infestation and other conditions in the apartment significantly worsen Mr. Foster's allergies and breathing difficulties and present other risks to his health.

53.    The odor and other conditions in the apartment have aggravated Mr. Foster's health problems and have caused him to incur additional medical expenses.

54.    Lindsey is aware of the previous flooding of apartments at the Fountain Lakes apartment complex and have failed to address the issues caused by the flooding. *Exhibit H, BBB Complaint # 190292298, Justin Thompson.*

55.    The experiences of Mr. Foster in being shown an apartment in good condition while the apartment he actually received was in very poor condition, the insect infestation, and other conditions are common occurrences at apartment complexes managed by Lindsey as demonstrated by the attached exhibits.

**Kitty Smith**

56.    Sandra "Kitty" Smith was a resident of the Vantage Point Apartments in

Springdale, Arkansas when the apartment complex was purchased by Lindsey.

57.     Lindsey assumed responsibility for managing Vantage Point Apartments on February 1, 2013. *Exhibit I, Letter from Sexton Associates, Inc., Jan. 23, 2013.*

58.     Ms. Smith is sixty-five years old and depends on social security.

59.     Ms. Smith reported problems with mold around her window sills and leaks around the windows.

60.     Electrical outlets in Ms. Smith's apartment are loose, creating risk of electric shock and fire.

61.     The door knob on the front door sometimes will not open.   In the event of a fire, this could be a significant hazard.

62.     Window screens don't fit properly allowing insects inside the apartment.

63.     Page 5 of the Rules & Regulations[1] provided with the lease states that tenants shall not make any disturbing noises or conduct which is disturbing or annoying to neighboring tenants. *Exhibit J, Rules & Regulations.*   After complaining to Lindsey's corporate office about noisy neighbors, Ms. Smith received a "Warning Notice" accusing her of "disorderly conduct" for complaining about the noisy neighbors. *Exhibit K, Warning Notice.*

64.     Due to limited parking, the lease restricts parking to two spaces per unit.  Lindsey has refused enforce this limit and their failure to enforce this rule has significantly inconvenienced Ms. Smith. *Exhibit J, pg 2, Vehicles, par. 1.*

65.     The water heater in Ms. Smith's apartment leaks and, although Ms. Smith has reported it to the management, it has not been repaired.

66.     On one occasion when Ms. Smith and another resident had sewage backing up

---

[1] Sexton Associates, Inc. was the manager of the property when Ms. Smith moved in and, therefore, her lease is not the standard Lindsey lease.

into their kitchen sinks, the manager refused to respond until the following afternoon.   There has been an ongoing problem with the sink backing up.

67.    Ms. Smith has repeatedly complained both verbally and in writing to the apartment manager and Lindsey's corporate office about these issues but Lindsey refused to correct any of these problems.

68.    The sewage back up, mold, leaks, non-working front door knob, and loose electrical outlets all present a danger to Ms. Smith's health and safety.

69.    Lindsey's actions have resulted in Ms. Smith experiencing significant anxiety and depression which has required medical treatment.

70.    The experiences of Ms. Smith involving serious maintenance issues that Lindsey refuses to repair are common occurrences at apartments managed by Lindsey as evidenced by the attached exhibits.

<div align="center">**Heather Nelms**</div>

71.    Heather Nelms was a resident of The Fairways at Hurricane Creek in Bryant, Arkansas for almost five years.  The Fairways at Hurricane Creek is owned and managed by Lindsey. *Exhibit L, Lease Agreement.*

72.    Ms. Nelms frequently reported problems with spiders and roaches in her apartment.  Lindsey repeatedly failed to address the problem and told Ms. Nelms to take care of the problem herself.

73.    A window was broken through no fault of Ms. Nelms and the maintenance staff merely put tape over the window and did not replace it.

74.    There was constant mold around the window sills of Ms. Nelms apartment.  Ms. Nelms would clean as instructed but the cleaning would remove paint.

<div align="center">11</div>

75.     Ms. Nelms repeatedly complained about the insect infestation and other problems with the apartment but Lindsey refused to make repairs.

76.     Ms. Nelms frequently complained about noisy neighbors but the management disregarded her complaints.

77.     Ms. Nelms noticed that some property, including clothing and a work-out vest, were missing from her apartment.

78.     On March 20, 2013, a leasing consultant contacted the police and requested that they search Ms. Nelms apartment.   Ms. Nelms believes this call was prompted by a neighbor who did not like the fact that she has a bi-racial child.   Three police officers surrounded Ms. Nelms and pressured her into allowing her apartment to be searched.   The officers searched through all of her belongings but did not find any illegal items.   Officers found a small amount of marijuana in a purse belonging to a guest who was present in the apartment

79.     Later that same day, the apartment staff posted a "Notice to Vacate" with Lindsey's name on the top (*Exhibit M, Notice to Vacate*)  on Ms. Nelms' door giving her three days to vacate the apartment.   The reasons cited on the Notice to Vacate were violations of paragraphs 1 and 19 of the lease—"Default by resident and unauthorized occupant."   The apartment staff accused Ms. Nelms of having another person living in the apartment.  The only people residing in the apartment were Ms. Nelms and her children.  Ms. Nelms had not violated the lease, in any way.

80.     Ms. Nelms had difficulty securing another apartment on such short notice, particularly considering that Lindsey initially provided a negative reference and later inconsistently stating that they had complaints but no problems with Ms. Nelms.

81.     Ms. Nelms was unlawfully evicted from her apartment.   Ms. Nelms had not

committed any action constituting an "unlawful detainer" pursuant to Arkansas Code Annotated § 16-50-304.  Ms. Nelms had not done anything to justify her eviction under Arkansas Code Annotated § 18-17-901.

82.     After illegally evicting Ms. Nelms and thereby breaking the lease, Lindsey has attempted to coerce Ms. Nelms to pay an additional $2,160 in liquidated damages and is refusing to refund her security deposit.  *Exhibit N, Security Deposit Disposition.*    Lindsey has referred this matter to a collection agency and is threatening to harm Ms. Nelms credit if she does not pay.

83.     Lindsey's actions have caused Ms. Nelms and her children's privacy to be unreasonably invaded and has caused them to suffer emotional distress.

84.     The experiences of Ms. Nelms involving serious maintenance issues, insect infestations, breaches of contract, and improper charges and collection actions are common at apartment complexes managed by Lindsey as evidenced by the attached exhibits.

**Angela Courtney**

85.     Ms. Courtney  was a tenant at the Links at Sherwood, managed by Lindsey. *Exhibit O, Lease Agreement.*

86.     Ms. Courtney's apartment was infested with rodents.  In early November, 2012 Ms. Courtney complained both to the on-site management and Lindsey's corporate office and she was informed that pest control was her responsibility.   Ms. Courtney paid a pest control company $162 to assist with the problem.    Within a few days, the rodents returned and Ms. Courtney again notified the on-site management.  After much persistence, the manager sent a maintenance person to look for points of entry.

87.     On November 10, 2012, the stench from dead rodents became unbearable.  On

November 11, Ms. Courtney paid an additional $100 to someone to locate and remove several dead rodents that were in the dryer duct.

88.     Ms. Courtney incurred costs of $587 related to attempts to address to rodent problem and dealing with the issue caused her to miss several hours of work.

89.     On December 4, 2012, the manager demanded additional rent even though Ms. Courtney had already paid her rent.   The manager referenced a letter Ms. Courtney had sent to Lindsey regarding the problems she was having with pest control.   A short time later, Ms. Courtney found a Notice to Vacate on her door. *Exhibit P, Notice to Vacate.*

90.     On December 11, 2012, Lindsey filed a Complaint in Pulaski County Circuit Court against Ms. Courtney for "Unlawful Detainer" accusing her of not paying her December rent, even though her rent had been paid on time.

91.     On December 31, 2012, Ms. Courtney provided 30 days written notice of her intention to vacate the property.

92.     Shortly after moving out, Ms. Courtney received a collection letter for attorney's fees and January rent.

93.     Lindsey refused to refund Ms. Courtney's deposit charging her $205 for cleaning even though she had the apartment professionally cleaned after moving out.

94.     On January 4, 2013, a Writ of Possession was served on Ms. Courtney ordering her to vacate within 24 hours.  Ms. Courtney hired an attorney but the attorney delayed filing an Answer until January 7, 2013.   The Unlawful Detainer action was dismissed on April 15, 2013.

95.     Ms. Courtney vacated the apartment but was unable to move all her possessions within 24 hours and this property was never returned to her.

96.     Ms. Courtney was unable to secure other housing and was forced to stay in a hotel

for several days.

97.    Ms. Courtney paid $1500 in legal fees for an attorney to represent her in the Unlawful Detainer action.

98.    After illegally evicting Ms. Courtney, Lindsey tried to collect an additional $1399.50 from her. *Exhibit Q, Security Deposit Disposition.*

99.    Ms. Courtney has suffered significant financial damages and emotional distress as a result of the actions of Lindsey.

100.    The experiences of Ms. Courtney involving pest problems, breaches of contract, unlawful eviction, and improper charges and collection activities are common at apartment complexes managed by Lindsey as evidenced by the attached exhibits.

## COUNT I
## VIOLATIONS OF THE ARKANSAS DECEPTIVE AND
## UNCONSCIONABLE TRADE PRACTICES STATUTE
### Arkansas Code Annotated § 4-88-107 *et. seq*

101.    Plaintiffs incorporate and reallege herein each and every allegation set forth above in the preceding paragraphs.

102.    Defendants' policy of showing model apartments in good condition while knowing the apartment the tenant will actually get is in poor condition violates Arkansas Code Annotated § 4-88-107(a)(1) & §§ 4-88-108(1)&(2).

103.    Defendants violated Arkansas Code Annotated § 4-88-107(a)(6) & § 4-88-108(2) by knowingly failing to identify water or other damage to the apartments at Fountain Lakes and other apartment complexes.

104.    Defendants policy of refusing to allow perspective tenants to inspect apartments before signing a lease violates Arkansas Code Annotated § 4-88-107(a)(10) & § 4-88-108(2).

105.    Defendants policy of refusing to refund security deposits when apartments are in

15

poor condition or when an apartment is not available as promised violates Arkansas Code Annotated § 4-88-107(a)(10) & § 4-88-108(2).

106.     Defendants failure to make repairs to apartments and allowing insect infestation and other conditions to endanger the health and safety of tenants violates Arkansas Code Annotated § 4-88-107(a)(10).

107.     Defendants have repeatedly violated Arkansas Code Annotated § 4-88-108 by engaging in deception and fraud in the leasing of apartments and the concealment and omission of material facts relating to the condition of the apartments with the intent to induce potential tenants to rely on the concealments and omissions by entering into a lease agreement.

108.     By accepting deposits when an apartment meeting the specified criteria is not available, Defendants have violated Arkansas Code Annotated § 4-88-107(a)(3),(5)(D)&(10).

109.     Defendants violated Arkansas Code Annotated § 4-88-107(a)(10) by improper charges against security deposits and billing former tenants for cleaning and repairs that were unnecessary or not done.

110.     Defendants violated Arkansas Code Annotated § 4-88-107(a)(10) by failing to enforce rules regarding noise, parking and other rules (par. 9 of Lindsey's lease) thereby denying tenants the benefit of the quiet enjoyment of the leased property.

111.     Defendant Lindsey has exercised direct or indirect control over the personnel who have committed the acts alleged herein in violation of the ADTPA. Defendant Lindsey knew or reasonably should have known of the existence of the facts stated herein.

112.     As a result of Defendants' violations of the Arkansas Deceptive and Unconscionable Trade Practices Statute, Plaintiffs are entitled to actual damages, punitive damages, and reasonable attorney's fees pursuant to Arkansas Code Annotated § 4-88-204.

## COUNT II
## BREACH OF CONTRACT

113.    Plaintiffs incorporate and reallege herein each and every allegation set forth above in the preceding paragraphs.

114.    Courts should disregard the fiction of the corporate entity in order to do justice. *Malvern Gravel Co. v. Mitchell*, 238 Ark. 848 (1964). A subsidiary or auxiliary corporation which is created by a parent corporation merely as an agency for the latter may be regarded as identical with the parent corporation, especially if the stockholders or officers of the two corporations are substantially the same or their systems of operation unified. *Id.*; *see also Chicago, Milwaukee RR. Co.* v. *Minneapolis Civic Assn.*, 247 U.S. 490, 62 L.Ed. 1229 (1918). When one corporation makes use of another as its instrument through which to transact its business, the principal corporation is really represented by the agent of the sub-corporation and its liability is the same as if it had done business in its own name. *Id.*

115.    The Arkansas Supreme Court has pierced the fiction of the corporate entity when justice so demanded. Some of these cases are: *Rounds and Porter* v. *Burns*, 216 Ark. 288, 225 S.W. 2d 1 (1949); *Plant* v. *Cameron*, 228 Ark. 607, 309 S.W. 2d 312 (1958) and *Black & White* v. *Love*, 236 Ark. 529, 367 S.W. 2d 427 (1963). The Arkansas Supreme Court has pierced the fiction of separate corporate entities, and held the parent corporation liable for the debt of its subsidiary because the parent corporation manipulated the subsidiary to its own advantage at the expense of the a party. This conduct entitles the plaintiffs to a judgment directly against the parent corporation without regard to the separate entitle of the subsidiary.  In *Plant* v. *Cameron*, *supra*, the court held the parent corporation liable for the debt of the subsidiary corporation, saying: "Though the corporations are separate legal entitles it would constitute a constructive

17

fraud in this case to allow Nashville to now claim an entirely separate existence from Cameron." In *Black & White* v. *Love, supra,* the court said that because the two corporations were owned by the same shareholders, operated by the same officers, and the cabs were interchanged. It would be putting fiction above right and justice to allow Black & White to hide behind the corporate entity of Checker in this case."

116.    While Lindsey contracts in the name of its subsidiary entities, these subsidiary entities are merely alter egos of or tools used by Lindsey and Lindsey is not entitled to hide behind these entities to escape liability.    Lindsey manipulates the subsidiary entities to its advantage and Lindsey should be held directly liable for its actions.    It would constitute constructive fraud and be putting fiction above right to allow Lindsey to escape liability for its actions by hiding behind these sham entities.

117.    Paragraph 10 of Lindsey's lease agreement indicates that both conditions affecting health or safety of ordinary persons and those items identified by the tenant on the Statement of Apartment Condition will be repaired.

118.    Paragraphs 14 and 18 of Lindsey's lease agreement creates a contractual duty on the party of Lindsey to maintain and make repairs to the property.

119.    Frequently, when tenants move into apartments, conditions exist that affect the health or safety of ordinary persons.

120.    Although tenants complete the required Statement of Apartment Condition as Lindsey routinely fails to repair the identified conditions and defects.

121.    By failing to repair conditions that affect the health and safety of ordinary persons, failing to repair the conditions and defects identified by tenants on the Statement of Apartment Condition, and failing and refusing to properly maintain and repair the properties,

*18*

Lindsey is in material breach of Paragraphs 10, 14, and 18 of its lease agreement.

122.    Paragraph 9 of Lindsey's lease creates a contractual duty that requires Defendants to enforce certain Rules and Regulations to ensure that tenants get the benefit of quiet enjoyment of the leased property.

123.    By failing to enforce rules regarding noise, parking, and other rules, Defendant have materially breached the lease agreements.

124.    Defendants have unlawfully evicted tenants from apartments when the tenant had not violated the terms of the lease agreement.  These actions are material breaches of the lease agreements.

125.    Plaintiffs are entitled to special, general, compensatory and reliance damages related to Defendants' material breach of the lease agreement.

126.  Pursuant to Arkansas Code Annotated § 16-22-308, Defendants are liable for the Plaintiff's attorneys' fees and costs.

<div align="center">

**COUNT III**
**FRAUD**

</div>

127.    Plaintiffs incorporate and reallege herein each and every allegation set forth above in the preceding paragraphs.

128.    Defendants falsely represent to potential tenants that the apartments that they will be leasing are in the same condition as the model they are shown.

129.    Defendants know that the apartments potential tenants will be leasing are not in the same condition as the models they are shown.

130.    Defendants intend that potential tenants will rely on the misrepresentations of the apartments' condition.  Defendants intend to induce potential tenants to lease apartments that Defendants know to be in significantly inferior condition than the model apartment they are

shown.

131.   Tenants justifiably relied on the Defendants' misrepresentations regarding the apartment conditions when they signed a lease.   Based on Defendants' misrepresentations, tenants justifiably believed that the apartments they leased were in the same condition as the model apartment they were shown.

132.   Based on Defendants' misrepresentations, tenants entered into a lease agreement for, and lived in, apartments that were in poor condition and that presented a risk to their health and safety.

133.   Defendants obtain security deposits and application fees from potential tenants by misrepresenting that apartments that meet specified criteria are or will be available by a certain date.   Potential tenants rely on these misrepresentations by paying the application fee and deposit and by making arrangements to move.   When the apartment is not available as promised, Defendants refuse to return deposits and fees.

134.   Defendants are liable to Plaintiffs for damages and Plaintiffs are entitled to rescind the lease agreements, return of deposits and fees, reimbursement for other expenses incurred as a result of Defendants' actions, and punitive damages.

### COUNT IV
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

135.   Plaintiffs incorporate and reallege herein each and every allegation set forth above in the preceding paragraphs.

136.   Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

137.   Defendants routinely breach the duty of good faith and fair dealing required by their lease agreements in inducing tenants to enter the agreements through fraud and deception.

138.    Defendants routinely breach the duty of good faith and fair dealing required by the lease by failing fulfill their obligations to correct deficiencies in the apartments that endanger tenants' health and safety, and refusing to make necessary repairs.

139.    Defendants routinely breach the duty of good faith and fair dealing required by the lease by failing to fulfill their obligation to repair the items listed by tenants on the condition checklist.

140.    Defendants routinely breach the duty of good faith and fair dealing by applying improper charges to security deposits and billing tenants for repairs and cleaning that are either unnecessary or not done.

141.    Defendants routinely breach the duty of good faith and fair dealing by improperly referring accounts to collection agencies.

142.    Defendants' unlawful eviction of tenants also constitute breaches in the duty of good faith and fair dealing.

143.    Plaintiffs are entitled to special, general, compensatory and reliance damages related to Defendants' breaches of the duty of good faith and fair dealing.

144.    Pursuant to Arkansas Code Annotated § 16-22-308, Defendants are liable for the Plaintiff's attorneys' fees and costs.

### COUNT V
### CIVIL CONSPIRACY

145.    Plaintiffs incorporate and reallege herein each and every allegation set forth above in the preceding paragraphs.

146.    Lindsey Management Co., Inc., conspired with Fountain Lakes, A   Limited Partnership, and Fountain Lakes Management Company, Inc., and its other subsidiary or affiliated entities to develop and implement policies that require their employees to engage in

21

business practices that violate the Arkansas Deceptive and Unconscionable Trade Practices Act.

147.  Lindsey Management Co., Inc., conspired with Fountain Lakes, A Limited Partnership, and Fountain Lakes Management Company, Inc., and its other subsidiary or affiliated entities to develop policies that lead to the breaches of their contracts with tenants.

148.  Lindsey Management Co., Inc., conspired with Fountain Lakes, A Limited Partnership, and Fountain Lakes Management Company, Inc., and its other subsidiary or affiliated entities to breach the duty of good faith and fair dealing required by their lease agreements.

149.  Lindsey Management Co., Inc., conspired with Fountain Lakes, A Limited Partnership, and Fountain Lakes Management Company, Inc., and its other subsidiary or affiliated entities to develop policies that a require their employees to engage in fraudulent business practices.

150.  Plaintiffs have been damaged by acts committed by both entities pursuant to this conspiracy and Defendants are liable to Plaintiffs for those damages.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiffs pray that this action be certified as a class action and for judgment against Defendants as follows:

> a.  actual damages in an amount to be determined at trial, punitive damages, costs and reasonable attorneys fees, incurred as a result of Defendants' violation of the Arkansas Deceptive and Unconscionable Trade Practices Act;
>
> b.  special, general, compensatory, and reliance damages, and attorneys fees incurred as a result of Defendants' Breaches of Contract;
>
> c.  special, general, compensatory, and reliance damages, and attorneys fees

<div align="center">

22

</div>

incurred as a result of Defendants' breaches of their duty of good faith and fair dealing required by the lease agreements;

d.  damages incurred as a result of Defendants' fraudulent misrepresentations and punitive damages;

e.  damages incurred as a result of acts committed by Defendants in further of a civil conspiracy;

f.  rescission of the lease agreements;

g.  an injunction barring Defendants from reporting derogatory information to any credit bureaus regarding any plaintiff, barring Defendants from initiating any improper collection actions against any plaintiff, and barring Defendants from providing any negative references regarding any plaintiff; and

h.  for such other and further relief as may be just and proper.

Plaintiffs demand a jury trial on all claims.

Respectfully submitted,

Mickey Stevens
Ark. Bar # 2012141
Attorney for Plaintiffs
P.O. Box 2165
Benton, AR 72018
501-303-6668
Fax:  877-338-6063
stevens_mickey@yahoo.com

23

## CERTIFICATE OF SERVICE

I, Mickey Stevens, do hereby certify that a copy of the foregoing has been forwarded, via Facsimile and/or U.S. Mail, to the following:

Marshall Ney
Brad Shumpert
425 West Capitol Ave.
Ste. 1800
Little Rock, AR 72201

Anne Mourney
Adam Rose
1200 East Joyce Boulevard
P.O. Box 13000
Fayetteville, AR 72703

on this 21st day of June, 2013.

Mickey Stevens

24

# *Lindsey Management Company, Inc.*

1165 Joyce Boulevard □ P.O. Box 13000 □ Fayetteville, AR 72703 □ 479.521.6686 □ Fax 479.527.8834

March 6, 2006

**Via E-Mail:**   **OCC**   regs.comments@occ.treas.gov
**Board**   regs.comments@federalreserve.gov
**FDIC**   comments@FDIC.gov
**OTS**   regs.comments@ots.treas.gov

Office of the Comptroller of the Currency, Treasury (OCC); Board of Governors of the Federal Reserve System (Board); Federal Deposit Insurance Corporation (FDIC); and Office of Thrift Supervision, Treasury (OTS).

RE:   OCC Docket No. 06-01
Board Docket No. OP-1248
OTS Docket No. 2006-01

Ladies and Gentlemen:

Lindsey Management Company, Inc. is an Arkansas based developer and operator of multi-family housing. We have been in business since 1981 and currently own and operate more than 25,000 apartment units in a seven-state region, providing homes for over 60,000 people. We consistently build 2,000 new apartment units each year at a cost of more than $100,000,000.00, providing jobs for hundreds of people and adding stability to the local tax bases. We have been able to maintain this growth because of our relationships with lenders who know us, know our history, know our markets, and know our products and services. Many of these lenders are small community banks who participate with others like them to finance our new projects.

We understand the concerns of those who fear that the real estate "bubble" will burst, leaving lenders with overvalued properties and borrowers without the ability to meet their obligations. Our business operates in America's heartland and we haven't experienced the meteoric rise in land prices found in some of the nation's coastal areas. Yet the same underwriting standards that apply to megabanks financing construction in California, New York or the Gulf Coast will apply to community banks in Arkansas, Missouri, Oklahoma, Kansas and other central states in which we do business.

We believe the proposed regulations are unnecessarily stringent and would have a host of unintended consequences, including:

1.      Depressed land values due to decreased availability of real estate financing;

**EXHIBIT A**

2.   Increased unemployment, especially in construction, real estate management and sales, and banking related industries;

3.   Stifled growth in business and industry because of the decrease in supply of new housing for their employees;

4.   Increased foreclosures resulting from developers' inability to complete or expand developments, and from banks who must pressure them to move their real estate loans;

5.   Increased bank failures, because of all these problems.

For these reasons, we ask that you do not adopt the proposed real estate lending standards. Please contact me if you wish to discuss this matter further.

Sincerely,

James E. Lindsey, Chairman
Lindsey Management Company, Inc.
1165 Joyce Blvd.
Fayetteville, AR 72703
Tel. 479-521-6686
jim.lindsey@lindseymanagement.com

cc:   Hon. Mark Pryor:   senator.pryor@pryor.senate.gov
Hon. Blanche Lincoln:   blanche_lincoln@lincoln.senate.gov
Hon. John Boozman:   boozman.congress@mail.house.gov
Hon. Marion Berry:   berry.congress@mail.house.gov
Hon. Vic Snyder:   snyder.congress@mail.house.gov
Hon. Mike Ross:   ross.congress@mail.house.gov

COMPLAINT # 19032931

**COMPANY INFO**
NAME:       **Lindsey Management Co., Inc.**
----------------------------------------------------------------------------------------------------------------------------------
------------------------

**CONSUMER INFO**
NAME:       **Shaletra Jordan**                      DAY PHONE: 903 742-0197
ADDRESS:    1116 Links Dr Apt.4                      EVE PHONE:       -
            Jonesboro, AR
            72404                                    EMAIL: shaletraj@yahoo.com
$ VALUE:    $0.00                                    FAX:
----------------------------------------------------------------------------------------------------------------------------------
------------------------

**DETAILS**
CONCERNING: **Service Issues**
OPENED      10 January 2012                    CLOSE CODE: 121 - AJR
CLOSED      25 January 2012                    CLOSED BY: Lori Plant
ENTERED BY:
ASSIGNED TO: Lori Plant


NATURE OF DISPUTE: I moved into the Links apartment at Jonesboro, Ark on 1/4/12. Both me and my sister have recently received chemotherapy and my sister's chemotherapy treatment is more recent then mine so therefore we are still both immunocompromised. The outside of the apartment is filled with spider webs and filth. The inside of the apartment has a horrible smell. The carpet needs to be replaced in every room because the smell is coming from the carpet. The bathrooms were not cleaned. Someone urinated on the toilet seat in one bathroom and did not clean it. The wooden bar on the outside on the balcony is broken, which is a safety hazard. I contacted management who claim that they will come to get the smell out and as far as the cleaning the outside of the apartment, the management either says that the water hose was frozen or they do not have enough staff to assist with the problem. The apartment was suppose to be ready when we moved in and these conditions are horrible. If something triggers an immune response due to uncleaniness of this apartment, me and my sister could be fighting for out life due to the fact that we are immunocomprised. Our oncologist is in Houston, TX at MD Anderson. So we are far from home if something happens, which we are aware of, but nothing as far as our living condition should contribute to this problem. $175 of my $250 deposit was used to clean this apartment, but evidently it was not cleaned thoroughly. Our health is very important and detrimental. We can eat in this apartment because it makes us nauseated so therefore we eat in our vehicles, which does not make any sense since we are paying to stay in this apartment. We mask in order to stay in this apartment at night. We try to stay at school as much as possible and come to this apartment at night if possible. We have worked really hard to get into this Master's program at Arkansas State University. We do not believe that we can spend 12 months in this type of living condition. The apartment is located at 1116 apt. 4 Jonesboro, Arkansas 72404.

DESIRED RESOLUTION: We can either move into a better apartment that is thoroughly cleaned or receive refund for this month's rent plus my deposit fee and terminate the contract between the links apartment at jonesboro and Shaletra Jordan and Shanetra Hodge.

BUSINESS RESPONSE: Please see attachment "Receive Business Response."

DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| 01/05/2012 | web | BBB | Case Received by BBB |
| 01/10/2012 | lorp | BBB | Case Reviewed by BBB |
| 01/10/2012 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 01/10/2012 | Otto | EMAIL | Notify Business of Dispute |
| 01/20/2012 | lorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business Response." |
| 01/20/2012 | lorp | EMAIL | Forward Business response to Consumer |
| 01/23/2012 | lorp | BBB | BBB REVIEWS CONSUMER REBUTTAL TO BUSINESS RESPONSE : I am sorry for |

the late reply. The apartment complex did allow us to move out of the apartment without any penalties, but what i do not understand is why we did not get some of my money back for the simple reason that the apartment was not ready for us to move into. We had been calling this apartment complex since Monday prior to us moving in and

EXHIBIT B-1

therefore if you tell me that my apartment is going to be ready on Wednesday then we should not have had any problems with apartment both inside and outside. I mean these guys did not even do a walk through with us, but was steady rushing us to get over to the city water and lights prior to closing. I feel as if I deserve some of my money back if not all because this is not how you do business. As far as the excuse of not having enough staff, that is really not an issue because a lot of jobs work short staff. I am in the medical field and we work short staff all the time and that's like saying that I can not take of you or your family member/friend because we do not have enough staff. Thanks for all your help!

**01/25/2012      lorp    BBB      BUREAU JUDGED CASE AJR :** The business explained that it has allowed the consumer to rescind her lease agreement, although not contractually required to, in response to the consumer's complaints about the condition of the apartment. The business denied that the apartment was not move-in ready. The consumer is not entitled to a refund of her security deposit since she did not comply with the 30 day notice of intent to vacate requirement in her lease agreement. For these reasons, this case is being closed.

**01/25/2012      Otto    EMAIL**  Inform Consumer - Case ADMINISTRATIVELY CLOSED
**01/25/2012      Otto    EMAIL**  Inform Business - Case ADMINISTRATIVELY CLOSED
**01/25/2012      Otto    BBB**    Case ADMINISTRATIVELY CLOSED

**COMPLAINT # 19026386**

**COMPANY INFO**
NAME:     **Lindsey Management Co., Inc.**
-----------------------------------------------------------------------------------------------------------
----------------------

**CONSUMER INFO**
NAME:      **Amanda England**                          DAY PHONE: 501 747-0929
ADDRESS:   4 Weatherwood Lane                          EVE PHONE: 501 912-3100
           Maumelle, AR
           72113                                        EMAIL: amanda.england@rocketmail.com
$ VALUE:   $0.00                                        FAX:
-----------------------------------------------------------------------------------------------------------
----------------------

**DETAILS**
CONCERNING: **Repair Issues**
OPENED      08 March 2011                              CLOSE CODE: 111 - Assumed Resolved
CLOSED      04 December 2012                           CLOSED BY: OttOOtto
ENTERED BY:
ASSIGNED TO: Lori Plant


NATURE OF DISPUTE: I signed a lease in April of 2010. And was not told about any mold/mildew problems, that may occur, although I had stated that my children have allergies to such things. When the winter months started the windows started to sweat which caused water puddles up in the windows.Mold, serious mold, hairy mold, started to grow. I called the manager and filled out a complaint against the problem. They come to clean the mold, but the mold was still there, and they placed small fans in all three windows. Stating that this would fix the problem. It still continued, but was worse than before. Due to my children having a chronic cough and me having to put them back on their inhalers due to the mold I had no choice to find another place to live. My lease wasn't up until March but we moved out Feb. first and turned in a notice to vacate. I was still charged for February's rent and part of March's. Just received a letter in the mail that I am being charged for the damaged window sills, and the drywall repairs due to allowing water to accumulate in the windows, which were rotten and cracked because of the water and mold. It is not the renters fault that the building were built so cheaply! It is poor management skills this problem is not being taken care of, problems like this can kill people! I think that the public should be aware of what they are getting into when they sign a lease with Links @ The Rock! Be prepared for your health to deteriorate!

DESIRED RESOLUTION: I paid for February's rent, even though I didn't live there. I shouldn't have to pay for any of March's rent, nor should I have to pay for the window sills or the drywall repairs that are fully due to the poor and cheap building conditions.

BUSINESS RESPONSE: Please see attachment "Receive Business Response."

DECISION:

ACTIVITY:

| Date | | | Description |
|---|---|---|---|
| 03/03/2011 | web | BBB | Case Received by BBB |
| 03/08/2011 | lorp | BBB | Case Reviewed by BBB |
| 03/08/2011 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 03/08/2011 | Otto | EMAIL | Notify Business of Dispute |
| 03/21/2011 | Otto | BBB | No response to first notice to business |
| 03/21/2011 | Otto | EMAIL | Consumer - Have You Heard From the Company |
| 03/21/2011 | Otto | EMAIL | Reminder of Dispute to Business |
| 04/01/2011 | Otto | BBB | No Response received from Business on 2nd Notice |
| 04/05/2011 | lorp | BBB | BBB PHONE CALL OR ADDITIONAL TIME : Sent an e-mail to Anne Mourney reminding her of the complaint. Requested a response by April 8, 2011. |
| 04/11/2011 | Otto | BBB | No Response received from Business on 2nd Notice |
| 04/15/2011 | lorp | MAIL | FINAL NOTICE TO NON-MEMBER - VIA MAIL/FAX : Sending third and final notice by e-mail, fax, and regular mail. |
| 04/21/2011 | lorp | BBB | Inform Consumer No Response from Business |
| 04/21/2011 | Otto | EMAIL | Inform Consumer - Case Closed UNANSWERED |
| 04/21/2011 | Otto | EMAIL | Inform Business - Case Closed UNANSWERED |
| 04/21/2011 | Otto | BBB | Case Closed - UNANSWERED |
| 11/20/2012 | lorp | BBB | ReOpen the Complaint |

EXHIBIT B-2

| 11/20/2012 | lorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business Response." |
| 11/20/2012 bumped because: Holiday | lorp | EMAIL | FORWARD BUSINESS RESPONSE TO CONSUMER : Complaint Response Date |
| 12/04/2012 | OttO | BBB | No Consumer Response- Assumed Resolved with Letter |
| 12/04/2012 | OttO | EMAIL | Inform Business - Case Closed ASSUMED RESOLVED |
| 12/04/2012 | OttO | BBB | Case closed - ASSUMED RESOLVED |

COMPLAINT # 19024891

COMPANY INFO
NAME:     **Lindsey Management Co., Inc.**
--------------------------------------------------------------------------------------------------------

----------------------
CONSUMER INFO
NAME:     **Teresa Rodriguez**              DAY PHONE:        -
ADDRESS:  2003 Tallwood Drive #12           EVE PHONE:        -
          Paragould, AR
          72450                             EMAIL: ethanjace@yahoo.com
$ VALUE:  $0.00                             FAX:
--------------------------------------------------------------------------------------------------------

----------------------
DETAILS
CONCERNING:  **Billing or Collection Issues**
OPENED       13 December 2010                CLOSE CODE: 111 - Assumed Resolved
CLOSED       05 January 2011                 CLOSED BY: OttOOtto
ENTERED BY:
ASSIGNED TO: Lori Plant


NATURE OF DISPUTE: In September of this year, I cleaned some apartments for Silverwood. I spent $100.00 in cleaning supplies, the man, Brett, who was supposed to turn in the invoice for me to get paid never did and Silverwood refuses to reimburse me. Brett is a friend of the managers and he turned in the invoice for himself and kept the money. The managers told me this. They say that is now between me and Brett. First, the manager was in one of the apartments when I cleaned it, so he knows that I did in deed clean them, and it is completely unfair that they knew what Brett did and didn't advise me of it.

Also, I have been calling for a week now because my heat is out. They still have not fixed it. The solution they gave me was to A) turn on my stove and open the door to it to heat the apartment or B) move to another apartment until they fix it. I have major problems with both of these solutions. First, I have a child who lives with me and leaving the oven on and running IS NOT SAFE. Second, if I do move to another apartment, there is no telling how long it will take them to fix the problem. My down stairs neighbor actuallies bangs on the roof (my floor) because the noise from the heater is so loud.

Next, my front door knob was broke. It took the managers almost 2 months to fix. I sent in 3 requests for they to come and fix the problem and eventually I started to call everyday to see when they would fix the door. It got so bad to where they had to come and open the door for me, either to let me in or let me out. As I have mentioned I have a child who lives with me, what where we supposed to do if, God forbid, the apartment had caught on fire. We live upstairs. I guess JUMP!!!! The excuse they gave me for taking so long for them to fix the door knob was they didn't have one to replace it. The night the manager did show up to fix it, me and my son waited outside in the cold for 45 minutes waiting for him to get there and another 20 minutes while he tried to get the door open himself.

I want my money for cleaning those 2 apartments. These managers are the laziest people who have no idea what they are doing.

DESIRED RESOLUTION: I want a reimbursement of $100.00 for cleaning supplies and then the amount they pay for the 2 apartments I cleaned.

BBB NOTE: THE BBB DOES NOT HANDLE LABOR OR EMPLOYMENT ISSUES. THE CONSUMER IS ADVISED TO CONTACT THE ARKANSAS DEPARTMENT OF LABOR FOR ASSISTANCE IN THESE AREAS. THE ONLY PART OF THIS COMPLAINT THAT CAN BE ADDRESSED BY THE BBB ARE THE REPAIR ISSUES. THE BUSINESS IS ASKED TO RESPOND TO THE REPAIR ISSUES ONLY.

BUSINESS RESPONSE: Please see attachment "Receive Business Response" to view.

DECISION:

ACTIVITY:

**12/10/2010    web    BBB**    Case Received by BBB

EXHIBIT B-3

| 12/13/2010 | Iorp | BBB | Case Reviewed by BBB |
|---|---|---|---|
| 12/13/2010 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 12/13/2010 | Otto | MAIL | Notify Business of Dispute |
| 12/22/2010 | Iorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business Response" to view. |
| 12/22/2010 | Iorp | EMAIL | FORWARD BUSINESS RESPONSE TO CONSUMER : Complaint Response Date bumped because: New Years Holiday |
| 01/05/2011 | OttO | BBB | No Consumer Response- Assumed Resolved with Letter |
| 01/05/2011 | OttO | EMAIL | Inform Business - Case Closed ASSUMED RESOLVED |
| 01/05/2011 | OttO | BBB | Case closed - ASSUMED RESOLVED |

COMPLAINT # 19021318

**COMPANY INFO**

NAME:  **Lindsey Management Co., Inc.**

-----------------------------------------------------------------------------------------------------------------------
--------------------

**CONSUMER INFO**

NAME:  **Sandra Escobedo**                                    DAY PHONE:      -

ADDRESS:  PO Box 1493                                        EVE PHONE:      -

Springdale, AR

72765-1493                                                   EMAIL: sandraescobedo@ymail.com

$ VALUE:  $0.00                                              FAX:

-----------------------------------------------------------------------------------------------------------------------
--------------------

**DETAILS**

CONCERNING:  **Billing or Collection Issues**

OPENED       05 April 2010                        CLOSE CODE: 121 - AJR

CLOSED       06 July 2010                         CLOSED BY: Lori Plant

ENTERED BY:  Lori Plant

ASSIGNED TO: Lori Plant

NATURE OF DISPUTE:       I need to file a complaint about Lindsey & Associates. When I ran my credit report in the year 2007, I had an unknown charge in the amount of $2,433.00. I called the 800 # and was told it was from Lindsey & Associates. I have never rented from Lindsey & Associates. In April of 2003, my mother Magdalena Torrez, had rented a 1bedroom apt. from Lindsey & Associates. I had drove my mother in April 2003 to the Office of Appleby Apts. because she couldnt drive she was elderly and physically disabled. I reeled her into the office of Appleby Apts. in her wheelchair and my mother asked the Office Manager at the time, if she had a one bedroom handicap accessable apt. available. The Office Manager told her the amount of the deposit/monthly rent and that she had to sign a contract for six months. My mother being handicap couldnt write and asked me to fill out the application for her. I asked the Office Manager if I can fill out her paperwork, I dont have Power of Atty. and she said "yes, just put your initials and signature showing you filled it out." While I filled my mom's application for her, my mother paid the Office Manager the deposit money and the lady wrote out a receipt and told her the apt would be ready in a few days. Few days later, I drove my mother back there to the Office of the Apts. and the Office Manager handed me my mom's keys. It was not handicap accessable, it was a one bedroom upstairs apt. My mother and I had told her how is an upstairs apt. handicap accessable, the lady apologized she goofed up, she was fairly new. My mother wanted the deposit back and the woman refused to give it back to her. My mother and i asked what were my mom's options and she said she would put her in a 2 bedroom downstairs temporary and as soon as a one bedroom downstairs would become available she would let her know. My mother lived in the 2 bedroom apt but the office manager never moved her into a one bedroom. She moved out at the 5month because the Apt. needed maintance and no one ever did anything about it. She had called the Office Manager and had told her the bathroom sink was leaking and they never sent anyone out there to repair it.

DESIRED RESOLUTION: This is the United States of America, to my understanding there are no laws that say I have to pay for my mother's so called debt.

BUSINESS RESPONSE: The business has provided a copy of the lease agreement signed by the consumer. To view, please see attachment entitled "Received Business Follow-Up Response/Req'd Info."

DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| 04/05/2010 | lorp | BBB | Case Received by BBB |
| 04/05/2010 | lorp | BBB | Case Reviewed by BBB |
| 04/05/2010 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 04/05/2010 | Otto | EMAIL | Notify Business of Dispute |
| 04/05/2010 | lorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business Response" to view. |
| 04/05/2010 | lorp | EMAIL | Forward Business response to Consumer |

EXHIBIT B-4

COMPLAINT # 19023054

**COMPANY INFO**
NAME:    **Lindsey Management Co., Inc.**
-------------------------------------------------------------------------------------
---------------------

**CONSUMER INFO**
NAME:        **Devon (Nikki) Brisher**          DAY PHONE: 870 450-5702
ADDRESS:     1005 S. 22nd St Apt 3              EVE PHONE:        -
             Paragould, AR
             72450                              EMAIL: nik7_rn@yahoo.com
$ VALUE:     $0.00                              FAX:
-------------------------------------------------------------------------------------
---------------------

**DETAILS**
CONCERNING:  **Contract Issues**
OPENED       09 August 2010                     CLOSE CODE: 121 - AJR
CLOSED       13 August 2010                     CLOSED BY: Lori Plant
ENTERED BY:
ASSIGNED TO: Lori Plant


NATURE OF DISPUTE: Lindsey Management (Silverwood Apartments)
2200 Clubhouse Drive
Paragould, AR 72450
870 239-3815
www.LindseyManagement.com


I rented an apartment in March 2010, I was shown a very nice apartment, and when I signed my
lease and paid my money I recieved my key to my apartment. Upon entering my apartment for the
first time, the carpets were dirty, the walls were partially painted, there was a dryer in the living room
floor, and one of the bathrooms was under construction. I then called the managers and they said
they would have it ready within the week, so I still couldnt move in my apartment. they then called
about a week 4 days later and said it was ready but the bathroom wasnt done and someone would be
there to finish it soon but I could go ahead and move in.  So i told them ok and would leave that
bathroom off limits till they got it done. Then they gave me a form to fill out, to list anything thats
wrong with the apartment and I had 48 hours to complete it.  I gave it back to them and had listed
several other small things like stains on the carpet, broken microwave handle, two tears in the living
room carpet, and tears in the kitchen flooring. None of those things have been addresses either. Its
been 5 months and these things are still not done, and I have submitted several requests that they be
done. I requested that they deduct the difference in a one and a two bathroom apartment and to
reimburse me the difference for the first 4 months and they agreed to do that but only take it off my
rent. July's rent I paid them for a one bath.  This month I paid them for a one bath and deducted the
difference and when paying them, they excepted it. I also gave them written request to have all things
wrong completed within 7 days or I would move out and they would be in default of the lease
according to the contracted lease. I had went out of town after that and when I came home I had a
note on my door stating that I still owed the difference or they would evict me. I was also told that
they could enter my apartment any time to do things that need to be done.  I told them I didnt really
like not knowing when they were there, and I was told then that anytime they enter an apartment
they have to leave a note stating they were there.  Well there have been two incidences where my
apartment was entered and my door was left unlocked and my lights were left on. The grounds are
suppose to be kept clean but they are not.

DESIRED RESOLUTION: All I am asking is that they honor our verbal agreemnet to reimburse me by taking
the difference from my rent, that I be allowed out of this contract lease and my 500.00 deposit money
be returned, because I cant live in a place like this.  So far Ive only been lied to and cant trust them
to make things right at this point.

BUSINESS RESPONSE: Please see attachment "Receive Business Response" to view.

DECISION:

EXHIBIT B-5

ACTIVITY:

| 08/09/2010 | web | BBB | Case Received by BBB |
| 08/09/2010 | lorp | BBB | Case Reviewed by BBB |
| 08/09/2010 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 08/09/2010 | Otto | EMAIL | Notify Business of Dispute |
| 08/10/2010 | lorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business Response" to view. |
| 08/10/2010 | lorp | EMAIL | Forward Business response to Consumer |

08/12/2010   WEB   BBB   BBB REVIEWS CONSUMER REBUTTAL TO BUSINESS RESPONSE : (The consumer indicated he/she DID NOT accept the response from the business.)

I do not accept thier response. Everything they are saying is a lie. They state that all my complaints have been addressed by the seven days that I gave them and they have not. I asked that the bathroom be finished, the paint job to be redone because it looks horrible, the carpets are dirty, the mircowave handle is still broken, among several other small things that I had mentionsed when I first moved in. They say that I have not submitted any requests for things to be done and I have on several occations. They say the things that I listed originally are "cosmetic" and dont affect my living here. Well thats there opinion. If I had known all these things were wrong before I signed my lease, I would not have rented this place. But I had already signed the lease and therefore have tried to give them resonible time to fix these things and they still have not. As far as them saying they have no record of me submitting requests, I have a copy of the last time I submitted a request but only listed the bigger issues. I did not make copies of the first few times I made requests because at that time I trusted them to do what they were suppose to. I was also told by the onsite apartment management on Monday 8/9/10 that they would let me out of this lease and I would get all of my deposit money back. There were also several witnesses to that conversation, including Tonya, Tyler, and another resident of the apartment Brianna Denham and her two children. As far as people entering my apartment to do things that are neccesary, I was aware according to the lease that they could do that but they had to leave a note stating they were there, which they did not do. I was also told by Mica on the phone when I spoke to her about my door being left unlocked, her respose was that Rid A Pest had been there and Tyler was with them. The only problem I have with that is the fact that they handed out monthly news letters for the month of August and my building which is 1005 isnt scheduled for Rid A Pest until August 25th. So that leds me to believe they are lying as to why they were in my apartment. I feel my rights have been violated and that this apartment was rented to me under what you would call "false advertisment". When I first leased this apartment I was excited to move here, but it was a different story after I was giving my key and got to see my apartment. It was not what I had expected but I tried to give them the benifit of the doubt and let them fix these issues but they dont seem to care. And like I said before Im not the only one that has had thses issues.

08/13/2010   lorp   BBB   BUREAU JUDGED CASE AJR : The Better Business Bureau has determined that this complaint should be administratively closed. Per the consumer's lease agreement with the business, the consumer agreed that any modifications or amendments to the contract must be in writing. Consequently, any verbal agreements not in writing will not be effective. The business explained that if the consumer has repair issues with the apartment, that the consumer should submit a maintenance repair request. The BBB is unable to find that the consumer is entitled to be released from the lease agreement under the circumstances presented in the complaint.

| 08/13/2010 | Otto | EMAIL | Inform Consumer - Case ADMINISTRATIVELY CLOSED |
| 08/13/2010 | Otto | EMAIL | Inform Business - Case ADMINISTRATIVELY CLOSED |
| 08/13/2010 | Otto | BBB | Case ADMINISTRATIVELY CLOSED |

COMPLAINT # 19023365

**COMPANY INFO**
NAME:  **Lindsey Management Co., Inc.**
----------------------------------------------------------------------------------------------------
--------------------

**CONSUMER INFO**
NAME:      **Michael Spencer**              DAY PHONE: 615 372-4783
ADDRESS:   6504 Alyssa Lane                EVE PHONE:      -
           Rogers, AR
           72758                            EMAIL: mspencerus@yahoo.com
$ VALUE:    $0.00                           FAX:
----------------------------------------------------------------------------------------------------
--------------------

**DETAILS**
CONCERNING: **Billing or Collection Issues**
OPENED      30 August 2010              CLOSE CODE: 121 - AJR
CLOSED      13 December 2012            CLOSED BY: Lori Plant
ENTERED BY:
ASSIGNED TO: Lori Plant


NATURE OF DISPUTE: I leased a property at 603 Picadilly Street, Bentonville, AR 72712 for 3 1/2 years. I had a $600 security deposit that has not been returned. In January of this year, I vacated the property. This was two weeks prior to the expiration of the lease. During the tour of the property, Lindsey Management informed me that they were impressed with the cleanliness of the property. Lindsey then sent me a bill for $945.39 for painting and carpet cleaning. After applying my deposit, that left a $345.39 bill.

Paragraph 21 of the lease only authorizes Lindsey Property Management to deduct reasonable charges from the security deposit and does not authorize the company to seek further payment beyond the deposit. Moreover, Lindsey claims that there were holes that needed to be filled in the walls and for the walls to be repainted. Nevertheless, there were never any pictures or items hung on the walls. Lindsey has refused to show me any invoice showing such issues. I sent a certified letter on February 9, 2010 disputing theses charges. Lindsey then violated the Federal Debt Collections Practices Act by hiring a collection agency to collect this erroneous "debt". My attorney, Tim Hutchinson, wrote a letter to them with the above concerns and demanded that my deposit be returned. Instead, Lindsey has now attempted to ruin my credit history by having this infomration placed on my credit reports with Equifax, Experian and TransUnion.

DESIRED RESOLUTION: I am demanding my $600 deposit and removal of this erroneous "debt" from my credit history.

BUSINESS RESPONSE: Please see attachment "Receive Business Response."

DECISION:

ACTIVITY:

| Date | | | Description |
|---|---|---|---|
| 08/30/2010 | web | BBB | Case Received by BBB |
| 08/30/2010 | lorp | BBB | Case Reviewed by BBB |
| 08/30/2010 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 08/30/2010 | Otto | EMAIL | Notify Business of Dispute |
| 09/10/2010 | OttO | BBB | No response to first notice to business |
| 09/10/2010 | OttO | EMAIL | Consumer - Have You Heard From the Company |
| 09/10/2010 | OttO | FAX | Reminder of Dispute to Business |
| 09/21/2010 | OttO | BBB | No Response received from Business on 2nd Notice |
| 09/28/2010 | OttO | BBB | No Response received from Business on 2nd Notice |
| 09/28/2010 | OttO | BBB | BBB PHONE CALL OR ADDITIONAL TIME : In a phone conversation, the corporate counsel for Lindsey Management Co., Inc. stated that she would be submitting a response to this complaint. |
| 10/04/2010 | OttO | BBB | No Response received from Business on 2nd Notice |
| 10/04/2010 | lorp | MAIL | FINAL NOTICE TO NON-MEMBER - VIA MAIL/FAX : Being sent via e-mail, fax, and regular mail. |
| 10/13/2010 | lorp | BBB | BBB PHONE CALL OR ADDITIONAL TIME : From: Lori Plant |

Sent: Wednesday, October 13, 2010 12:07 PM

EXHIBIT **B-6**

To: 'Anne Mourney'
Subject: UNANSWERED COMPLAINT: Case # 19023365: Michael Spencer
Importance: High
Dear Ms. Mourney:
I am afraid that we will have to close this complaint as unanswered if we do not get a response within three days. We sent the third and final notice on October 4, 2010, and still have not received a response. A copy of the third and final notice is attached.
Thank you for your time on this matter, and please let me know if you have any questions or concerns.
Sincerely,
Lori A. Plant - Director, Dispute Resolution

| | | | |
|---|---|---|---|
| 10/18/2010 | OttO | BBB | No Response received from Business on 2nd Notice |
| 10/18/2010 | lorp | BBB | Inform Consumer No Response from Business |
| 10/18/2010 | lorp | EMAIL | Inform Consumer - Case Closed UNANSWERED |
| 10/18/2010 | Otto | EMAIL | Inform Business - Case Closed UNANSWERED |
| 10/18/2010 | Otto | BBB | Case Closed - UNANSWERED |
| 11/20/2012 | lorp | BBB | ReOpen the Complaint |
| 11/20/2012 | lorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business Response." |
| 11/20/2012 | lorp | EMAIL | Forward Business response to Consumer |
| 11/20/2012 | WEB | BBB | BBB REVIEWS CONSUMER REBUTTAL TO BUSINESS RESPONSE : (The consumer indicated he/she DID NOT accept the response from the business.) |

There are four succinct issues. First, paragraph 21 of the lease argreement only authorizes Lindsey Property Management to deduct "reasonable charges" from the security deposit and does not authorize the company to seek further payment from the tenant beyond the depositt. Secondly, Ms. Christle White personally toured the property and informed me that the residence was thoroughly cleaned. Thirdly, Lindsay Property Management illegally authorized Southwest Credit Systems to harass me in violation of the FDCPA. Fourth, Lindsay Property has attempted to ruin my credit rating by submitting this fraudulent charge to several credit reporting agencies.

Complaint Response Date bumped because: Holiday

| | | | |
|---|---|---|---|
| 11/27/2012 | lorp | MAIL | BBB REQUESTS INFORMATION FROM THE CONSUMER  : E-mailed consumer requesting copy of lease agreement. |
| 12/03/2012 | lorp | BBB | RECEIVED CONSUMER'S FOLLOW-UP RESPONSE : Please see attachment "Received Consumer's Follow-up Response." |
| 12/13/2012 | lorp | BBB | BUREAU JUDGED CASE AJR : The BBB has determined that this case should be administratively closed. The resident is liable, under Paragraph 23 of the lease agreement, for damages or repairs to the house or its contents. Consequently and contrary to the consumer's allegation, the lease does not provide that the business is only authorized to hold the tenant's security deposit in the event of damages to the property. For this reason, the BBB is closing this case at this time. The consumer may wish to speak with a private attorney if he chooses to pursue the matter further. |
| 12/13/2012 | Otto | EMAIL | Inform Consumer - Case ADMINISTRATIVELY CLOSED |
| 12/13/2012 | Otto | EMAIL | Inform Business - Case ADMINISTRATIVELY CLOSED |
| 12/13/2012 | Otto | BBB | Case ADMINISTRATIVELY CLOSED |

COMPLAINT # 19024193

**COMPANY INFO**
NAME:   **Lindsey Management Co., Inc.**
-----------------------------------------------------------------------------------------------------
-----------------------

**CONSUMER INFO**
NAME:       **Khalen Laubaugh**              DAY PHONE: 269 365-8008
ADDRESS:    194 Delaware Circle              EVE PHONE:       -
            Little Rock AFB, AR
            72099                            EMAIL: laubaughk@yahoo.com
$ VALUE:    $0.00                            FAX:
-----------------------------------------------------------------------------------------------------
-----------------------

**DETAILS**
CONCERNING:   **Billing or Collection Issues**
OPENED        25 October 2010                CLOSE CODE: **110 - Resolved**
CLOSED        26 October 2010                CLOSED BY: **Lori Plant**
ENTERED BY:
ASSIGNED TO: Lori Plant


NATURE OF DISPUTE: links at sherwood
3514 east kiehl ave
Sherwood, AR 72120
501 833-8010


Upon move out of the premises i showed up in person to turn in my keys and for the associates to
inspect the premises before my final move out so they may let me know what needs to be done to
avoid charges. They informed me that they would tell the manager to call me. I later called 3 times to
scheduel an appointment each time, the associates ask me to leave my number to have the manager
call back. After no sucess i droped the issue. 3 weeks later i recieved a notice in the mail that i owed
$165 for cleaning, carpet cleaning, painting. I then called back a total of 3 more times only to go
through the same run around. I then showed up to the apartment complex to see the manager who
was not there yet again. Also contained in my lease was a clause that states minimum charges upon
move out. In this clause there was no number instead the letters MAC wich is to indicate I'm military.
When moving in I specifically aske of this clause for them to explain it further. I was told that because
i am military that I have to pay no deposite and I would not have to worry about this section.
Contained in my notice is no account information, a number (5018338010) with no names which when
i call i am told to leave my number for a call back. No payment methods are explained only a mailing
address 3434 east kiehl ave, sherwood ar 72120. Also stated was the inspection date which was 10
days after i moved out. No damages are noted only $45 for cleaning, $45 for painting, $15 cost of
paint, $60 carpet cleaning. Also upon move out I used my own carpet cleaner on the floors and
thoroughly cleaned the appt. I still have yet to hear a responce 4 days after calling about this bill.

DESIRED RESOLUTION: I am looking to have the bill dropped since no one will help me in this matter nor
provide proof of the matter. Also considering my lease is singed stating that there is no move out fee
which I have a copy of.

BUSINESS RESPONSE:

DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| 10/23/2010 | web | BBB | Case Received by BBB |
| 10/25/2010 | lorp | BBB | Case Reviewed by BBB |
| 10/25/2010 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 10/25/2010 | Otto | EMAIL | Notify Business of Dispute |
| 10/26/2010 | lorp | BBB | DISPUTE RESOLVED- WITH LETTER : i have recieved a notice in the mail |

concerning my complaint. The notice states that my bill has been dropped and I no longer have a balance that I
owe to them. Thank u for your help.

| | | | |
|---|---|---|---|
| 10/26/2010 | Otto | EMAIL | Inform Business - Case Closed RESOLVED |
| 10/26/2010 | Otto | BBB | Case Closed RESOLVED |

EXHIBIT B-7

COMPLAINT # 19025234

**COMPANY INFO**
NAME: **Lindsey Management Co., Inc.**
----------------------------------------------------------------------------------------------------
--------------------
**CONSUMER INFO**
NAME: **SARA DRIGGS**                          DAY PHONE:    -
ADDRESS: 1806 SE MOBERLY MANOR APT 16          EVE PHONE:    -
Bentonville, AR
72712                                          EMAIL: FLOWERCHILDDRIGGS@YAHOO.COM
$ VALUE: $0.00                                 FAX:
----------------------------------------------------------------------------------------------------
--------------------
**DETAILS**
CONCERNING: **Customer Service Issues**
OPENED     06 January 2011                      CLOSE CODE: 110 - Resolved
CLOSED     07 February 2011                     CLOSED BY: OttOOtto
ENTERED BY:
ASSIGNED TO: Lori Plant


NATURE OF DISPUTE: Hole in ceiling and bugs in apartment that is cleaned regularly- children run and play in streets and 9 month old tenant above us is very loud; toilet is often broken and windows can become moldy- we were told to buy product ourselves to fix it. Good tenants and pay our rent on time automatically each month.
  When I called the Resident Relations Director she accused me of having "bed bugs" and told me she did not "have a degree in child development" but was "pretty sure the 9 month old above you cannot run in the street". Told me to complain to BBB if I "felt like i had to".

DESIRED RESOLUTION: I want out of my lease or an apology from the company for the level of service.

BUSINESS RESPONSE: Please see attachment "Receive Business Response" to view.

DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| 01/06/2011 | web | BBB | Case Received by BBB |
| 01/06/2011 | jend | BBB | Case Reviewed by BBB |
| 01/06/2011 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 01/06/2011 | Otto | EMAIL | Notify Business of Dispute |
| 01/17/2011 | Otto | BBB | No response to first notice to business |
| 01/17/2011 | OttO | EMAIL | Consumer - Have You Heard From the Company |
| 01/17/2011 | OttO | EMAIL | Reminder of Dispute to Business |
| 01/28/2011 | OttO | BBB | No Response received from Business on 2nd Notice |
| 02/03/2011 | lorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business |

Response" to view.
| 02/03/2011 | lorp | EMAIL | Forward Business response to Consumer |
| 02/05/2011 | WEB | BBB | DISPUTE RESOLVED- WITH LETTER : (The consumer indicated he/she |

ACCEPTED the response from the business.)
| 02/07/2011 | OttO | EMAIL | Inform Business - Case Closed RESOLVED |
| 02/07/2011 | OttO | BBB | Case Closed RESOLVED |

EXHIBIT **B-8**

**04/07/2010    lorp    BBB**    BBB REVIEWS CONSUMER REBUTTAL TO BUSINESS RESPONSE : The Company's response is not satisfactory because I still have that charge of $2,433.00 on my credit reports.  When I called the 800# it was Southwest Credit Systems on behalf of Lindsey.  I need that charge to be removed from my credit reports on the 3 Credit Bureaus immediately because I never rented from Lindsey & Associates or Lindsey Management Company.  I havent been able to get a loan from any bank to buy a house or anything because of that charge on my credit reports.

Thank You,

**04/07/2010    lorp    EMAIL**    CASE AGAINST WRONG COMPANY - LETTER TO CONSUMER : The business has indicated that it has no record of this consumer. The consumer has been advised by our office to seek a resolution with Southwest Credit Systems regarding this issue. If the consumer feels that her case was closed in error, or obtains information to this effect, she should contact our office and we will consider reopening the case.

**04/07/2010    Otto    BBB**    Case Closed as UNABLE TO PROCESS

**06/14/2010    lorp    BBB**    ReOpen the Complaint

**06/14/2010    lorp    BBB**    RECEIVED BUSINESS FOLLOW-UP RESPONSE / REQ'D INFO. : Please see attachment "Received Business Follow-Up Response/Req'd Info." to view amended response by business.

**06/14/2010    lorp    EMAIL**    Forward Business' Second Response to Consumer

**06/14/2010    WEB    BBB**    RECEIVED CONSUMER'S FOLLOW-UP RESPONSE : (The consumer indicated he/she DID NOT accept the response from the business.)

I do not accept this business' resolution because as I mentioned before I have never rented from Lindsey & Associates. I am disputing this inaccurate charge on my credit report.

**06/16/2010    lorp    MAIL**    BBB REQUESTS INFORMATION FROM THE BUSINESS : The BBB has requested a copy of the lease agreement from the business.

**06/16/2010    lorp    BBB**    RECEIVED BUSINESS FOLLOW-UP RESPONSE / REQ'D INFO. : The business has provided a copy of the lease agreement signed by the consumer. To view, please see attachment entitled "Received Business Follow-Up Response/Req'd Info."

**06/16/2010    lorp    EMAIL**    FORWARD BUSINESS' SECOND RESPONSE TO CONSUMER : The Better Business Bureau is asking that the consumer provide a response as to the signed lease agreement produced by the business.

**06/23/2010    lorp    BBB**    RECEIVED CONSUMER'S FOLLOW-UP RESPONSE : From: Sandra Escobedo

Sent: Monday, June 21, 2010 5:26 PM

To: Better Business Bureau

Subject: Re: BBB Complaint Case#19021318(Ref#71-6737-19021318-24-4100)

I am disputing the charge of $ 2,433.00. My mother, Magdalena Torrez did rent an apt. at Appleby Apts. in the year 2004. She only rented for 5 months, because the property manager never repaired anything that was wrong with the apt.

When my mother had first moved in there were many problems with the apt.

I remember many times my mother would call me just to tell me she called the property manager to tell her about a bathroom leak.  The property manager had told her many times she was sending a plumber out there and never did. My mother even broke her hip because she slipped on water that came from the leak in the bathroom. It would have helped it it would have been handicap accessible, no handrails or anything for her to grab a hold of. The property manager had lied to her and told her it was handicap accessible.

I am not responsible to pay for my mother's so called debt. I do not have to pay for something I do not owe.  It is not right that im being charged the amount of $ 2433.00 because of a Property Manager who was fairly new and didnt have good ethics.

*The property manager put MY MOM in a 2bedroom downstairs because she had goofed up and had told my mother she had a one bedroom downstairs. But in reality she only had a one bedroom upstairs. THE PROPERTY MANAGER ASKED ME IF I WAS GOING TO LIVE THERE AND I TOLD HER NO. I had disclosed to the property manager that I was a FULL TIME STUDENT and living with my boyfriend in Springdale, AR*

Lindsey & Associates, Please forgive my mother's so called Debt. My mother has passed away.

I was reviewing the correspondence, that is not my handwriting. My last name is misspelled on that document which seems to be a contract. My last name is Escobedo.

**06/24/2010    lorp    EMAIL**    Forward Consumer Rebuttal to Business

**07/05/2010    Otto    BBB**    No Response from Business to Consumer Info

**07/06/2010    lorp    BBB**    BUREAU JUDGED CASE AJR : The Better Business Bureau has determined that this complaint should be administratively closed. Documentation provided to the BBB shows that the consumer signed a rental application and lease agreement, rendering her liable for rental expenses associated with the rental property. If the consumer wishes to pursue this matter further, she is advised to speak with a private attorney.

**07/06/2010    Otto    EMAIL**    Inform Consumer - Case ADMINISTRATIVELY CLOSED

**07/06/2010    Otto    EMAIL**    Inform Business - Case ADMINISTRATIVELY CLOSED

**07/06/2010    Otto    BBB**    Case ADMINISTRATIVELY CLOSED

COMPLAINT # 19020600

**COMPANY INFO**

NAME:  **Lindsey Management Co., Inc.**

-------------------------------------------------------------------------------------------------------
-----------------------

**CONSUMER INFO**

| | | | |
|---|---|---|---|
| NAME: | **Marcus Kennedy** | DAY PHONE: | - |
| ADDRESS: | 7365 River Pointe Dr. | EVE PHONE: | - |
| | North Little Rock, AR | | |
| | 72113 | EMAIL: marcuskennedy@hotmail.com | |
| $ VALUE: | $0.00 | FAX: | |

-------------------------------------------------------------------------------------------------------
-----------------------

**DETAILS**

CONCERNING:  **Refund or Exchange Issues**

| | | | |
|---|---|---|---|
| OPENED | 11 February 2010 | CLOSE CODE: 111 - Assumed Resolved | |
| CLOSED | 26 March 2010 | CLOSED BY: OttOOtto | |

ENTERED BY:

ASSIGNED TO: Lori Plant

NATURE OF DISPUTE: The Link at the Rock
12025 Paul Eells Drive
North Little Rock, AR 72113

I went to The Links at the Rock for a showing of a 2 bedroom 2 bath apartment and was told that there were some available. on February 4, 2010 I submitted an application with a security deposit because I was told by Fredrick that there were some 2bedroom 2 bath apartments available. on Friday, February 5, my husband called to check status of application and was told it was not complete due to the credit processor being down.  On Saturday, February 6,2010 my husband went by The Links at the Rock and was told by Leslie the application was incomplete still and my husband was asked for a previous landlord's name and number. This information was provided, and the landlord was contacted and the application was complete at that time.  At this time Leslie stated there were no apartments available.  Fredrick stepped in called the manager Jeannie to ask for permission to move furniture from a furnished apartment for us and was told that could not be done.  Then we were told there would be no apartments available by march 1st.  When asking for the security deposit back on February 9th we were told by Katie it was non refundable.  On February 10th we went in to see Jeannie and was not seen by Jeannie but by her husband David Wolski.  David told us that they do move furniture and that they did have apartments available but we could not receive the security deposit back because it was in the application.  When I restated that the application states that the deposit will not be credited if the applicant declined a reserved apartment.  (We never had an apartment on reserve because we were told that there were no apartments available after paying a deposit on an apartment that we were told by Fredrick was available but couldn't be reserved until after the credit check).  After talking with David today, February 10 we were directed to resident relations, and we talked with Wendy and she stated that she doesn't believe what we were saying because she never has any complaints from this office, but she would investigate the issue.  After approximately 15 min Wendy called back saying she had investigated the issue and we would not receive a refund of the security deposit.

DESIRED RESOLUTION: I would like my security deposit back.

BUSINESS RESPONSE: Please see attachment "Receive Business Response" to view.

DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| 02/10/2010 | web | BBB | Case Received by BBB |
| 02/11/2010 | lorp | BBB | Case Reviewed by BBB |
| 02/11/2010 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 02/11/2010 | Otto | EMAIL | Notify Business of Dispute |
| 03/01/2010 | OttO | BBB | No response to first notice to business |
| 03/01/2010 | OttO | EMAIL | Consumer - Have You Heard From the Company |

EXHIBIT B-9

| 03/01/2010 | OttO | EMAIL | Reminder of Dispute to Business |
| 03/12/2010 | OttO | BBB | No Response received from Business on 2nd Notice |
| 03/12/2010 | lorp | MAIL | FINAL NOTICE TO NON-MEMBER - VIA MAIL/FAX : Left message for Ms. Mourney indicating that I was sending final notice of complaint today and that business will have five days to respond before complaint is closed as unanswered. Sending final notice via fax and e-mail. |
| 03/15/2010 | lorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business Response" to view. |
| 03/15/2010 | lorp | EMAIL | Forward Business response to Consumer |
| 03/26/2010 | OttO | BBB | No Consumer Response- Assumed Resolved with Letter |
| 03/26/2010 | OttO | EMAIL | Inform Business - Case Closed ASSUMED RESOLVED |
| 03/26/2010 | OttO | BBB | Case closed - ASSUMED RESOLVED |

COMPLAINT # 19039208

<u>COMPANY INFO</u>
NAME:   **Lindsey Management Co., Inc.**
------------------------------------------------------------------------------
----------------------

<u>CONSUMER INFO</u>
NAME:        **Lisa Doering**                    DAY PHONE: 573 777-0284
ADDRESS:     6 W G.E. Patterson Avenue #402      EVE PHONE:     -
             Memphis, TN
             38103                               EMAIL: lisa.doering@fedex.com
$ VALUE:     $0.00                               FAX:
------------------------------------------------------------------------------
----------------------

<u>DETAILS</u>
CONCERNING:   **Refund or Exchange Issues**
OPENED        02 October 2012                    CLOSE CODE: 121 - AJR
CLOSED        10 January 2013                    CLOSED BY: Lori Plant
ENTERED BY:
ASSIGNED TO: Lori Plant

NATURE OF DISPUTE: *I did not receive a full refund of my security deposit. I left the unit in better shape when I left than what it was when I moved in.*
*I was charged for cleaning, painting, cost of paint, carpet cleaning and for drip pans from my security deposit. I did not hang any pictures or anything for that matter on walls. I did not cook there, thus stove was immaculate. I vacuumed and cleaned thoroughly before I vacated. The unit looked and smelled better when I left than when I moved in. It appears that this place falsely listed charges just to retain the majority of my deposit.*

DESIRED RESOLUTION: *Based on the way I lived and the way I left the apartment, I deserve my security deposit back in its entirety.*

BUSINESS RESPONSE: See attachment.

DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| **09/25/2012** | **web** | **BBB** | Case Received by BBB |
| **10/01/2012** | **lorp** | **MAIL** | BBB REQUESTS INFORMATION FROM THE CONSUMER : The BBB is sending an e-mail to the consumer requesting the name and address of the apartment complex at issue. |
| **10/02/2012** | **lorp** | **BBB** | RECEIVED CONSUMER'S FOLLOW-UP RESPONSE : Good morning, |

   Yes. It is the Greens at Irene complex at 8285 Irene Boulevard, Memphis, TN 38125
   My best, Lisa Doering

| | | | |
|---|---|---|---|
| **10/02/2012** | **lorp** | **EMAIL** | Notify Business of Dispute |
| **10/15/2012** | **OttO** | **BBB** | No response to first notice to business |
| **10/15/2012** | **OttO** | **EMAIL** | Consumer - Have You Heard From the Company |
| **10/15/2012** | **OttO** | **EMAIL** | Reminder of Dispute to Business |
| **10/26/2012** | **OttO** | **BBB** | No Response received from Business on 2nd Notice |
| **11/02/2012** | **lorp** | **BBB** | MORE INFO RECEIVED FROM THE CONSUMER : I have not yet heard anything from this business. |
| **12/03/2012** | **lorp** | **BBB** | BBB PHONE CALL OR ADDITIONAL TIME : Sent e-mail reminder to company. |
| **12/07/2012** | **OttO** | **BBB** | No Response received from Business on 2nd Notice |
| **01/09/2013** | **lorp** | **BBB** | RECEIVE BUSINESS RESPONSE : See attachment. |
| **01/09/2013** | **lorp** | **EMAIL** | Forward Business response to Consumer |
| **01/10/2013** | **WEB** | **BBB** | BBB REVIEWS CONSUMER REBUTTAL TO BUSINESS RESPONSE : (The consumer indicated he/she DID NOT accept the response from the business.) |

   The apartment was not clean when I moved in and I stated that on the move in form. They state here that I didn't mention it, when I in fact DID. The apartment was NOT recleaned either after I moved in. That is also a false statement. The apartment did NOT need recleaning after I moved out because I cleaned it thoroughly...I left it in better shape when I moved out than it was when I moved in. I didn't even hang one picture on the walls...they did not need repainting either. Also, I didn't even use the stove, and they claimed the stove needed new drip pans. It did NOT. I basically only used that place to store a few items and clothes and slept there.

| | | | |
|---|---|---|---|
| **01/10/2013** | **lorp** | **BBB** | BUREAU JUDGED CASE AJR : The BBB has determined that this case should be administratively closed. The business alleges that, in her lease agreement, the consumer agreed to contractually fixed cleaning charges with the minimum charge fixed at $150. The consumer does not deny this in her rebuttal |

statement. The BBB is unable to find that the business did not act within the terms of the lease agreement. If the consumer wishes to pursue the matter further, she may consider speaking with a private attorney or pursuing the matter in small claims court.

**01/10/2013**   **Otto**   **EMAIL**   Inform Consumer - Case ADMINISTRATIVELY CLOSED
**01/10/2013**   **Otto**   **EMAIL**   Inform Business - Case ADMINISTRATIVELY CLOSED
**01/10/2013**   **Otto**   **BBB**   Case ADMINISTRATIVELY CLOSED

COMPLAINT # 19038629

**COMPANY INFO**
NAME: **Lindsey Management Co., Inc.**
-----------------------------------------------------------------------------------------
-----------------------

**CONSUMER INFO**
NAME: **WHITNEY DIONNE MOORE**     DAY PHONE: 501 410-4603
ADDRESS: 400 N. PALM ST APT 60     EVE PHONE: 501 945-4997
NORTH LITTLE ROCK, AR
72114     EMAIL: *moorew08@yahoo.com*
$ VALUE: $250.00     FAX:
-----------------------------------------------------------------------------------------
-----------------------

**DETAILS**
CONCERNING: **Refund or Exchange Issues**
OPENED     31 August 2012     CLOSE CODE: 111 - Assumed Resolved
CLOSED     15 October 2012     CLOSED BY: OttOOtto
ENTERED BY:
ASSIGNED TO: Lori Plant

NATURE OF DISPUTE: On July 17th, 2012 my roommate and I were interested in renting a dwelling from the Links starting the month of September 2012. We applied and turned in our applications along with a check for $280.00 dollars to cover the deposit and application fee. We were told that the deposit would refunded if they could not accommodate us by the time of our desired move in date. A week later the check cleared the account and we were informed that we were approved and would be contacted with further notice of a dwelling for the month of September. August 1st, 2012 office assistant Andrea called to see if we wanted to move in a month in advance. We informed them that we wanted to move in September 2012. August 14th, 2012 office assistant Kimberly called and assigned apartment 9804 to us and stated they would receive the keys back by August 28th, and it would take two to three days for them to clean the apartment. She said the apartment would be available at the beginning of September which was acceptable. August 28th, office assistant Kimberly contacted us and asked "Would you mind moving your location to the back-side of the apartment building?" I stated "No, we would prefer to keep the assigned apartment on the front-side of the building" Kimberly stated that was acceptable and said she would inform her office. A few hours later Kimberly called back and stated that the apartment was available for "move-in" and we specified for the second time that we would like to move on September 1st. At that time Kimberly then stated that the assigned apartment had been given away to another tenant because he didn't like the area that was initially offered to him. I asked when had the apartment been given away and she stated "Mid August". I then asked why would she ask if we wanted to switch apartments if she had already given the assigned apartment away. She could not give me a valid answer. She then told me if we did not take the newly assigned apartment that we would be placed on a waiting list. The next available apartment would be in October. She also stated if we didn't want to be placed on the waiting list then we would forfeit the deposit. I then called the office and spoke to Christy about transferring the deposit to another Lindsey Management Property and she transferred me to the Manager. He stated to me "We offered you dwelling 9804 which you declined and now we have 9404 which you are declining so we cannot transfer the deposit." I then explained to him that we had accepted 9804, but the apartment was given away without being informed. He then stated " Oh well  we have another apartment now if you don't want it you forfeit your deposit". I asked him again was there not any other way to get the deposit transferred and he stated no again and abruptly ended the conversation. Product_Or_Service: Deposit
Account_Number: Contract

DESIRED RESOLUTION: DesiredSettlementID: Other (requires explanation)
So now I am seeking assistance from legal aid to see if a letter of recommendation can be issued to Lindsey Mgmt to allow us to transfer the deposit to the Eagle Hill location so we can rent a dwelling there. If not we would like to receive the refund of the deposit.

BUSINESS RESPONSE: Lori:

I cannot ascertain which apartment community Ms. Moore is submitting a complaint against. As you know, Lindsey Management Co., Inc. provides management and administrative services to apartment

communities and other property owners, on behalf of their owners. There are several apartment communities in Arkansas (and outside of Arkansas) called "The Links," and I do not know at which apartment community Ms. Moore applied. Upon receipt of this information, I will promptly request a copy of Ms. Moore's application file from the property manager and prepare a response on behalf of the apartment community.

Thank you,

Sara E. Heck
Lindsey Management Co., Inc.


DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| 08/31/2012 | web | BBB | Case Received by BBB |
| 08/31/2012 | lorp | BBB | Case Reviewed by BBB |
| 08/31/2012 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 08/31/2012 | Otto | EMAIL | Notify Business of Dispute |
| 09/11/2012 | OttO | BBB | No response to first notice to business |
| 09/11/2012 | OttO | EMAIL | Consumer - Have You Heard From the Company |
| 09/11/2012 | OttO | EMAIL | Reminder of Dispute to Business |
| 09/24/2012 | OttO | BBB | No Response received from Business on 2nd Notice |
| 10/02/2012 | lorp | BBB | BUSINESS REQUESTS ADDITIONAL INFORMATION : Lori: |

     I cannot ascertain which apartment community Ms. Moore is submitting a complaint against. As you know, Lindsey Management Co., Inc. provides management and administrative services to apartment communities and other property owners, on behalf of their owners. There are several apartment communities in Arkansas (and outside of Arkansas) called "The Links," and I do not know at which apartment community Ms. Moore applied. Upon receipt of this information, I will promptly request a copy of Ms. Moore's application file from the property manager and prepare a response on behalf of the apartment community.

     Thank you,

     Sara E. Heck
     Lindsey Management Co., Inc.

| | | | |
|---|---|---|---|
| 10/02/2012 | lorp | EMAIL | Forward Business response to Consumer |
| 10/15/2012 | OttO | BBB | No Consumer Response- Assumed Resolved with Letter |
| 10/15/2012 | OttO | EMAIL | Inform Business - Case Closed ASSUMED RESOLVED |
| 10/15/2012 | OttO | BBB | Case closed - ASSUMED RESOLVED |

COMPLAINT # 19039110

**COMPANY INFO**
NAME:  **Lindsey Management Co., Inc.**
-----------------------------------------------------------------------------
----------------------

**CONSUMER INFO**
NAME:  **Kelley Robinson**               DAY PHONE: 901 215-6533
ADDRESS:  1508 Village Dr               EVE PHONE: 901 215-6533
          West Memphis, AR
          72301                          EMAIL: kelleyrobinson3301@comcast.net
$ VALUE:  $450.00                        FAX:
-----------------------------------------------------------------------------
----------------------

**DETAILS**
CONCERNING:  **Billing or Collection Issues**
OPENED     26 September 2012          CLOSE CODE: 600 - Letter of Experience
CLOSED     19 October 2012            CLOSED BY: Lori Plant
ENTERED BY:
ASSIGNED TO: Lori Plant

NATURE OF DISPUTE: I WANTED TO EXPRESS MY CONCERNS TO THE BBB ABOUT THE APARTMENT COMPLEX KNOWN AS THE GREENS OF MARION AR THAT IS CURRENTLY OWNED BY LINDSEY MANAGEMENT COMPANY OF FAYETTEVILLE AR. I APPLIED FOR AN APARTMENT WITH THE GREENS ON WEDNESDAY SEPTEMBER 12,2012 AND WAS APPROVED WITH A DEPOSIT OF 450.00 BASED UPON MY CREDIT. I UNDERSTAND THAT MY CREDIT IS NOT THE BEST, SO I HAD NO PROBLEM PAYING THE DEPOSIT OF 450. ON FRIDAY THE 14TH I ARRIVED TO THE GREENS WITH A MONEYORDER OF 450.00 FOR MY DEPOSIT. I WAS MEET BY THE PROPERTY MANAGER PEGGY AND THE SO-CALLED MAINTENCE TEAM, TO BE SHOWN THE AVAILABLE UNIT. UPON ARRIVING AT THE APARTMENT UNIT THE MAINTENCE GUY WENT THROUGH THE WINDOW OF THE UNIT INSTEAD OF USING A KEY TO OPEN THE DOOR. LOOKING AROUND THE APARTMENT IT WAS VERY NICE AND WAS READY FOR MOVE IN. I WENT BACK TO THE LEASING OFFICE SPOKE WITH PEGGY AND TOLD HER I REALLY LIKED THAT APARTMENT AND WOULD LIKE TO MOVE IN BY SUNDAY THE 16TH OF SEPTEMEBER. MS. PEGGY STATED NO PROBLEM. ON SATURDAY I CALLED MS.PEGGY TO FIND OUT WHAT THE PRO-RATED RENT AMOUNT I ADVISED MS PEGGY THAT I WOULD BE IN AROUND 4PM TO PAY THE RENT AND SHE QUOTED THATS FINE. UPON ARRIVING TO THE LEASING OFFICE ON SATURDAY BEFORE I COULD GET MY FOOT THROUGH THE DOOR I WAS MEET BY THE MAIENTENCE GUY QUOTING ARE YOU READY TO MOVE I QUOTED YES, HE STOPPED FOR A SECOND AND SAID WE HAVE A PROBLEM I ASKED WHAT WAS WRONG HE QUOTED TO ME THAT THE APARTMENT HAD BEEN DAMAGED BY THE UPSTAIRS NEIGHBOR AND WE HAVE ANOTHER UNIT THAT YOU CAN MOVE INTO, I WAS IMMEDIATLY TAKEN TO ANOTHER UNIT FACING A WOODED AREA AND I SPECIFICALLY ASKED TO BE FACING THE GOLF COURSE. THIS UNIT WASNT READY FOR ANYONE TO MOVE IN THE CARPET WAS DIRTY THE LINOLEUM WAS DAMAGE AND THE OUTSIDE OF THE BUILDING HAD SPIDER NEST EVERYWHERE. I TOLD THE MAIENTANCE GUY THAT THE UNIT WAS UNACCEPTABLE. I RETURN TO THE LEASING OFFICE IMMEADIATLY REQUESTING MY DEPOSIT BACK AND I WAS TOLD NO BY MS PEGGY. AFTER GOING BACK/FORTH SHE FINALLY GAVE THE MONEY ORDER BACK AND STAMPED VOID ON IT.
Product_Or_Service: APARTMENT RENTAL
Order_Number: N/A
Account_Number: N/A

DESIRED RESOLUTION: DesiredSettlementID: Other (requires explanation)
 I CALLED THE MAIN OFFICE IN FAYETTEVILLE EXPLAINING THE SITUATION. I WAS TOLD I WOULD GET A CALL BACK AND NEVER RECEIVED A CALL. I HAVE TO SEND THE VOIDED MONEY ORDER TO MINNEAPOLIS FOR A REFUND THAT CAN TAKE 60 TO 90 DAYS TO PROCESS;PLUS I HAVE TO PAY THE FEES OF 45.00 TO PROCESS THE MONEY ORDER FOR A REFUND VIA MONEY GRAM. I HAVE BEEN INCONVENIENCE A GREAT DEAL. WITH EXPECTING TO BE MOVED BY TODAY. I'M STUCK WITH NO PLACE TO GO AND NO MONEY TO PUT DOWN FOR A DEPOSIT, NO CALL BACKS.

BUSINESS RESPONSE: Please see attachment.

DECISION:

EXHIBIT B-12

ACTIVITY:

| | | | |
|---|---|---|---|
| 09/18/2012 | web | BBB | Case Received by BBB |
| 09/19/2012 | Otto | BBB | Forward to Another BBB - OTTO |
| 09/19/2012 | JAD | EMAIL | Inform Consumer Case Transferred to Another BBB |
| 09/19/2012 | Otto | EMAIL | Inform other BBB Case Transferred |
| 09/19/2012 | Otto | BBB | Case Closed as TRANSFERRED to another BBB |
| 09/21/2012 | BBB | BBB | Case Received by BBB |
| 09/26/2012 | lorp | BBB | CASE DETERMINED TO BE INFO ONLY - NO WAIT : The BBB is forwarding this complaint to the company as a letter of experience. The BBB is not formally processing the complaint because the consumer has an avenue for receiving a refund. The company does not hold any of her funds. The complaint is being forwarded due to the customer service issues raised by the consumer. |
| 09/26/2012 | Otto | EMAIL | Inform Consumer - Case Closed INFO ONLY - No Wait |
| 09/26/2012 | Otto | EMAIL | Inform Business of Case Closed INFO ONLY - No Wait |
| 09/26/2012 | Otto | BBB | Case Closed INFO ONLY |
| 10/19/2012 | lorp | BBB | ReOpen the Complaint |
| 10/19/2012 | lorp | BBB | RECEIVED BUSINESS RESPONSE SEND LETTER - INFO ONLY : Please see attachment. |
| 10/19/2012 | Otto | EMAIL | Inform Consumer of Business Response - INFO ONLY |
| 10/19/2012 | Otto | BBB | Case Closed INFO ONLY |

COMPLAINT # 19038799

**COMPANY INFO**
NAME:   **Lindsey Management Co., Inc.**
-----------------------------------------------------------------------------------
---------------------

**CONSUMER INFO**
NAME:      **Sarah Ann Qualls**                    DAY PHONE: 501 766-5008
ADDRESS:   12100 Fieldstone Lane APT L60           EVE PHONE: 501 766-5008
           Bryant, AR
           72022                                   EMAIL: sarah.qualls@fisglobal.com
$ VALUE:   $100.00                                 FAX:
-----------------------------------------------------------------------------------
---------------------

**DETAILS**
CONCERNING: **Contract Issues**
OPENED     13 September 2012                        CLOSE CODE: 111 - Assumed Resolved
CLOSED     31 December 2012                         CLOSED BY: OttOOtto
ENTERED BY:
ASSIGNED TO: Lori Plant

NATURE OF DISPUTE: I was a resident at the Lakes at Hurricane creek for one year.  Upon the end of my lease agreement, I went to the management office to ask Don and Linda Courtois to "walk through" the apartment with me and tell me what had to be done in order for me to get the most of my deposit back ($250 deposit was paid when I moved in). Don Courtois informed me that they did not do such "walkthroughs" and I would just have to clean and they would inspect after I turned in my keys.  I, being 7 months pregnant at the time, cleaned the apartment until it was spotless.  I cleaned the stove, refridgerator, behing the refridgerator and washer/dryer, I dusted the ceiling fans, vaccummed, mopped, spot cleaned the carpet, patched all nail holes, cleaned the toilet, tub, vents, replaced all lightbulbs, cleaned windows, countertops, sinks and patio area.  I did not leave a single corner unkept. I then recieved a refund of 32.95 from Lindsey Managment.  They had charged me for lightbulbs, carpet cleaning, painting, drip pans, preparing walls for painting, and batteries in smoke detectors. After contacting the local and corporate office, I was told that $120 was automatically deducted from each resident's deposit and that the contract stated so.  If this is the case, I am still owed a sum of $100.  The corporate office informed me that had I done a "walk through" with the managers I could have gotten that back as well, but the managers would not do this for me at the time I asked.  I spent a day and night in the hospital after cleaning this apartment.  I had done too much and was forced to be on temporary bedrest so to not lose my baby.  I find it very inconsiderate that the management knew I worked so hard and left my apartment in immaculate condition, to only take money that is rightfully mine.  I was also charged $20 for a gym and pool key that they claimed I did not turn in.  I did turn in the key and when asked about this their reply was "it was messed up so we charged you for it anyway".
Product_Or_Service: Security Deposit on Lease at apartment complex
Account_Number: APT 109 Bellerive

DESIRED RESOLUTION: DesiredSettlementID: Refund
I wish to be refunded the $100 that is due me.  That is the $250 I originally deposited minus the $120 cleaning fee, minus the $30 that was already given to me.

BUSINESS RESPONSE: Please see attachment "Receive Business Response."

DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| 09/07/2012 | web | BBB | Case Received by BBB |
| 09/13/2012 | brew | BBB | Case Reviewed by BBB |
| 09/13/2012 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 09/13/2012 | Otto | EMAIL | Notify Business of Dispute |
| 09/24/2012 | OttO | BBB | No response to first notice to business |
| 09/24/2012 | OttO | EMAIL | Consumer - Have You Heard From the Company |
| 09/24/2012 | OttO | EMAIL | Reminder of Dispute to Business |

EXHIBIT B-13

COMPLAINT # 19037156

## COMPANY INFO
NAME:        **Lindsey Management Co., Inc.**
------------------------------------------------------------------------------------------

--------------------
## CONSUMER INFO
NAME:        **Kevin Adair**          DAY PHONE:    -
ADDRESS:     211B Fox Run Place       EVE PHONE:    -
             Lowell, AR
             72745                    EMAIL: kevinadair32@yahoo.com
$ VALUE:     $0.00                    FAX:
------------------------------------------------------------------------------------------

--------------------
## DETAILS
CONCERNING:  **Billing or Collection Issues**
OPENED       03 July 2012             CLOSE CODE: 111 - Assumed Resolved
CLOSED       01 August 2012           CLOSED BY: Lori Plant
ENTERED BY:
ASSIGNED TO: Lori Plant


NATURE OF DISPUTE: I recieved a security deposit disposition from lindsey management from turtle creek
in rogers. i lived in unit 2330. They are charging me with unreported roof leak for $200 turtle creek
does monthly inspections on the town houses and we had previous mantenance man repair leak
multiple times therefore i should not be held liable for any damge caused by structure damage that
comes from outside. I am being charged 50 dollars for clean out of property left in town house when
there was nothing left to be cleaned out. They are charging me for 100 dollars for the texture falling
off ceiling due to bathroom not venting properly. I did not spray the texture on ceiling i should not be
held responsible for someone else's poor quality of application of product. We vacated property on 5-
28-2012. Turtle Creek sent security deposit dispostion to coorperate office on 6-9-2012. This was
turned over to collections on 6-27-2012. I received a copy of security deposit dispostionon the 6-28-
2012 never having oppertunity to resolve or pay before having this put on my credit report.

DESIRED RESOLUTION: I am seeking that the dollar amount of 350 dollars be adjusted to my security
deposit dispostion for property damage I am being charged with. I also would like my credit report
corrected due to not being notified in timely manner to resolve issue.

BUSINESS RESPONSE: Please see attachment "Receive Business Response."

DECISION:

ACTIVITY:

| | | | |
|---|---|---|---|
| 07/03/2012 | web | BBB | Case Received by BBB |
| 07/03/2012 | lorp | BBB | Case Reviewed by BBB |
| 07/03/2012 | Otto | EMAIL | Send Acknowledgement to Consumer |
| 07/03/2012 | Otto | EMAIL | Notify Business of Dispute |
| 07/16/2012 | Otto | BBB | No response to first notice to business |
| 07/16/2012 | Otto | EMAIL | Consumer - Have You Heard From the Company |
| 07/16/2012 | Otto | EMAIL | Reminder of Dispute to Business |
| 07/20/2012 | lorp | BBB | RECEIVE BUSINESS RESPONSE : Please see attachment "Receive Business Response." |
| 07/20/2012 | lorp | EMAIL | Forward Business response to Consumer |
| 07/23/2012 | lorp | BBB | BBB REVIEWS CONSUMER REBUTTAL TO BUSINESS RESPONSE : I disagree with the response for we had reported the leak mutiple times to previous management and previous maintenance man. It is convenient to not have any record of mutiple reports. Its clear they will not accept any responsibility. I know for a fact that there was no trash left in the apartment when we left and for them to say they removed trash for 2 hours is a lie. I refuse to accept the response as acceptable. |
| 07/31/2012 | Otto | BBB | No response from Consumer |
| 08/01/2012 | lorp | BBB | No Consumer Response- Assumed Resolved with Letter |
| 08/01/2012 | Otto | EMAIL | Inform Business - Case Closed ASSUMED RESOLVED |
| 08/01/2012 | Otto | BBB | Case closed - ASSUMED RESOLVED |

EXHIBIT B-14

**INTERROGATORY NO. 29:** What was the basis of Lindsey Management Co., Inc.'s counterclaim against the Plaintiff in *Daryl King vs. Lindsey Management d/b/a Eagle Hill, et. al.*, case no. 4:07-cv-01081-SWW.

**RESPONSE TO INTERROGATORY NO. 29:** Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure. Without waiving said objections, Management Company has no knowledge or information as to any counterclaim Lindsey Management Co., Inc. may have had with Daryl King.

**INTERROGATORY NO. 30:** If a tenant fails to fulfill his or her obligations under a lease, does Lindsey Management Co., Inc. or any of its affiliates report this information to credit bureaus? If so, what business name is shown as the creditor?

**RESPONSE TO INTERROGATORY NO. 30:** Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure. Without waiving said objections, to the best of Management Company's knowledge and information, Fountain Lakes Apartments' lease provides notice that if a resident vacates owing amounts to Fountain Lakes Apartments, the resident's account may be reported to collection agencies. If a resident's account is reported, Fountain Lakes Apartments' management reports the account and Fountain Lakes, ALP, is shown as the creditor.

22

## Response to Request for Production No. 1:

# Articles of Amendment with Restatement of Fountain Lakes, ALP

RESPONSE TO REQUEST FOR PRODUCTION
NO. 1



# STATE OF ARKANSAS

## SECRETARY OF STATE

### Charlie Daniels
SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Charlie Daniels, Secretary of State of Arkansas, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

### Articles of Amendment with Restatement

of

### FOUNTAIN LAKES, A LIMITED PARTNERSHIP

filed in this office

November 3, 2009

**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 3rd day of November 2009.



_Charlie Daniels_
Secretary of State

Jocument Number: 11967050015

FOUNTAIN LAKES, A LIMITED PART

ARTICLES OF AMENDMENT WITH RESTATEM

FILED: 11/03/09, NPages:2

Arkansas Secretary of State
Business Services Division

<u>**SECOND AMENDED AND RESTATED
CERTIFICATE OF LIMITED PARTNERSHIP
OF
FOUNTAIN LAKES, A LIMITED PARTNERSHIP**</u>

The original certificate
was filed July 20, 1993

The undersigned, for the purpose of amending and restating the Amended and Restated Certificate of Limited Partnership of Fountain Lakes, a Limited Partnership, and all amendments thereto, hereby certifies:

(1)    <u>NAME:</u>  The name of the Limited Partnership is **Fountain Lakes, a Limited Partnership.**

(2)    <u>DATE OF FILING OF ORIGINAL CERTIFICATE</u>:  The original Certificate of Limited Partnership of Fountain Lakes, a Limited Partnership was filed in the Secretary of State's office of the State of Arkansas on July 20, 1993.

(3)    <u>ADDRESS OF LIMITED PARTNERSHIP OFFICE:</u>  The address of the principal office of the Partnership is 1200 E. Joyce Boulevard, 6th Floor, Fayetteville, Arkansas 72703.

(4)    <u>NAME AND ADDRESS OF AGENT FOR SERVICE OF PROCESS:</u>  The name and address of the Registered Agent for service of process is D. Scott Rogerson, 1200 E. Joyce Boulevard, 6th Floor, Fayetteville, Arkansas 72703.

(5)    <u>NAME AND ADDRESS OF GENERAL PARTNER:</u>  The name and address of the General Partner is Fountain Lakes Management Company, Inc., 1200 E. Joyce Boulevard, 6th Floor, Fayetteville, Arkansas  72703

(6)    <u>TERM:</u>  The latest date upon which the Limited Partnership is to dissolve is December 31, 2039.

(7)    <u>AMENDMENTS TO LIMITED PARTNERSHIP AGREEMENT AND/OR CERTIFICATE OF LIMITED PARTNERSHIP:</u>

(A)    The original Certificate and Agreement of Limited Partnership, and all amendments thereto, should be amended and restated.

(B)    The original Agreement of Limited Partnership, and all amendments thereto, have been amended and replaced by the Second Amended and Restated Agreement of Limited Partnership.  Those items in the Second Amended and Restated Agreement of Limited Partnership which were amended and which are required by statute to be set forth in this Second Amended and Restated Certificate of Limited Partnership are stated above.

(8)  SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT: A complete copy of the Second Amended and Restated Agreement of Limited Partnership of Fountain Lakes, a Limited Partnership (along with amendments thereto or restatements thereof) is kept at 1200 E. Joyce Boulevard, 6th Floor, Fayetteville, Arkansas 72703.

DATED this 1st day of October, 2009.

FOUNTAIN LAKES MANAGEMENT
COMPANY, INC., General Partner

By:_____
James E. Lindsey, President

## ACKNOWLEDGMENT

STATE OF ARKANSAS              )
                               ) ss.
COUNTY OF WASHINGTON           )

On this 1st day of October, 2009, before undersigned, a Notary Public, duly commissioned, qualified and acting, within and for the said County and State, appeared in person the within named **James E. Lindsey**, to me personally known, who stated that he was the President of **Fountain Lakes Management Company, Inc.**, an Arkansas corporation, and was duly authorized in his respective capacity to execute the foregoing instrument for and in the name and behalf of said entity, and further stated and acknowledged that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 1st day of October, 2009.

My Commission Expires:

_____
Notary Public

```
OFFICIAL SEAL
JOY L. HOOPS
NOTARY PUBLIC . ARKANSAS
WASHINGTON COUNTY
COMMISSION EXP. 09/01/2014
```

## Response to Interrogatory No. 9:

Articles of Incorporation and Change of
Registered Agent of Office of Fountain
Lakes Management Company, Inc.

# STATE OF ARKANSAS



## SECRETARY OF STATE

**W. J. "Bill" McCuen**

Secretary of State

*To All to Whom These Presents Shall Come, Greetings:*

*I, Bill McCuen, Secretary of State of the State of Arkansas, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of*

ARTICLES OF INCORPORATION

OF

FOUNTAIN LAKES MANAGEMENT COMPANY, INC.

ORIGINAL ARTICLES FILED:
SEPTEMBER 27, 1993

# ARTICLES OF INCORPORATION

## OF

## FOUNTAIN LAKES MANAGEMENT COMPANY, INC.

*Howell*

The undersigned, in order to form a corporation for the purposes hereinafter stated, under and pursuant to the provisions of Act No. 958 of the 1987 Acts of the General Assembly of the State of Arkansas entitled "Arkansas Business Corporation Act", and all amendments thereto, does hereby certify as follows:

**FIRST**:  The name of this corporation is Fountain Lakes Management Company, Inc.

**SECOND**:  The corporation is authorized to issue One Thousand (1,000) shares of common capital stock and each share shall have no par value.

**THIRD**:  The initial registered office of this corporation shall be located at 3900 Front Street, Fayetteville, Arkansas 72702, and the name of the Registered Agent of this corporation at that address is James E. Lindsey.

**FOURTH**:  The name and address of the incorporator is as follows:

> James E. Lindsey
> 3900 Front Street
> Fayetteville, Arkansas  72702

**FIFTH**:  The nature of the business of the corporation and the object or purposes proposed to be transacted, promoted, or carried on by this corporation are as follows:

(A)  The primary purpose of this corporation, pursuant to Section 4-27-202(A)(5) of the Arkansas Code of 1987 Annotated, shall be to engage in the operation, management, renting and construction of apartment complexes and other

SIXTH:  It is agreed and understood by and between the incorporator and all original subscribers of stock in said corporation and all other persons who may become stockholders of record and own stock in this corporation that if any one of them at any time decides to sell their initial stock, or any other stock issued to them in this corporation, that they will give the remaining holders of stock in this corporation the right of first refusal to purchase the same, each remaining stockholder to be entitled to purchase that part of the stock according to his pro-rata interest in the corporation at that time, said stock to be sold and purchased at the then market value of the same; and if the remaining stockholders, or any of them, fail or refuse to purchase the stock of the withdrawing stockholder within thirty (30) days after the notice of intention to sell, then the withdrawing stockholder shall have the right to sell his stock to anyone else of his choosing.  The methods and procedures for the operation of this provision may be clarified, amplified, enlarged, or restricted in the By-Laws of the corporation without amendment to these Articles of Incorporation.  This provision applies to and includes all stockholders who are subscribers to the stock of this corporation prior to the filing of these Articles of Incorporation or any person who receives any of the stock that might have been issued by this corporation.

SEVENTH:  The number of Directors constituting the initial Board of Directors shall be five (5).  The members of the initial Board of Directors and their Post Office addresses are:

| Name | Address |
|------|---------|
| James E. Lindsey | 3900 Front Street<br>Fayetteville, AR.  72702 |
| John R. Rutledge | P. O. Box 1009<br>Searcy. AR.  72143 |

**EIGHTH**:  All shares of stock issued by the corporation shall be represented by certificates.

**NINTH**:  To the fullest extent permitted by the Arkansas Business Corporation Act as it now exists or may hereafter be amended, a Director of this corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

**TENTH**:  All shareholders are entitled to cumulate their votes for Directors.

**ELEVENTH**:  The corporation elects to have preemptive rights.

**TWELFTH**:  The corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding to the fullest extent permitted by the Arkansas Business Corporation Act as it now exists or may hereafter be amended.

IN WITNESS WHEREOF, the undersigned has set his hand this _27th_ day of _September_, 1993.

_____
JAMES E. LINDSEY--Incorporator

**CERTIFICATE OF INCORPORATOR**

STATE OF ARKANSAS

COUNTY OF _St. Francis_ ss

BE IT REMEMBERED, That on this date before the undersigned, a Notary Public within and for the County and State aforesaid, duly commissioned and acting, personally appeared James E. Lindsey, to me well known, and acknowledged that he had executed the foregoing instrument as his free act and deed for the purposes, uses and conditions therein mentioned and set forth.

WITNESS my hand and official seal as such Notary Public on

# STATE OF ARKANSAS



## SECRETARY OF STATE

### Charlie Daniels
SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Charlie Daniels, Secretary of State of Arkansas, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

## Change of Registered Agent or Office

of

## FOUNTAIN LAKES MANAGEMENT COMPANY, INC.

filed in this office

January 5, 2007

**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 5th day of January 2007.



_____
Secretary of State



# Arkansas Secret

Document Number: 8369848002

FOUNTAIN LAKES MANAGEMENT COMP

CHANGE OF REGISTERED AGENT OR OFFIC

## Charlie Daniels

State Capit┌
501-68┐FILED:01/08/07, NPages:1

94

Arkansas Secretary of State
Business Services Division

## NOTICE OF CHANGE OF REGISTERI┐
## OR REGISTERED AGENT, OR Buιн

### MARK ENTITY TYPE

[X] Corporation-Profit           [ ] General Partnership           [ ] Limited Liability Limited Partnership
[ ] Corporation-Non Profit       [ ] Limited Partnership
[ ] Limited Liability Company    [ ] Limited Liability Partnership

Pursuant to the Laws of the State of Arkansas, the undersigned submits the following statement for the purpose of changing its registered office or its registered agent, or both in the State of Arkansas. If this statement reflects a change of registered office, this form must be accompanied by notice of such change to any and all applicable entities.

1. Name of corporation: __Fountain Lakes Management Company, Inc.__

2. Is the entity: [X] Domestic or [ ] Foreign    Name of Tax Contact: __D. Scott Rogerson__
   P.O. Box 13000, Fayetteville, AR 72703

3. Street address of registered office changing from: __3900 Front Street__
   _Street Address_
   Fayetteville, AR 72703
   _City, State, Zip_

4. Street address to which registered office changing: __1200 E. Joyce Blvd., 6th Floor__
   _Street Address_
   Fayetteville, AR 72703
   _City, State, Zip_
   (The address of the registered office and the business address of the registered agent must be identical.)

5. Name of registered agent changing from: __James E. Lindsey__    To: __D. Scott Rogerson__

I, __D. Scott Rogerson__ hereby consent to serve as registered agent for this entity.

__D Scott Rogerson__
_Successor Agent_  D. Scott Rogerson

A letter of consent from successor agent may be substituted in lieu of this signature.

A copy bearing the file marks of the Secretary of State shall be returned.

If this entity is a corporation governed by Act 576 of 1965 such change must be filed with the County Clerk of the County in which its registered office is located, unless the registered office is located in Pulaski County, in which event no filing with the County Clerk is required.

I understand that knowingly signing a false document with the intent to file with the Arkansas Secretary of State is a Class C misdemeanor and is punishable by a fine up to $100.00 and/or imprisonment up to 30 days.

_Signature and Title of Authorized Officer_
James E. Lindsey, President

Dated: __December 8, 2006__

Fee For Corporation or Limited Liability Company - $25.00
Fee For General Partnership, Limited Partnership, Limited Liability Partnership or Limited Liability Limited Partnership - $15.00

DO-3/DN-04/F-05/ "ALL" Rev. 4/06

## Response to Request for Production No. 16:

## Fountain Lakes Apartments' Lease





# Apartment Lease Contract (Arkansas)

Date _____
(When form is filled out)

__1. **PARTIES**. This lease is between_____
_____(Resident), and

| Fountain Lakes, a Limited Partnership | , (Owner), |
|---|---|

on Apartment No. _____, at_____ in   **Benton**_____,
Arkansas, for use as a private residence only.   The term "Resident" in this lease refers to all Residents listed above, unless otherwise stated. The term "Owner" will include Owner's authorized representatives.

**OCCUPANTS**.  The apartment will be occupied by Resident and:  (list all other adults and minors)
_____. No
other occupants are permitted, other than occasional guests. A guest will be considered an unauthorized occupant, rather than an occasional guest, if (a) the guest has been evicted by Owner or asked to leave the premises due to a violation of Owner's Rules and Regulations; (b) the guest is on the premises for any five (5) consecutive days or any eight (8) nonconsecutive days in any calendar month unless Resident has received prior written approval from Owner's representative, or; (c) the guest has been convicted of a crime involving violence, sexual abuse or theft of property.

**OCCUPANCY STANDARDS**.  Occupancy is limited to no more than two persons per bedroom.  Children under age two at the time the lease (or extension or renewal) is executed will not be counted toward this limit.  Three adults may occupy an apartment only if all three are related to each other by blood or marriage.  Occupancy by more than three adults is not permitted.

**OWNER'S RIGHT TO MODIFY APARTMENT**.   Owner reserves the right during the lease term and any extension or renewal thereof to make such modifications to the apartment and common areas as may be necessary to comply with requirements of the Fair Housing Act and Americans With Disabilities Act.

**NO SUBLETTING**.  Subletting, assignment, replacements, or change of Residents or occupants will be allowed only upon Owner's prior written consent.  In such event, Resident remains fully liable hereunder but shall receive credit for all rentals paid by succeeding Residents.

__2.   **LEASE TERM**.  The initial term of the lease shall commence on the _____ day of _____, _____ and end the  **28th**  day of _____, _____.

__3.   **MOVE-OUT NOTICE AND EARLY MOVE-OUT**.  At least 30 days' written notice of intent to move out must be given to Owner's representative.  Verbal move out notice is not sufficient under any circumstances.  Owner's form for written move-out notice should be used.  If Owner's move-out form is not used, Resident shall be responsible for obtaining written acknowledgment from Owner's representative that move-out notice has been received.  Resident's written move-out notice must terminate the lease on the last day of the month following the next rental due date after the notice.  If no 30-day written move-out notice is given to Owner's representative, Resident will forfeit the security deposit.  If Resident moves out before fulfilling the terms of the lease including having paid rent in full for the entire lease term and any renewal or extension period, Resident will forfeit the security deposit and be liable under paragraph 19 for liquidated damages, and for unpaid rent or late charges which accrue during any month in which Resident occupies the apartment, for property damage caused by the Resident, and for cleaning and painting charges.

In no event may Resident's written move-out notice terminate the lease sooner than the end of the lease term or renewal or extension period.

__4.   **HOLD-OVER AND AUTOMATIC RENEWAL**.  Resident agrees to give Owner thirty (30) days' written notice prior to the termination of the initial lease term stating that Resident does not desire to renew this lease.  In the event that a timely notice is not given by Resident within the period prescribed or, after having given notice, Resident shall remain or continue to be in possession of the leased premises or any part thereof after the end of the lease term or any extension thereof, Owner may at its option: (a) treat such holding over as a renewal of the lease for a term equivalent to the immediately preceding lease term at a rental equal to the prevailing rental charges of the Owner for substantially the same type of apartment, subject to each of the covenants and conditions of this lease which shall continue in full force and effect; or (b) refuse to renew the lease, in which event Owner shall give Resident three (3) days' notice to vacate the premises.  Owner may proceed to let the premises to another resident and charge Resident for any damages resulting from Resident's failure to deliver possession on the date of termination, in addition to any other rights accruing to Owner hereunder. Resident shall be liable to pay rents for the holdover period and to indemnify Owner and prospective residents for damages (including lost rentals, lodging expenses, and attorney's fees).  Holdover rents shall be immediately due on a daily basis and delinquent without notice or demand.

__5.   **SECURITY DEPOSIT**.  Resident agrees that the security deposit(s) will be the total sum of $_____ payable on or before signing of this lease.  Refunds shall be made in accordance with this lease.  Resident may not apply any portion of the security deposit(s) to rent and is prohibited by statute from applying security deposit(s) to rent.  The full monthly rent shall be paid on or before the due date of each month, including the last month of occupancy.

__6.   **RENT**.  Resident will pay $_____ rental for the lease term, payable in the following manner: (a) prorated rent from commencement date to the first of next month in the amount of $_____; and (b) _____ installments of $_____, in advance and without demand at the apartment manager's office with the first monthly installment due on the  **1st**  day of _____, _____, and _____ additional installments of the same amount due on the first (1st) day of each month thereafter until paid in full. Rent unpaid after the due date is delinquent and will authorize all remedies in this lease, particularly paragraph 19.  If all rent is not



__8.  **UTILITIES AND SERVICES.**  Resident will be responsible for scheduling the hookup and paying of deposits to the electric, water, gas, telephone and TV cable companies.  Resident will at all times keep electric, water (and gas, if applicable) service to Resident's apartment.  If such service is discontinued for any reason, Owner may reinstate such service and charge the cost of such reinstatement and utility service to Resident.  Resident hereby agrees to place waste and garbage inside a plastic bag before placing it in the dumpster located on the property.  If permitted by law, Owner shall have the right at any time and from time to time to contract for service to the apartment community, including Resident's apartment, from companies providing electricity, gas, water, sewer, sanitation, telephone or cable television service.  Owner shall in no way be liable or responsible for any loss, damage, or expense that Resident may sustain by reason of any change, failure, interference, disruption or defect in the supply or character of such utility service.

__9.  **RULES AND REGULATIONS.**  Resident, Resident's guests, and occupants shall comply with all written rules and regulations, which shall be considered part of this lease.  Owner may make reasonable rule changes.  Resident agrees that the conduct of Resident and Resident's guests and occupants shall not be disorderly, boisterous, or unlawful, and shall not disturb the rights, comforts, or conveniences of other persons in the apartment community.  Resident shall be liable to Owner for damages caused by Resident or Resident's guests or occupants.  Sidewalks, steps, entrance halls, walkways, and stairs shall not be obstructed or used for any purpose other than ingress or egress.  Resident shall keep the apartment clean and sanitaryand shall dispose of garbage at least weekly, only in appropriate receptacles.  Any swimming pools, saunas, hot tubs, exercise rooms, storerooms, laundry rooms, and other improvements are to be used wholly at the risk of the person using them.  Owner may regulate the manner, time and place of all parking.  Owner may regulate, limit or prohibit from the apartment or apartment community, the following:  motorcycles, bicycles, tricycles, skateboards, recreational vehicles, boats, trailers, grills, patio furniture, furniture movers, deliverymen, solicitors, and guests who in the Owner's reasonable judgment have been disturbing the peace, disturbing other residents, or violating this lease or apartment rules and regulations.  All vehicles parked on the premises must be operable and have valid current license plates.  "Operable" means the vehicle must have inflated tires, have all major components intact, including windows and windshields, and be reasonably clean.  Any violation of the foregoing will subject the vehicle to being towed at the expense of the vehicle owner or operator.  Flashlights (and not candles or kerosene lamps) shall be used if electricity is interrupted or terminated.  No business or childcare services may be operated in or from the apartment.  Upon payment of a reasonable charge, Resident may require Owner to change (or re-key) a door lock.  A Resident who moves out prior to the end of the lease term or renewal or extension period is no longer entitled to occupancy or keys.  Keys may not be duplicated without Owner's written consent.  All written rules may be enforced through Owner's representatives or agents, and Resident shall hold same harmless from reasonable enforcement.

__10.  **CONDITION OF THE PREMISES ON MOVING IN AND MOVING OUT.**  Resident accepts the apartment, fixtures, and any furnishings as is, except for conditions materially affecting health or safety of ordinary persons.  Owner makes no implied warranties.  A Statement of Unit Condition and Security Deposit Return form will be provided to Resident upon move-in.  Within 48 hours after move-in, Resident shall note any defects or damages on the form and return it to Owner's representative; otherwise, everything will be deemed to be in clean and good condition.  Resident shall use reasonable diligence in care of the apartment.  Resident may not make any alterations or improvements to Owner's property without Owner's prior written consent.  No holes or stickers shall be put anywhere inside or outside the apartment, except a reasonable number of small nail holes for picture hanging will be permitted in sheetrock walls and in grooves of wood-paneled walls.  Alternative picture hanging methods (in lieu of small nails) may be required by Owner's rules and regulations.  No antenna or satellite receiver installation, additional phone or cable TV outlets, or lock changes (including re-keying or additions of locks) will be permitted except by Owner's prior written consent.  Resident will not remove Owner's fixtures or furniture from the apartment for any purpose.  When Resident moves in, Owner shall furnish light bulbs of prescribed wattage for apartment fixtures and any lamps furnished by Owner; thereafter, light bulbs will be replaced at Resident's expense.  When moving out, Resident agrees to surrender the apartment in good, clean condition, as determined by Owner.

__11.  **CLASSIFICATIONS OF PROPERTY.**  (1) APARTMENT: Subject to the provisions of paragraph 17 herein, the interior of the apartment shall be under the exclusive control of Resident.  (2) COMMON AREAS: The balconies, stairways, grounds, parking lots, driveways, and amenities (including, but not limited to club room, fitness center, pool, playground, tennis court, basketball court, volleyball court and similar facilities) are common areas for the nonexclusive use and benefit of Owner and all residents.  (3) RESTRICTED AREAS: Use and occupancy of the attics, exterior walls, roofs and ledges are restricted to Owner and any use or occupancy by Resident is prohibited.

__12.  **LIABILITY.**  Owner will not be liable to Resident or Resident's guests or occupants for any damages or losses to person or property caused by other persons, including theft, burglary, assault, vandalism, or other crimes.  Owner will not be liable to Resident or Resident's guests or occupants for personal injury or for damage to or loss of their personal property (furniture, jewelry, clothing, etc.) from fire, flood, water leak, rain, hail, ice, snow, smoke, lightning, wind, explosion, interruption of utilities, or other occurrences.  Owner strongly recommends that Resident secure insurance to protect against all of the above occurrences.  Resident agrees that existing locks and latches are safe and acceptable, subject to Owner's duty to make needed repairs of same upon written request by Resident.  Owner shall have no duty to furnish smoke detectors, security guards, or additional locks and latches, except as required by statute.  When smoke detectors are furnished, Owner shall test same and initially provide working batteries at lease commencement as required by statute; thereafter, Resident shall pay for and replace smoke detector batteries, if any, as needed.  Resident agrees to test the smoke alarm monthly and report any malfunctioning alarm to Owner.  If Owner's employees are requested to render services not contemplated in this lease, Resident agrees to hold Owner harmless from all liability regarding same.  Residents on premises adjoining or in proximity to golf courses assume the risk of damage to personal property and personal injury caused by golf balls and agree to hold Owner harmless for any such damage or injury.

__13.  **MOLD AND MILDEW.**  Resident agrees to regularly inspect the Apartment for water leaks, moisture, mold and mildew.  Potential sources of water or moisture include roof leaks, humidifiers, plumbing leaks, steam from cooking, watering houseplants, baths and showers.  Leaks may occur around water heaters, toilets, sinks, tubs, showers, windows and doors.  Discolored areas on walls and ceilings and moisture in carpets may indicate roof leaks or clogged air conditioner drains.  Resident agrees to immediately notify Owner in writing if Resident detects leaks, mold or mildew within the apartment.  Resident agrees to clean and remove mold and mildew in accordance with cleaning instructions available at the apartment manager's office.  If Resident discovers mold and mildew in areas not accessible to Resident for cleaning, Resident agrees to inform Owner so that Owner can remove mold and mildew from those areas.

__15.   **REIMBURSEMENT.** Resident shall promptly reimburse Owner for any loss, property damage, or cost of repairs or service caused in the apartment or community by negligence or improper use by Resident, or Resident's guests or occupants. Owner will not be liable for and Resident shall pay for the following if it occurs during the lease term or renewal or extension period: (a) damage to doors, windows, or screens unless due to negligence of Owner, and (b) repair costs and damage from plumbing stoppages in lines exclusively serving Resident's apartment, and (c) damage from windows or doors left open. Owner's failure or delay in demanding damage reimbursement, late-payment charges, returned check charges, pet charges or other sums due by Resident shall not be deemed a waiver, and Owner may require payment of same at any time, including deduction from security deposit. Owner may require advance payment of repairs for which Resident is liable.

__16.   **NO PETS (ANIMALS).** No pets (animals including mammals, rodents, reptiles, birds, fish, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless Owner has so authorized in writing. No unauthorized pets, stray animals or wild animals may be fed from the apartment or any part of the apartment community. These prohibitions apply to non-pet animals used in a trade or profession. An animal deposit is considered a general security deposit. Owner will authorize a support animal for a disabled person, but may require a written statement from a qualified professional verifying the need for the support animal. Violation of the foregoing by Resident or Resident's guests or occupants, with or without Resident's knowledge or permission, will subject Resident to the charges, damages, and eviction provisions of this lease.

__17.   **CONSENT TO REASONABLE ENTRY.** Resident consents, when Resident or Resident's guest or occupant is present, to entry of the apartment at reasonable times for reasonable business purposes, by Owner, Owner's representatives, repair persons, or service persons. If no one is in the apartment, repair persons, service persons, Owner or Owner's representatives are hereby given consent to enter at reasonable times by duplicate or master key (or by other means if locks have been changed in violation of this lease) if such entry is for responding to Resident's request; repairs, estimating repair or refurbishing costs; extermination; preventive maintenance; filter changes; inspections; retrieving unreturned tools or appliances; emergency safety or fire inspections; avoiding property damage; preventing waste of utilities; exercising contractual lien; leaving notices; removing or re-keying unauthorized locks or latches; removing unauthorized window coverings; retrieving property owned or leased by previous Residents; showing apartment to prospective Residents (after move-out or vacate notice has been given); or showing apartment to government inspectors, fire marshals, lenders, appraisers, prospective purchasers, or insurance agents. During and in anticipation of sub-freezing temperatures, Owner or Owner's representatives are hereby given consent to enter the apartment and turn on heating units to a setting that will keep water pipes from freezing, and allow water to drip from the faucets to avoid property damage.

__18.   **DEFAULT BY OWNER.** Owner agrees to act with customary diligence to: (a) keep common areas reasonably clean, (b) maintain fixtures, furniture, hot water, heating and air conditioning equipment, (c) remain in substantial compliance with applicable federal, state and local laws regarding safety and sanitation, and (d) make all reasonable repairs, subject to Resident's obligation to pay for damages caused by Resident or Resident's guests or occupants. If Owner violates the foregoing, Resident may terminate this lease only when the following procedures are followed: (1) Resident shall make written request for repair or remedy of the condition, and all rents must be current at such time, (2) after receipt of such request, Owner shall have reasonable time to repair, considering the nature of the problem and the reasonable availability of materials, labor, and utilities, (3) if such reasonable time has lapsed and if Owner has not made a diligent effort to repair, Resident shall then give Owner written notice of intent to terminate the lease unless the repair is made within 7 days, and (4) if repair has not been made within such 7-day period, Resident may terminate this lease. Then the security deposit(s) and prorata rent will be refunded as required by law.

__19.   **DEFAULT BY RESIDENT.** If Resident fails to pay rent or other amounts owed by Resident under this lease; or if Resident or Resident's guests or occupants violate this lease or Owner's rules and regulations or applicable federal, state, and local laws, including any violation of criminal laws regardless of whether such violation occurs on or off the premises; if Resident gives any false or incorrect answers in a rental application; if Resident, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government; or if Resident abandons the apartment, then Owner's representative may (with or without demand for performance) terminate Resident's right of occupancy by giving Resident three (3) days' written notice to vacate, and Owner shall be entitled to possession by eviction suit or any other lawful means. Notice may be mailed or personally delivered to Resident or left in a conspicuous place. Termination of possession rights or subsequent reletting by Owner shall not release Resident from liability for future rentals under this lease. After Owner gives notice to vacate or after Owner files eviction suit, Owner may still accept rent or other sums due; and such notice, filing, or acceptance shall not waive or diminish Owner's right of eviction or any other contractual or statutory right. Acceptance of monies at any time will not waive Owner's right of property damages, past or future rent, or other sums due. If Resident's rent is delinquent and if three (3) days' prior written notice is personally delivered to Resident, Owner may terminate utilities furnished and paid for by Owner. Owner may report unpaid rental or unpaid damages to local credit agencies for recordation in Resident's credit record.

**FALSE INFORMATION.** Resident understands that the information provided to Owner in connection with qualification guidelines for Residents of this apartment community are relied upon by Owner in entering into the lease. Should the information provided prove to be false, Resident understands that same shall be considered as a material breach of the lease entitling Owner to evict Resident upon three (3) days' written notice.

**ACCELERATION.** All monthly rentals for the remainder of the lease term of renewal or extension period shall be accelerated automatically without notice or demand (either before or after acceleration) and shall be immediately due and delinquent if, without Owner's written consent: (1) Resident moves out, removes property in contemplation of moving out, or gives verbal or written notice (in person or by co-occupant) of intent to move out prior to the end of the lease term or renewal or extension period, and (2) rentals for the entire lease term and renewal or extension period have not been paid in full. Remaining rents shall likewise be accelerated if Resident is evicted. Such right of acceleration is in lieu of having rental for the entire lease term payable at the beginning of the lease.

**LIQUIDATED DAMAGES.** Owner and Resident have contemplated and agree that Owner will suffer damages in the event Resident vacates the apartment without having paid rent for the entire lease term, and any extensions thereof, and that the amount of damages will be difficult to ascertain. Owner and Resident agree that, in such event, Owner shall be entitled to recover as liquidated damages an amount equal to one-half of the rent calculated from the first day of the month following the date on which Resident vacates the apartment through the end of the lease term; but in no event shall the amount of liquidated damages exceed an amount equal to three

__21.   **FORWARDING ADDRESS.** A written copy of each Resident's forwarding address shall ●● left with Owner or Owner's representative and with the U.S. Postal Service.

## DEDUCTIONS FROM TOTAL SECURITY DEPOSIT

__22.   **CLEANING.** The apartment, including furniture, bathrooms, and kitchen appliances, must be cleaned thoroughly. MOVE-OUT CLEANING INSTRUCTIONS (available in apartment manager's office) shall be followed. If Resident fails to clean in accordance with the move-out cleaning instructions, reasonable charges to complete such cleaning shall be deducted. This includes charges for cleaning carpets, window coverings, furniture, painting walls, etc., plus any utility expenses incurred because of such cleaning. It is understood by Resident that Owner has cleaned the carpets and painted the apartment in advance to Resident occupying the apartment. It is also understood by Resident that Owner will clean the carpets and paint the apartment when Resident moves out. This charge will be deducted from Resident's security deposit.

__23.   **FIXED CLEANING CHARGE.** The following minimum charge will be deducted in any event for cleaning which Owner requires to be done commercially or by Owner's employees: $_____. This charge does not relieve Resident from the cleaning provisions of paragraph 22 above.

__24.   **OTHER DEDUCTIONS.** Resident shall be liable for and appropriate charges will be deducted for any unpaid sums due under the lease; unpaid rent; unpaid utilities; unreimbursed service charges; damages or repairs to the apartment or its contents (beyond reasonable wear); utilities for repairs; trips to let in company representatives to remove Resident's telephone or TV cable services or rental items (if Resident requests same as has moved out); trips to open apartment when Resident has lost or forgotten key; key duplicates; unreturned keys; insufficient light bulbs; stickers, scratches, burns, stains, or unapproved holes; removing or re-keying unauthorized locks or latches; agreed costs-of-reletting; packing, removing or storing property removed or stored pursuant to paragraph 20; removing illegally parked vehicles; late payment and returned check charges; attorney's fees, court costs, and Owner's or Owner's representative's time and inconvenience in any valid eviction proceeding against Resident; and other lawful deductions. If keys are not returned or if rent has been accelerated under paragraph 19 or if Resident is evicted, charges may be made for change of door locks and new keys. Security deposits will be first applied to non-rent items, then to unpaid rent.

If for any reason Resident is evicted, fails to complete the lease term or fails to give notice as required under paragraph 3, there will be no refund of Resident's security deposit.

__25.   **INSPECTION UPON MOVE-OUT.** Resident is urged to make an appointment with Owner's representative for move-out inspection of the apartment, using MOVE-IN and MOVE-OUT inventory and condition forms. Estimates or commitments by Owner's representative regarding amount or deductibility of repairs, damages, or charges are subject to subsequent correction, modification or disapproval by Owner before final refunding or accounting.

__26.   **RETURN OF DEPOSIT.** After lawful deductions have been made, the balance of all security deposits and an itemized accounting of any deductions will be mailed to Resident no later than 30 days after surrender except where otherwise provided by statute. For purposes of determining relinquishment of possession, damages, clean-up charges and other deductions, "surrender" shall occur on the latest of the following dates: (a) when all keys have been turned in, (b) when move-out date has expired and all Residents live elsewhere, or (c) when it reasonably appears that all Residents have permanently moved out.

## MISCELLANEOUS

__27.   **MULTIPLE RESIDENTS OR OCCUPANTS.** Each Resident and each Resident's share of the total security deposit is jointly and severally liable for all obligations and sums due under the lease. Violation of the lease by Resident or Resident's guests or occupants shall be considered a violation by all Residents. Notice by Owner's representative to one Resident constitutes notice to all Residents. Entry permission or service request from any Resident, occupant, or guest shall be deemed to be from all Residents. The balance of all security deposits may be refunded in one check jointly payable to all Residents; and such joint refund check and/or itemization of deductions may be mailed to one Resident only.

__28.   **DELAY OF OCCUPANCY.** If occupancy is or will be delayed because of construction or prior resident's holding over, Owner shall not be liable to Resident for such delay, and the lease shall remain in force subject to (1) abatement of rentals on a daily basis during delay, and (2) Resident's right to terminate as set forth below. Notice of such termination must be in writing. After such termination, Resident shall be entitled only to refund of deposit(s) and any rentals paid. Resident's above right of rent abatement or lease termination shall not apply if delay is due to cleaning or repairs which do not prevent occupancy by Resident.

**NOTICE OF ANTICIPATED DELAY.** If Owner gives written notice to any one of the Residents listed in paragraph 1 before lease commencement date and if such notice states that construction delay is anticipated and the apartment will be ready for occupancy on a specific date, Resident may terminate the lease within 7 days after any one of such Residents receives such written notice, but not thereafter.

**NOTICE OF ACTUAL DELAY.** If Owner gives written notice to any one of the Residents listed in paragraph 1 on or after lease commencement date and if such notice states that occupancy has been delayed because of construction or a prior resident's holding over and the apartment will be ready for occupancy on a specific date, Resident may terminate the lease within 3 days after any one of such Residents receives such written notice, but not thereafter.

**NEW COMMENCEMENT DATE.** A readiness date given by Owner to Resident in writing shall be considered the new lease commencement date for all purposes, including the right of Resident to terminate under this paragraph if the apartment is not ready on such new commencement date. Such new commencement date may never be moved to an earlier date except by mutual agreement of Owner and Resident.

__30.   **RENT INCREASES.** The following s██ apply unless otherwise specified in paragraph 7█wner reserves the right to institute periodic rent increases. Resident will receive a written 30-day notice of rent increase. No rent increases shall be allowed during the lease term.

__31.   **COPIES.** Resident acknowledges receipt of a copy of this Apartment Lease Contract. A copy of Owner's rules and regulations, if any, will be furnished when Resident moves in, or earlier if desired. When a Statement of Unit Condition and Security Deposit Return form is completed after Resident moves in, both Resident and Owner should retain a copy.

__32.   **PEST CONTROL.** Although Owner will periodically treat the premises for pests, Resident assumes the responsibility for keeping the premises free of infestation by roaches, water bugs, rodents, moths, and other pests, and assumes the risk of all damages therefrom, and Owner shall not be liable or responsible for damages or injury to furnishings, wearing apparel, or personal belongings of the Residents or other occupants of the premises from such sources.

__33.   **INSPECTION.** Owner reserves the right to make an inspection of the apartment every three months or any other time as Owner may reasonably deem necessary.

__34.   **SUBORDINATION.** This lease shall be subject and subordinate to any mortgage or other lien that is now on or affects the leased premises or its contents or that any Owner of the premises may hereafter at any time elect to place on such premises, and to all advances already made or that may be hereafter made on account of any such mortgage, to the full extent of the principal sums secured thereby, interest thereon and fees. Furthermore, Resident shall on request hereafter execute any documents that Owner's counsel may deem necessary to accomplish such subordination of Resident's interest in this lease, in default of which Owner is hereby appointed as Resident's attorney in fact to execute such documents in the name of Resident, and this authority is hereby declared to be coupled with an interest and irrevocable.

__35.   **WAIVER.** Failure by Owner to exercise any option herein contained upon breach by Resident shall not constitute a waiver of Owner's right to exercise such option upon any further breach.

__36.   **HANDICAPPED ACCESSIBILITY.** Owner will provide a handicapped accessible or adaptable apartment in the apartment community or in another Lindsey apartment community for Residents who require them. If it is not feasible for structural reasons to provide an accessible or adaptable apartment, Owner will make such adaptations as are reasonable to improve the accessibility of the apartment.

__37.   **COMPLETE AGREEMENT.** It is agreed that neither party hereto is relying upon any oral or written information or representation of the other party and that this lease constitutes the entire agreement between the parties and shall not be hereafter amended or modified except by written agreement signed by Resident and Owner.

__38.   **SEVERABILITY.** In the event any provision of this lease is declared to be invalid for any reason, it shall not affect the validity of any other provision of this lease.

__39.   **GOVERNING LAW.** This lease shall be governed by the laws of the State of Arkansas.

__40.   **BINDING AGREEMENT.** Resident hereby acknowledges that all terms, conditions, covenants, agreements and representations herein are binding upon and shall inure to the benefit of the parties hereto, jointly and severally, their respective heirs and assigns.

**NO SECURITY DEPOSIT WILL BE REFUNDED UNLESS A 30-DAY WRITTEN NOTICE IS
GIVEN BY RESIDENT AND RESIDENT HAS FULFILLED THE TERMS OF THE LEASE.**

---

**THIS IS A BINDING LEGAL DOCUMENT -- READ CAREFULLY BEFORE SIGNING.**

**Resident Signature & Social Security No.**                    **Owner or Owner's Representative**
**(All Residents must sign here)**

_____SSN:_____        _____

_____SSN:_____        _____

_____SSN:_____

## <u>Response to Request for Production No. 17:</u>

## Policy of Fountain Lakes Apartments

# Terms of transfer

It is possible to transfer between our various apartment communities. I will be happy to share some guidelines with you. (This does not apply to apt. to house transfers or vise versa)

1) You must be a resident in good standing. All rents and monies owed to the current apartment community must be paid prior to any transfer. If you have received a concession, it would need to be paid back in order to be able to transfer to another Lindsey community. The resident cannot be under eviction or in violation of the lease terms including rules and regulations.

2) A new security deposit will need to be placed for the new apartment. Make sure you get a receipt and show this to your current manager. Additionally, make sure you tell the new manager that you are transferring from a Lindsey Managed Community. The deposit from your current apartment will be applied to cleaning charges for that apartment. Any remaining deposit will be mailed to your new address.

3) A 30-day written notice to your current community director/manager is required (this is called the Notice to Vacate Form). We ask that you give a minimum of 30 days notice with the 28th day of the month as last day of residency. A full 30 days must be given for the new manager to be able to accept you into the new community.

4) You would begin a new lease agreement at the new community that is not already in place. If you are being added to a lease that has already been signed by a roommate, this would not qualify for the transfer guidelines.

We ask that you vacate the old apartment within 24 hours from the time the new apartment is ready. Your compliance with these guidelines will ensure your release from your current lease. Again, you will begin a new lease, that is not currently in existence, at the new property.

## I agree to the terms of transfer and will abide by the terms:

Sign:_____   Date:_____

Sign:_____   Date:_____

# EXHIBIT F

## IN THE CIRCUIT COURT OF SALINE COUNTY, ARKANSAS
## THIRD DIVISION

SANSTON M. FOSTER IV                                        **PLAINTIFF**

v.                                        No. 63CV-12-898

LINDSEY MANAGEMENT CO., INC.                          **DEFENDANTS**
FOUNTAIN LAKES, A LIMITED
PARTNERSHIP, and FOUNTAIN
LAKES MANAGEMENT COMPANY, INC.

### DEFENDANT FOUNTAIN LAKES, A LIMITED PARTNERSHIP'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION

COMES NOW Separate Defendant, Fountain Lakes, A Limited Partnership, d/b/a Fountain Lakes Apartments (hereinafter referred to as Fountain Lakes), by and through its undersigned attorney, and for its Objections and Responses to Plaintiff's First Set of Interrogatories and Request (sic) for Production of Documents states as follows:

### GENERAL OBJECTIONS

Fountain Lakes objects to Plaintiff's definitions and general instructions to the extent they seek to impose obligations in excess of and in violation of the Arkansas Rules of Civil Procedure. Fountain Lakes objects to Plaintiff's Interrogatories and requests for production of documents to the extent that they seek to obtain information, documents and communication that are privileged. Fountain Lakes makes the following responses without waiving said objections.

**INTERROGATORY NO. 1:** Please set forth the name, addresses and telephone numbers (and applicable corporate titles, if any) of all people who helped and assisted in answering these interrogatories and Requests for Production.

1

**RESPONSE TO INTERROGATORY NO. 1**:   Megan Vanhoy, Resident Manager, Fountain Lakes Apartment, 3011 Congo Road, #1601, Benton, Arkansas 72019.

**INTERROGATORY NO. 2:**  State the name, address and telephone number of each person known to you who has knowledge or information relating to the allegations set forth in the Complaint and Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 2:**

Megan Vanhoy, Resident Manager, Fountain Lakes Apartment, 3011 Congo Road, #1601, Benton, Arkansas 72019, Fountain Lakes management processes and procedures, condition of apartment.

Santson M. Foster, IV, 3011 Congo Road, Apt. 1410, Benton, Arkansas 72019.

Amanda Pearce, Former Leasing Agent, 1601 Hogan Lane, Conway, Arkansas 72034, communications with Santson M. Foster, IV.

James Booten, Former Maintenance Tech. To the best of Fountain Lakes information, Mr. Booten currently lives at P.O. Box 1351, Bald Knob, Arkansas 72010, condition of apartment.

Dylan Sproul, Maintenance Tech, 3011 Congo Road, #1601, Benton, Arkansas 72019, maintenance procedures at Fountain Lakes.

Painters Brandon Blakely or Tim Parsons, with Nelson Enterprises, condition of apartment.

Independent Contract Cleaner, Katherine Booten, condition of apartment.

Carpet cleaners from LagenWalter, condition of apartment.

2

**INTERROGATORY NO. 3:**  Identify, by stating the name, address and phone number of each person you expect to designate as or call at trial as an *expert* witness, including any expert witness you intend to call for rebuttal purposes only.

**RESPONSE TO INTERROGATORY NO. 3:**  Fountain Lakes has not retained any expert witnesses for use at the trial of this matter at this time, but reserves the right to amend its Response.

**INTERROGATORY NO. 4:**  As to each person identified in your response to Interrogatory No. 3, state his/her field of expertise (including the most current copy of his/her resume/Curriculum Vitae), and the subject matter on which he/she is expected to testify.

**RESPONSE TO INTERROGATORY NO. 4:**  See Response to Interrogatory No. 3.

**INTERROGATORY NO. 5:**  Provide the name, address and telephone number for each person you expect to call as a *lay* witness at trial and for each person give the subject matter on which that person is expected to testify at the trial of this case.

**RESPONSE TO INTERROGATORY NO. 5:**  Fountain Lakes has not yet determined its witness list for trial. However, Fountain Lakes may call any of the individuals listed in its Response to Interrogatory No. 2.

**INTERROGATORY NO. 6:**  Identify and state the present location of any and all documents you are aware of which have any bearing on the factual questions at issue in the present litigation, including, but not limited to, the claims addressed in the Complaint and Amended Complaints.

3

**RESPONSE TO INTERROGATORY NO. 6:**   Plaintiff's resident file maintained by Fountain Lakes is located at Fountain Lakes.

**INTERROGATORY NO. 7:**   Please list the owners, partners, shareholders, members, officers, directors, and/or managers of Fountain Lakes, A Limited Partnership. Please state their ownership interest and/or position.   Please include all individuals or entities with an ownership interest.

**RESPONSE TO INTERROGATORY NO. 7:**   Objection. Separate defendant Fountain Lakes Management Company, Inc. is the general partner of Fountain Lakes, A Limited Partnership, and holds a one percent ownership interest in Fountain Lakes, A Limited Partnership. Fountain Lakes objects to providing the rest of the information requested because it is not relevant, nor is it reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information.

**REQUEST FOR PRODUCTION NO. 1:**   Please provide the partnership agreement, articles of incorporation, and/or other documents relating to the formation and ownership of Fountain Lakes, A Limited Partnership.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:** Objection. Fountain Lakes objects to this request to the extent that it requests documents that are neither relevant nor likely to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the

4

entry of an appropriate protective order to protect the confidentiality of such information. Subject to this objection, Fountain Lakes will provide Articles of Amendment with Restatement of Fountain Lakes which is filed with the Arkansas Secretary of State.

**INTERROGATORY NO. 8:** Please list the shareholders, owners, partners, members, officers, directors and/or managers of Lindsey Management Co., Inc. Please state their ownership interest and/or position. Please include all individuals or entities with an ownership interest.

**RESPONSE TO INTERROGATORY NO. 8:**   Fountain Lakes has no information responsive to this Interrogatory.

**REQUEST FOR PRODUCTION NO. 2:**   Please provide the articles of incorporation, shareholder agreement, and/or other documents relating to the formation and ownership of Lindsey Management Co., Inc.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2**: Fountain Lakes has no documents responsive to this Request.

**INTERROGATORY NO. 9:**   Please list the owners, partners, shareholders, members, officers, directors, and/or managers of Fountain Lakes Management Company, Inc.. Please state their ownership interest and/or position. Please include all individuals or entities with an ownership interest.

**RESPONSE TO INTERROGATORY NO. 9:**   Objection. Fountain Lakes objects to this Interrogatory to the extent that it requests information that is neither relevant nor likely to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the entry

5

Limited Partnership, and Fountain Lakes Management Company, Inc. for the management of the Fountain Lakes Apartment Community in Saline County, Arkansas.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:** Objection. Fountain Lakes objects to this request to the extent that it requests documents that are neither relevant nor likely to lead to the discovery of admissible evidence in this matter. Fountain Lakes also objects to this request to the extent it requests production of documents exempt from discovery under the attorney work product doctrine, the attorney client privilege or other applicable privileges. Subject to such objections, and upon entry of an appropriate protective order as set forth above, Fountain Lakes will produce all relevant, non-privileged documents responsive to this request.

**INTERROGATORY NO. 11:** Please state the name of the individual who is responsible for hiring the apartment manager of the Fountain Lakes Apartment Community. Please state the name of this person's employer and their position / job title.

**RESPONSE TO INTERROGATORY NO. 11:** Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence and, therefore is not discoverable under the Arkansas Rules of Civil Procedure. Subject to said objections, Job Branch, President, Multi-Family Field Operations, Lindsey Management Co., Inc., and Dee Ann Huffman, Vice President/Regional Supervisor, Lindsey Management Co., Inc.

**INTERROGATORY NO. 12:** Please state the name of the individual who makes the final employment decisions (whether to hire or fire) regarding the leasing agents, maintenance staff and other personnel at the Fountain Lakes Apartment Community. Please state the name of the person's employer and their position / job title.

7

**RESPONSE TO INTERROGATORY NO. 12**:  Objection.  This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence and, therefore is not discoverable under the Arkansas Rules of Civil Procedure.  Subject to said objections, the Resident Manager is hired by Job Branch, President, Multi-Family Field Operations, Lindsey Management Co., Inc., and Dee Ann Huffman, Vice President/Regional Supervisor, Lindsey Management Co., Inc.  Resident Manager, Megan Vanhoy, employed by Fountain Lakes, makes the final employment decisions regarding leasing agents, maintenance staff and other personnel at Fountain Lakes.

**INTERROGATORY NO. 13:**  Please state the name of the individual who handles the payroll and issues payroll checks for the staff at the Fountain Lakes Apartment Community.  Please state the name of the person's employer and their position / job title.

**RESPONSE TO INTERROGATORY NO. 13:**  Objection.  This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence and, therefore is not discoverable under the Arkansas Rules of Civil Procedure.  However, without waiving said objections, Fountain Lakes' payroll is processed by an outside payroll processing company, ADP.

**INTERROGATORY NO. 14:**  Please state the name of the owner of the bank account from which payroll checks for the staff at the Fountain Lakes Apartment Community are issued.

**RESPONSE TO INTERROGATORY NO. 14:**  Objection.  This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to

lead to the discovery of admissible evidence and, therefore is not discoverable under the Arkansas Rules of Civil Procedure.

**INTERROGATORY NO. 15:**  Please state the name of the owner of the bank account in which funds received from deposits and rentals of apartments at the Fountain Lakes Apartments Community are deposited.

**RESPONSE TO INTERROGATORY NO. 15:**  Objection.  This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence and, therefore is not discoverable under the Arkansas Rules of Civil Procedure.  However, without waiving said objections, Fountain Lakes is the owner of the bank account.

**INTERROGATORY NO. 16:** Please provide the names, addresses, and phone numbers for all staff employed at the Fountain Lakes Apartment Community at the time the initial Complaint in this action was filed including, but not limited to, the apartment manager, leasing agents, and maintenance personnel.

**RESPONSE TO INTERROGATORY NO. 16:**

Megan Vanhoy, Resident Manager, Fountain Lakes Apartment, 3011 Congo Road, #1601, Benton, Arkansas 72019

Amanda Pearce, Leasing Agent, 1601 Hogan Lane, Conway, Arkansas 72034

James Booten, Maintenance Tech, P.O. Box 1351, Bald Knob, Arkansas 72010

Brandon Vanhoy, part time maintenance, 3011 Congo Road, #1601, Benton, Arkansas 72019

**INTERROGATORY NO. 17:** Please state the name of the person(s) responsible for approving or denying maintenance requests at the Fountain Lake Apartment

9

Community and state the name of the person(s) is employer.  What is the process for determining whether a maintenance request will be approved or denied and what criteria are used to make this determination?

**RESPONSE TO INTERROGATORY NO. 17:**   Resident's maintenance requests are not approved or denied by Fountain Lakes' management.  Residents submit their written maintenance requests to Fountain Lakes' management as agreed in their lease with Fountain Lakes; Fountain Lakes' management obtains specific information about what is being requested in the request and sends maintenance staff to the resident's apartment; Fountain Lakes' maintenance has a reasonable time to complete depending on the type of maintenance needed. The residents' requests are addressed and completed as submitted.

**REQUESTS FOR PRODUCTION NO. 5:**   Please provide all records, documents, memorandums, email, instant messages or other related material stored in any format, whether written or electronic, related to requests for maintenance at the Fountain Lakes Apartment Community within the last 12 months.  Please provide all documents memorandums, email, instant messages or other related material stored in any format, whether written or electronic, relating to the approval and completion, or denial of these requests.

**RESPONSE TO REQUESTS FOR PRODUCTION NO. 5:**   Objection. Fountain Lakes objects to this request as being overly broad, and unduly burdensome in requesting all records for requests for maintenance which would require Fountain Lakes' management to search through all current and former resident files.  Fountain Lakes'

10

records do not indicate plaintiff has submitted a written maintenance request to Fountain Lakes.

**INTERROGATORY NO. 18:** Is there a "resident relations," "tenant relations, or similar department that tenants at the Fountain Lakes Apartment Community and/or other properties managed by Lindsey may contact with complaints? If so, please state the name of the individual(s) who staff this department and state the name of their employer.

**RESPONSE TO INTERROGATORY NO. 18**: Objection. This interrogatory is not reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information. Subject to such objections, Fountain Lakes has no knowledge or information regarding tenants at other properties managed by Lindsey Management Co., Inc. Fountain Lakes' residents are provided with access to "resident relations" services through Lindsey Management Co., Inc., Fountain Lakes' management company, which acts as a liaison between Fountain Lakes' management and Fountain Lakes' residents to facilitate resolution of resident issues.

**REQUEST FOR PRODUCTION NO. 6:** Please provide all records, documents memorandums, email, instant messages or other related material stored in any format, whether written or electronic, related to complaints made by residents of the Fountain Lakes Apartment Communtiy to the "resident relations," "tenant relations," or similar complaint resolution department within the last 12 months.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**   Objection. Fountain Lakes objects to this request as being overly broad, and unduly burdensome in requesting all records, etc. related to complaints made by residents of Fountain Lakes to "resident relations."   Fountain Lakes is not the custodian of the records of Lindsey Management Co., Inc.'s Resident Relations Department. Fountain Lakes further objects to this request because it is not relevant, nor is it reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties including private information of non-party residents, or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information.

Subject to this objection, to the best of Fountain Lakes' knowledge and information, various residents have contacted Lindsey Management Co., Inc.'s Resident Relations Department during the last twelve months about repair of a water leak, clothes dryer, scratch on mirror, issue with front door lock, an oven, heater, counter top repair, toilet leak, air conditioning, refrigerator light bulb, door trim, smoke alarm, dead bolt, and an indention on a wall from a door knob. Fountain Lakes is providing an email from Fountain Lakes to Resident Relations related to plaintiff.

**REQUEST FOR PRODUCTION NO. 7:** Please provide all records, documents memorandums, email, instant messages or other related material stored in any format, whether written or electronic, related to complaints received by the "resident relations," "tenant relations," or similar complaint resolution department within the last 36 months regarding any properties managed by Lindsey involving circumstances similar to those in

Plaintiff's Complaint: that is, being shown a model apartment in good condition and, after signing a lease, discovering the apartment rented was not in the same condition. Please provide all documents memorandums, email, instant messages or other related material stored in any format,  whether written or electronic related to complaints received by the "resident relations" or similar complaint resolution department within the last 36 months regarding any properties managed by Lindsey where a person who chose *not to lease an apartment was denied a refund of their deposit.*

    **RESPONSE TO REQUEST FOR PRODUCTION NO. 7**: Objection. This request is overly broad, beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence and, therefore, is not discoverable under the Arkansas Rules of Civil Procedure.  However, without waiving said objections, the Interrogatory is directed toward "Lindsey". Fountain Lakes has no knowledge or information regarding complaints similar to those in plaintiff's Complaint at any other properties managed by Lindsey.

    **INTERROGATORY NO. 19:** Please list all lawsuits to which Lindsey or any of its affiliated companies has been a party, either as Plaintiff or Defendant, in the last 10 years. Please provide the court, case number, and dates.

    **RESPONSE TO INTERROGATORY NO. 19:** Objection. This interrogatory is overly broad, beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence and, therefore, is not discoverable under the Arkansas Rules of Civil Procedure.  However, without waiving said objections, the Interrogatory is directed toward "Lindsey". Fountain Lakes has no knowledge or information as to lawsuits in which "Lindsey or any of its affiliated

companies has been a party." Fountain Lakes has not been a party to any lawsuits other than those for unlawful detainer, and that filed herein by plaintiff.

**INTERROGATORY NO. 20:** Please state the name of the person who signed the lease attached to Plaintiff's Complaint as the "Owner's Representative." Please state this person's position and the name of this person's employer and direct supervisor.

**RESPONSE TO INTERROGATORY NO. 20:** Megan Vanhoy, Resident Manager at Fountain Lakes and employed by Fountain Lakes. The Regional Supervisor for Fountain Lakes is DeeAnn Huffman.

**INTERROGATORY NO. 21:** Please state the names of all apartment complexes within the state of Arkansas that are managed by Lindsey. For each property, please state:

  a.   The owner's name and address;

  b.   Whether there are any owners, shareholders, members, partners, officers or directors common to both the owner and Lindsey;

  c.   If there are common owners, shareholders, members, partners, officers, or directors, please state their names, ownership interests, and/or positions;

  d.   Please state the names of any affiliated entities (such as Fountain Lakes Management Company, Inc.).

**RESPONSE TO INTERROGATORY NO. 21:** Objection. This interrogatory is overly broad, beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence and, therefore, is not discoverable under the Arkansas Rules of Civil Procedure.   Without waiving said

14

objection, Fountain Lakes contracts with Lindsey Management Co., Inc. for administrative management services.

**INTERROGATORY NO. 22:**  Please provide the name and any contact information in your possession for the tenant that occupied Plaintiff's apartment prior to Plaintiff.

**RESPONSE TO INTERROGATORY NO. 22:**  Objection.  This interrogatory is not reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information. Subject to this objection, Andrew Dodd was the resident who occupied Apartment No. 1410 at Fountain Lakes before plaintiff.

**REQUEST FOR PRODUCTION NO. 8:**  Please provide any and all records, documents, memorandums, email, instant messages or other related material stored in any format,  whether written or electronic related to any charges build to or against the deposit of the prior tenant for repairs to the apartment and records relating to the completion of those repairs.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:** Objection.  This request is not reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information.

**REQUEST FOR PRODUCTION NO. 9:**  Please provide copies of any and all contracts regarding cleaning and maintenance of apartments at the Fountain Lakes Apartment Community that have been in effect in the last 12 months.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**  Objection.  This Request is overly broad, and unduly burdensome, not reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information.  Subject to this objection, the independent contractor cleaner for the apartments at Fountain Lakes was Katherine Booten, Middlebrooks Electric of Benton, Arkansas provides air conditioner services, Rid-A-Pest, performs scheduled pest control, Carpet Tech provides carpet and vinyl replacement, and Get A Grip, of Jacksonville, Arkansas, provides counter top resurfacing.  Fountain Lakes has no documents responsive to this Request.

**INTERROGATORY NO. 23:**  Please state the percentage and dollar amount of the total rental income that has been expended on maintenance of the apartments at the Fountain Lakes Apartment Community in each of the last 3 years.

**RESPONSE TO INTERROGATORY NO. 23:**  Objection.  This interrogatory is not reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information.

16

**REQUEST FOR PRODUCTION NO. 10:**  Please provide any and all records that support your response to Interrogatory No. 23.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10**:  See Response to Interrogatory No. 23.

**INTERROGATORY NO. 24:**  Please state the name or names of persons who meet with potential tenants at the Fountain Lakes Apartment Community, show apartments, review applications from tenants, and discuss the lease with tenants.  Please state the names of the employer or employers of these persons.

**RESPONSE TO INTERROGATORY NO. 24:**  Objection.  This interrogatory is overly broad, beyond the scope of this lawsuit, is not limited in scope, and seeks information not reasonably calculated to lead to the discovery of admissible evidence and, therefore is not discoverable under the Arkansas Rules of Civil Procedure. However, without waiving said objections, the employees of Fountain Lakes who meet with potential tenants at Fountain Lakes, show apartments, review applications from tenants, and discuss the lease with tenants are its Resident Manager and Leasing Agent who are employed by Fountain Lakes.

**REQUEST FOR PRODUCTION NO. 11**   Please provide a copy of any handbooks, policy books, memos or other documents concerning the leasing policies and practices of Lindsey and any affiliated entities.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**  Fountain Lakes is providing copies of its Rental Application, Apartment Lease Contract, Rules and Regulations.  Fountain Lakes' management learns its practices on the job and has no handbooks, policy books, memos or other documents concerning the leasing policies.

17

**REQUEST FOR PRODUCTION NO. 12:**  Please provide any and all records documents, memorandums, email, instant messages or other related material stored in any format,  whether written or electronic, relating to the showing of an apartment to a prospective tenant prior to the signing of a lease.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**  Fountain Lakes has no documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13:**   Please provide all records, documents, memorandums, email, instant messages or other related material stored in any format, whether written or electronic relating to policies of Lindsey or affiliated entities relating to the showing of model apartments.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13**: Fountain Lakes is not the custodian of any records of "Lindsey or affiliated entities." Fountain Lakes has no documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 14:**   Please provide all documents relating to the policies and practices of Lindsey and affiliated entities regarding refunds of deposits.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14**: Objection.  This request is not reasonably calculated to lead to the discovery of relevant, admissible evidence. Subject to this objection, Fountain Lakes is not the custodian of any records of "Lindsey or affiliated entities."  Fountain Lakes follows the terms and conditions as agreed to by its residents in its Rental Application and Lease regarding refunds of deposits.  See documents provided in Response for Request for Production No. 11.

**INTERROGATORY NO. 25:**  Please provide the name of the company or individual who provides pest control services to the Fountain Lakes Apartment Community.

**RESPONSE TO INTERROGATORY NO. 4:** Rid-A-Pest.

**REQUEST FOR PRODUCTION NO. 15:** Please provide a copy of any and all contracts or agreements for pest control services for the Fountain Lakes Apartment Community that were in effect as of the date the initial Complaint was filed in this matter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**  Objection. This request is not reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information.   Subject to these objections, Fountain Lakes has no document responsive to this Request.

**INTERROGATORY NO. 26:**  Does Lindsey Management Co., Inc. advertise online, in newspapers or other publications, or recruit in  any other way apartment managers, leasing agents, and /or maintenance personnel for any of its apartment complexes in Arkansas?  Has Lindsey Management Co., Inc. ever advertised online, in newspapers or other publications, or recruited in any other way apartment managers, leasing agents, and/or maintenance staff for the Fountain Lakes Apartment Community?

**RESPONSE TO INTERROGATORY NO. 26:** Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead

19

to the discovery of admissible evidence and, therefore is not discoverable under the Arkansas Rules of Civil Procedure. However, without waiving said objections, Fountain Lakes is not the custodian of Lindsey Management Co., Inc.'s records and has no knowledge or information regarding any advertising it may do for other apartment complexes it may manage in Arkansas.   Lindsey Management Co., Inc. provides administrative and accounting services to Fountain Lakes, including placing advertising. Fountain Lakes advertises for employees through Craigslist and in the *Arkansas Democrat Gazette.*

INTERROGATORY NO. 27:  Has Lindsey Management Co., Inc. ever filed a claim in any court seeking payment of rent or other monies due under a lease agreement which was entered in a name other than "Lindsey Management Co., Inc? If so, please list dates, court, and case numbers.

RESPONSE TO INTERROGATORY NO. 27:  Objection.  This interrogatory is overly broad, beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure.   Without waiving said objections, Fountain Lakes has no knowledge or information as to whether or not Lindsey Management Co., Inc. has ever filed a claim in any court seeking payment of rent or other monies due under a lease agreement.

INTERROGATORY NO. 28:  Who is the owner of the Eagle Hill Apartments located on West Baseline Road in West Little Rock, Arkansas?   Does Lindsey Management Co., Inc. provide management services to these apartments?

**RESPONSE TO INTERROGATORY NO. 28:** Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure. Without waiving said objections, Fountain Lakes has no knowledge or information as to who is the owner of Eagle Hill Apartments. To the best of Fountain Lakes' management knowledge, Lindsey Management Co., Inc. is the management company for Eagle Hill Apartments.

**INTERROGATORY NO. 29:** What was the basis of Lindsey Management Co., Inc.'s counterclaim against the Plaintiff in *Daryl King vs. Lindsey Management d/b/a Eagle Hill, et. al.*, case no. 4:07-cv-01081-SWW.

**RESPONSE TO INTERROGATORY NO. 29:** Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure. Without waiving said objections, Fountain Lakes has no knowledge or information as to any counterclaim Lindsey Management Co., Inc. may have had with Daryl King.

**INTERROGATORY NO. 30:** If a tenant fails to fulfill his or her obligations under a lease, does Lindsey Management Co., Inc. or any of its affiliates report this information to credit bureaus? If so, what business name is shown as the creditor?

**RESPONSE TO INTERROGATORY NO. 30:** Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure. Without waiving said objections, Fountain Lakes'

21

lease provides notice that if a resident vacates owing amounts to Fountain Lakes, the resident's account may be reported to collection agencies.  If a resident's account is reported, Fountain Lakes reports the account and is shown as the creditor.

**INTERROGATORY NO. 31:**   Please explain, in detail, Lindsey's policies regarding a tenant's desire to break a lease including how much the tenant is required to pay.

**RESPONSE TO INTERROGATORY NO. 31**: Objection.  This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure.  Without waiving said objections, the terms and conditions of Fountain Lakes' lease are enforced by its Resident Manager and are as set out in its Lease with the resident. Fountain Lakes has no knowledge or information responsive to "Lindsey's policies" to break a lease.

**REQUEST FOR PRODUCTION NO. 16:** Please provide copies of any written policies whether they be in a policy manual, handbook, email, memorandum, or other format that in any way relate to your answer to Interrogatory No. 31.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16**: Fountain Lakes is providing a copy of its Lease.

**INTERROGATORY NO. 32:**   Please explain, in detail, Lindsey's policies regarding a tenant moving to another Lindsey managed property before the term of their lease expires.

**RESPONSE TO INTERROGATORY NO. 32**: Objection.  This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to

lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure.  Subject to said objections, to the best of Fountain Lakes' knowledge and belief, plaintiff has not made a request to Fountain Lakes' management for a transfer to another property managed by Lindsey Management Co., Inc.  It is Fountain Lakes practice to allow a resident in good standing who requests to transfer to another property managed by Lindsey Management Co., Inc. to transfer after showing proof the resident has placed a deposit at the new property, and submits a written 30 days notice to vacate with Fountain Lakes.

**REQUEST FOR PRODUCTION NO. 17:** Please provide copies of any written policies whether they be in a policy manual, handbook, email, memorandum, or other format that in any way relate to your answer to Interrogatory No. 32.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**  Fountain Lakes is providing the policy it follows.

**REQUEST FOR PRODUCTION NO. 18:**  Please provide a complete and accurate copy of the policy handbook entitled "Nuts and Bolts of Property Management" as it existed on the date that Plaintiff leased an apartment at the Fountain Lakes Apartment Community.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**  Fountain Lakes has no document responsive to this Request.

**INTERROGATORY NO. 33:**  Please describe the assets owned or controlled by Fountain Lakes Management Company, Inc.

**RESPONSE TO INTERROGATORY NO. 4:**  Objection.  This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead

to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure.   Subject to said objections, Fountain Lakes Management Company, Inc. is the general partner of Fountain Lakes. Its only asset is its ownership interest in Fountain Lakes.

**INTERROGATORY NO. 34:** Does Fountain Lakes, A Limited Partnership, own or control any assets other than the Fountain Lakes Apartment Community?  If so, please describe those assets.

**RESPONSE TO INTERROGATORY NO. 34:**  Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure. Subject to said objections, Fountain Lakes is a single purpose entity and has no ownership or control of any other entity other than Fountain Lakes.

**INTERROGATORY NO. 35:**   Please state the name(s) of the individuals responsible for maintaining the financial records of Lindsey Management Co., Inc., Fountain Lakes, A Llimited Partnership, and Fountain Lakes Management Company, Inc. Please state the name of this person(s) employer and his or her position / job title.

**RESPONSE TO INTERROGATORY NO. 35:** Objection. This interrogatory is beyond the scope of this lawsuit, and seeks information not reasonably calculated to lead to the discovery of admissible evidence, and therefore, is not discoverable under the Arkansas Rules of Civil Procedure. Subject to said objections, Fountain Lakes has no knowledge or information regarding who maintains the financial records for Lindsey Management Co., Inc. Fountain Lakes' financial records are maintained by its

24

management company, Lindsey Management Co., Inc.   In addition, Fountain Lakes' management keeps deposit records, packing slips and invoices, and monthly reports.

**REQUEST FOR PRODUCTION NO. 19:**   Please provide the most recent financial statements for Lindsey Management Co., Inc., Fountain Lakes, A Limited Partnership, and Fountain Lakes Management Company, Inc.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:** Objection. This Request is not reasonably calculated to lead to the discovery of relevant, admissible evidence, and seeks to obtain information containing or relating to trade secrets, personal information of third-parties or other confidential proprietary information of Fountain Lakes without the entry of an appropriate protective order to protect the confidentiality of such information.

## VERIFICATION

I, Megan Vanhoy, Resident Manager at Fountain Lakes Apartments, do hereby certify that I have read the foregoing Responses to Plaintiff's First Set of Interrogatories and Request (sic) for Production and that the same are true and correct to the best of my knowledge.

Dated this 12th day of April, 2013.

Megan Vanhoy, Resident Manager
Fountain Lakes Apartments

25

Respectfully submitted,

FOUNTAIN   LAKES,   A   LIMITED
PARTNERSHIP, Separate Defendant

By:  _Georganne Mourney_
          Georganne Mourney
          Arkansas Bar No. 2002141
          Lindsey Management Co., Inc.
          1200 East Joyce Boulevard
          Fayetteville, Arkansas 72703
          Phone 479-521-6686
          Fax 479-527-8840

## CERTIFICATE OF SERVICE

    I, the undersigned, do hereby certify that in accordance with Rule 5 of the Arkansas Rules of Civil Procedure, I have served a copy of the foregoing document upon Mickey Stevens, attorney for plaintiff, P.O. Box 2165, Benton, Arkansas 72018, this 12th day of April, 2013, by U.S. Mail, postage prepaid.

                    _Georganne Mourney_
                    Georganne Mourney

## Response to Request for Production No. 1:

## Articles of Amendment with Restatement of Fountain Lakes, ALP

# STATE OF ARKANSAS



SECRETARY OF STATE

## Charlie Daniels
SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Charlie Daniels, Secretary of State of Arkansas, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

### Articles of Amendment with Restatement

of

## FOUNTAIN LAKES, A LIMITED PARTNERSHIP

filed in this office

November 3, 2009

**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 3rd day of November 2009.



_____
Secretary of State

●　　　　　　　●

Document Number: 11967050015

FOUNTAIN LAKES, A LIMITED PART

ARTICLES OF AMENDMENT WITH RESTATEM

FILED:11/03/09, #Pages:2

Arkansas Secretary of State
Business Services Division

## SECOND AMENDED AND RESTATED
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## FOUNTAIN LAKES, A LIMITED PARTNERSHIP

The original certificate
was filed July 20, 1993

The undersigned, for the purpose of amending and restating the Amended and Restated Certificate of Limited Partnership of Fountain Lakes, a Limited Partnership, and all amendments thereto, hereby certifies:

(1)    NAME:  The name of the Limited Partnership is **Fountain Lakes, a Limited Partnership.**

(2)    DATE OF FILING OF ORIGINAL CERTIFICATE:  The original Certificate of Limited Partnership of Fountain Lakes, a Limited Partnership was filed in the Secretary of State's office of the State of Arkansas on July 20, 1993.

(3)    ADDRESS OF LIMITED PARTNERSHIP OFFICE:  The address of the principal office of the Partnership is 1200 E. Joyce Boulevard, 6th Floor, Fayetteville, Arkansas 72703.

(4)    NAME AND ADDRESS OF AGENT FOR SERVICE OF PROCESS:  The name and address of the Registered Agent for service of process is D. Scott Rogerson, 1200 E. Joyce Boulevard, 6th Floor, Fayetteville, Arkansas 72703.

(5)    NAME AND ADDRESS OF GENERAL PARTNER:  The name and address of the General Partner is Fountain Lakes Management Company, Inc., 1200 E. Joyce Boulevard, 6th Floor, Fayetteville, Arkansas 72703

(6)    TERM:  The latest date upon which the Limited Partnership is to dissolve is December 31, 2039.

(7)    AMENDMENTS TO LIMITED PARTNERSHIP AGREEMENT AND/OR CERTIFICATE OF LIMITED PARTNERSHIP:

(A)    The original Certificate and Agreement of Limited Partnership, and all amendments thereto, should be amended and restated.

(B)   The original Agreement of Limited Partnership, and all amendments thereto, have been amended and replaced by the Second Amended and Restated Agreement of Limited Partnership. Those items in the Second Amended and Restated Agreement of Limited Partnership which were amended and which are required by statute to be set forth in this Second Amended and Restated Certificate of Limited Partnership are stated above.

(8)  SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT: A complete copy of the Second Amended and Restated Agreement of Limited Partnership of Fountain Lakes, a Limited Partnership (along with amendments thereto or restatements thereof) is kept at 1200 E. Joyce Boulevard, 6th Floor, Fayetteville, Arkansas 72703.

DATED this 1st day of October, 2009.

FOUNTAIN LAKES MANAGEMENT COMPANY, INC., General Partner

By: _____
James E. Lindsey, President

## ACKNOWLEDGMENT

STATE OF ARKANSAS          )
                           ) ss.
COUNTY OF WASHINGTON       )

On this 1st day of October, 2009, before undersigned, a Notary Public, duly commissioned, qualified and acting, within and for the said County and State, appeared in person the within named **James E. Lindsey**, to me personally known, who stated that he was the President of **Fountain Lakes Management Company, Inc.**, an Arkansas corporation, and was duly authorized in his respective capacity to execute the foregoing instrument for and in the name and behalf of said entity, and further stated and acknowledged that he had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 1st day of October, 2009.

My Commission Expires:

_____
Notary Public

```
OFFICIAL SEAL
JOY L. HOOPS
NOTARY PUBLIC . ARKANSAS
WASHINGTON COUNTY
COMMISSION EXP. 09/01/2014
```

splitting it with another Community Director, due to their personal needs, such as when undergoing marital separation or due to the health conditions of one of the partners.[28]

The significance of this difference in the job duties between proposed class members—even those holding the same position—cannot be understated.  To be clear, one Community Director might manage all aspects of a community related to leasing, marketing and staffing while another might oversee maintenance, which sometimes involves varying degrees of manual labor, while yet another might manage all of these aspects alone.[29]  It is therefore impossible to determine whether the proposed class members were properly classified as exempt under the executive, administrative or combination exemptions to the FLSA without conducting an individualized analysis of each class member's job duties.

Even amongst Community Directors who have divided the management of a community in a similar manner, there is significant variance in the way the Community Directors carry out their responsibilities.[30]  Therefore, the job duties and responsibilities entailed in managing a community managed by Lindsey Management vary from Community Director to Community Director and from community to community based on a variety of factors including, but not limited to, the division of labor amongst the Community Directors, the number of units in a community, the number of employees working at a community, regional manager preferences, the age of the community, the location of the community, the onsite facilities, the vacancy rate, training responsibilities, whether the community includes corporate suites and the hours of operations.[31]

In addition to Plaintiffs' sparse evidence, the record evidence includes declarations from 10 Community Directors submitted by Defendants.  These declarations remove any doubt that

---

[28] Def. App. 137-138 [B. Fox Decl. ¶ 13-15].
[29] Def. App. 202-203 [J. Branch Decl. ¶20].
[30] Def. App. 203 [J. Branch Decl. ¶21].
[31] Def. App. 203 [J. Branch Decl ¶22].

5.

the duties and responsibilities for the putative class members are widely disparate. The evidence already before the Court, summarized in Exhibit A, demonstrates that a blanket determination of the exempt status of the Putative Exempt Class will be impossible.

D.  **The Putative Nonexempt Class Consists Of Resident Managers And Assistant Managers Who Are Compensated For All Hours Worked And Whose Job Duties And Responsibilities Differ**

1.  **Resident Managers**

Resident Managers oversee the operations of smaller communities.[32]   They are compensated on an hourly basis and are eligible for overtime pay whenever they work more than 40 hours in a workweek.[33] The hours worked, job duties, and responsibilities of each Resident Manager differ from that of Community Directors and Assistant Managers, but also differ from that of other employees within the same Resident Manager position.[34]   The amount and frequency of overtime worked by each Resident Manager also varies, with some Resident Managers typically working about five to ten hours of overtime per week, while others typically work 10-15 hours of overtime each week.[35] Some Resident Managers attest to never performing work when they are not clocked in for the day or without adjusting their time records, while others answer brief calls after work and elect not to report that time.[36]

2.  **Assistant Managers**

Assistant Managers work under the supervision of Community Directors or Resident Managers.[37] They are hourly employees whose schedules vary depending on each community's and their personal needs.[38]   That is so even according to Plaintiffs' own evidence, which

---

[32] Def. App. 124, 203 [J. Branch Decl. ¶ 23; C. Tucker Decl. ¶ 2].
[33] Def. App. 124-126, 136 [B. Fox Decl. ¶ 6; C. Tucker Decl. ¶¶ 3, 6; Carlat Decl. ¶ 5].
[34] Def. App. 204 [J. Branch Decl. ¶25].
[35] Def. App. 108, 125 [C. Tucker Decl. ¶ 7; Carlat Decl. ¶ 12].
[36] Def. App. 125-126 [C. Tucker Decl. ¶ 9-10].
[37] Def. App. 107, 114 [Declaration of Ashley Crow ("A. Crow Decl.") ¶ 2; Carlat Decl. ¶ 3].
[38] Def. App. 107 [Carlat Decl. ¶ 5].

6.

acknowledges that Assistant Managers at smaller apartment communities reported "fewer hours," while those in larger apartment communities reported more.[39]

Assistant Managers are eligible for overtime pay whenever they work more than 40 hours in a workweek, but the frequency and amount of overtime that each Assistant Manager works also varies, with some Assistant Managers not working overtime on a regular basis, to others who typically work no more than one to two hours of overtime in a week, and yet to others who worked more overtime hours.[40]   While Plaintiff Chad Lochridge states that, as an Assistant Manager he had to perform work whether he was "on-the-clock or not," for which he alleges he was not compensated,[41] other Assistant Managers did not perform work while off-the-clock, and fully reported and were properly compensated for their overtime work.[42]   Some Assistant Managers have performed work after hours and have had their time record adjusted for work performed after working hours, others have not.[43]

E.   **Defendants Maintain And Follow Proper Time Keeping And Reporting Policies And Practices**

Lindsey Management maintains a Timekeeping Policy that explicitly requires its employees and the employees of the properties it manages to accurately record time worked, and defines time worked as including "all time that an employee is physically at work performing tasks for the company."[44]   That policy also makes clear that non-exempt employees are paid one and one-half times their regular hourly rate for all hours worked in excess of 40 hours in a given week.[45]   Consistent with that policy, the Company instructs its employees and the employees of the properties it manages to use the biometric hand scanning system to record all hours worked,

---

[39] Docket Entry 49-3 [Declaration of Ray Danforth ("Danforth Decl.") ¶ 11-12].
[40] Def. App. 108, 114, 117-118, 136 [B. Fox Decl. ¶ 6; Declaration of Kevin Crow ("K. Crow Decl."), ¶ 5-6; A. Crow Decl. ¶ 6; Carlat Decl. ¶ 11].
[41] Docket Entry 49-3 [Declaration of Chad Lochridge ("Lochridge Decl."), ¶ 15].
[42] Def. App. 115 [A. Crow Decl. ¶¶ 7-8].
[43] Def. App. 115 [A. Crow Decl. ¶ 9].
[44] Def. App. 135, 141 [B. Fox Decl. ¶ 5 and Ex. 1].
[45] Def. App. 136, 141 [B. Fox Decl. ¶ 6 and Ex. 1].

7.

to review their payroll records for accuracy, and to report any error to their supervisors, managers, Human Resources, or Company's Payroll Department for review and correction.[46] The Company does not set a specific limit of overtime hours that employees may work in a given week, and does not counsel or discipline employees for working above a certain number of overtime hours.[47] Quite the contrary, they are instructed that if they work in excess of 40 hours in a work week, they must report the additional time worked and they are compensated for the hours.[48]

Various communities apply different practices to ensure the accuracy of time records before payment is issued to employees.[49] By way of example, at the Greens at Hurricane Creek, Community Directors require Assistant Managers to review the hours reported for each pay period before processing their payments in order to ensure accuracy.[50] At the Lake Point Apartments, the Resident Manager reviews a report of the hours to be paid each pay period for accuracy before payroll checks are issued, and corrects errors when necessary.[51] At The Links at Springdale, Community Director Kathy Smith requires non-exempt hourly employees to maintain a call log indicating any calls answered after work hours, which she adds to each employee's payroll.[52]

In the past, Plaintiffs' witness, former Regional Manager Ray Danforth, contacted Human Resources disputing the approval of overtime hours worked by his subordinates, but the

---

[46] Def. App. 14-15, 28, 109, 114, 118, 126, 136 [B. Fox Decl. ¶ 7; E. Smith Decl. ¶ 26; A. Crow Decl. ¶ 6; C. Tucker Decl. ¶ 14-15; K. Crow Decl. ¶ 10; Carlat Decl. ¶ 18].
[47] Def. App. 108-109, 114, 118, 126, 136 [B. Fox Decl. ¶ 9; A. Crow Decl. ¶ 6; C. Tucker Decl. ¶ 14; K. Crow Decl. ¶ 10; Carlat Decl. ¶ 12, 18].
[48] Def. App. 115-117, 125-126, 136 [B. Fox Decl. ¶ 6-8; A. Crow Decl. ¶ 11; C. Tucker Decl. ¶ 8, 14; K. Crow Decl. ¶ 7].
[49] Def. App. 204[ J. Branch Decl. ¶32].
[50] Def. App. 115 [A. Crow Decl. ¶ 10].
[51] Def. App. 126 [C. Tucker Decl. ¶ 12].
[52] Def. App. 8, 14-15 [K. Smith Decl. ¶ 2, 29].

8.

Company paid the employees for all overtime hours reported despite Danforth's concern.[53]  For instance, on August 31, 2009, Danforth informed VP/Human Resources Director Betsy Fox that he had not approved 64.5 hours of overtime reported in a biweekly pay period by one of his subordinates.[54]  In response, Ms. Fox reminded Mr. Danforth that the Company absolutely pays for all overtime hours worked.[55]  Accordingly, to the extent Mr. Danforth denied overtime compensation to his subordinates, he did so in direct and blatant disregard of Company policy and Ms. Fox's directives.

> **F.    Plaintiffs' Own Timekeeping And Payroll Records Contradict Their Allegations**

In a futile attempt to create an unlawful common policy or practice that binds all putative class members where there is none, Plaintiffs state that non-exempt, hourly employees were "required to work off the clock" and were "instructed that they were not allowed to clock in or alternatively – even if clocked in – would not be paid for all hours worked."[56,57]  Plaintiffs further claim that Resident Managers were scheduled for fifty-five (55) or sixty (60) hours per week and were not permitted to report more hours than they were scheduled, even if they actually worked more hours.[58]  In her sworn declaration testimony, Plaintiff Patsy Pickel further states that she was only paid "minimum wage for forty (40) hours and time and a half for the next fifteen (15) hours per week," and that "even though [she] almost always worked more hours than that," she "was *never* compensated for these hours."[59]  A mere cursory look at a sampling of Pickel's Earnings Statements for the relevant time period, however, makes clear that her sworn declaration statements are false.  <u>Contrary to her claim that she was "never" compensated</u>

---

[53] Def. App. 136 [B. Fox Decl. ¶ 11].
[54] Def. App. 136, 142-144 [B. Fox Decl. ¶ 11 and Exh. 2].
[55] Def. App. 136 [B. Fox Decl. ¶ 11].
[56] Docket Entry 50, p. 3 [Plaintiffs' Brief]; Docket Entry 49- 4 ¶ 15 [Lochridge Decl.]; Docket Entry 49-3 ¶ 15 [Pickel Decl.].
[57] Docket Entry 49-3 ¶ 13-15, 19-20 [R. Danforth Decl.]
[58] Docket Entry 49-3 ¶ 13-15, 19-20 [R. Danforth Decl.].
[59] (emphasis added) Docket Entry 49-5 ¶ 5 [P. Pickel Decl.].

for more than 15 hours of overtime per week, on several occasions Pickel reported, and was fully paid, for more overtime hours than that.[60]  To be clear, Pickel is not an anomaly.  A sampling of the timecards and payroll records of other named and opt-in Plaintiffs also reveal that, undisputedly, they regularly reported a wide range of regular rate and overtime hours, including hours in excess of 55 or 60 per week, and the Company fully compensated them for those hours.[61]

      G.    **Plaintiffs' Proposed Classes Do Not Even Include Individuals Who Have Already Opted Into This Litigation.**

Further demonstrating Plaintiffs' inability to show that they are similarly situated to the putative class members they seek to represent, some Plaintiffs never even held job titles that fall within either of their proposed classes. Plaintiffs seek to represent Community Directors, Resident Managers and Assistant Managers.  However, some of the Plaintiffs who are asking this court to allow them to represent the proposed classes do not even fall within the Plaintiffs' proposed classes because they never held any of the relevant job positions. Plaintiff Judy Kathryn Hale's last position with the company was Sales Specialist.[62]  She never held any of the relevant positions and was not assigned to any particular community.[63]  Plaintiff Vachelle Wheaton was a Leasing Consultant.[64]  She never held any of the relevant positions.[65] Finally, Plaintiff Kevin Kornegay was a Maintenance Manager who never held any of the relevant positions.[66]

---

[60] Compare Docket Entry 49-5 ¶ 5 [P. Pickel Decl.] to Def. App. 148-158 [sampling of Ms. Pickel's Earnings Statement attached as Exhibit 4].
[61] Def. App. 136, 142-144, 148-158 [sampling of timecards and payroll records of other named and opt-in Plaintiffs attached as Exhibit 4 and B. Fox Decl. ¶ 11 and Exh. 2 thereto].
[62] Def. App. 138 [B. Fox. Decl. ¶16].
[63] *Id.*
[64] Def. App. 139 [B. Fox. Decl. ¶21].
[65] *Id.*
[66] Def. App. 138 [B. Fox. Decl. ¶19].

10.

Plaintiffs cannot credibly claim that they are similarly situated to the putative class members – they never even held the same job positions.

## III.   ARGUMENT

### A.   Legal Standard

#### 1.   Authorization Of Notice Under The FLSA Is Discretionary And Should Only Be Granted In Appropriate Cases

There is no right in a collective action pursuant to § 216(b) for court supervised notice. *See Fetrow-Fix v. Harrah's Entm't, Inc.*, No. 2:10-cv-00560-RLH-PAL, 2011 U.S. Dist. LEXIS 150116, at *19 (D. Nev. Dec. 30, 2011) ("The FLSA does not require certification of collective actions."); *Harris v. FFE Transp. Servs., Inc.*, No. 3:05-CV-00777-P, 2006 U.S. Dist. LEXIS 51437, at *5 (N.D. Tex. May 15, 2006) (court-facilitated notice "is by no means mandatory"). That is, the FLSA does not expressly – or impliedly – require the judicial intervention Plaintiffs seek in their Motion. *Id.* Rather, the FLSA permits an individual to bring an action on behalf of themselves "and other employees similarly situated." 29 U.S.C. § 216(b). Whether the Court elects to intervene is a matter committed to the Court's sound discretion. *Fetrow-Fix*, 2011 U.S. Dist. LEXIS 150116, at *19.

In *Hoffmann-La Roche, Inc. v. Sperling*, the Supreme Court held that district courts "have discretion, *in appropriate cases* to implement" the collective action mechanism under § 216(b) "by facilitating notice to potential plaintiffs." 493 U.S. 165, 169 (1989) (emphasis added); *see also Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1233 (M.D. Ala. 2003) ("The power to authorize notice must, however, be exercised with discretion and only in appropriate cases").

In support of this conclusion, the Supreme Court pointed to the systemic benefits derived from a process that permits the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [. . .] activity." *Hoffmann-La Roche, Inc., supra*, at 170. "In other words, the court must be satisfied that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in this case." *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003); *see also*

11.

*Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1136 (D. Nev. 1999) (noting that "the Supreme Court has approved of applying at least some of the incidents of Rule 23 class actions to § 216(b)"). Absent the requisite commonality, "it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Horne, supra,* at 1234. Thus, courts and litigants alike have a "responsibility to refrain from stirring up unwarranted litigation" and a duty to avoid unduly burdening employers by permitting "a frivolous fishing expedition conducted by the plaintiff at the employer's expense." *Lentz v. Spanky's Rest. II, Inc.,* 491 F. Supp. 2d 663, 669 (N.D. Tex. 2007); *see also Horne*, 279 F. Supp. 2d at 1237; *Fetrow-Fix,* 2011 U.S. Dist. LEXIS 150116, at *10; *Songer v. Dillon Res., Inc.,* 569 F. Supp. 2d 703 (N.D. Tex. 2008) (denying certification and acknowledging the Court's duty to avoid stirring up litigation and unduly burdening employers by permitting frivolous fishing expeditions). Where, as here, Plaintiffs seek court-authorized notice merely as a means of "asking the court to assist in their efforts to locate potential [p]laintiffs and expand the scope of litigation the request for authorized notification must be denied." *Fetrow-Fix*, 2011 U.S. Dist. LEXIS 150116, at *10.

As succinctly noted by the Eastern District of Arkansas:

> A variety of factors may be considered in determining whether a case is suited to proceed as a collective class action, including (1) disparate factual and employment settings of the individual plaintiffs, (2) defenses available to the defendant that appear to be individual to each plaintiff, and (3) fairness and procedural considerations.

*Wright v. Pulaski County*, No. 4:09CV00065 SWW, 2010 U.S. Dist. LEXIS 87283, at *34 (E.D. Ark. Aug. 24, 2010). Here, the record indicates that putative class members work in different Communities, hold different job titles, perform different job duties, have different job responsibilities, oversee different staffing, and work under different supervisors, "all of which present disparate factual and employment settings that affect [whether or not any violation occurred]." *Id.* at *35. Thus, Plaintiffs are not similarly situated with respect to their claims and certification should be denied. *Id.*

12.

2.    **Plaintiffs Must Establish That They And The Putative Class Are "Similarly Situated" And Were Victims Of A Common Policy**

Moreover, it is the Plaintiffs' burden to establish "'similarity among the individual situations' and 'a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice.'" *Hinojos v. The Home Depot, Inc.*, No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434, at *5 (D. Nev. Dec. 1, 2006) (citing *Bonilla*, 61 F. Supp. 2d at 1138 n.6) (plaintiff must demonstrate the existence of a policy or practice of "general effect;" collective action cannot be maintained if "the action relates to other specific circumstances personal to the plaintiff")); *see also Severtson v. Phillips Beverage Co.*, No. 3-90 CIV 304, 1991 U.S. Dist. LEXIS 10561, at *4-5 (D. Minn. June 27, 1991). In other words, Plaintiffs must show "that they and potential plaintiffs together were victims of a *common policy or plan that violated the law.*" *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (emphasis added); *see also Guillen v. Marshalls of MA, Inc.*, No. 09-Civ-9575 (LAP) (GWG), 2012 U.S. Dist. LEXIS 4364, at *15 n.2 (S.D.N.Y. Jan. 13, 2012). Further, "unsupported assertions of widespread violations *are not sufficient* to meet Plaintiff[s'] burden." *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) (emphasis added). That is, with regard to Plaintiffs' burden of showing they are similarly situated to other employees, "mere allegations will not suffice; some factual evidence is necessary." *Bernard v. Household Int'l, Inc.*, 231 F. Supp. 2d 433, 435 (E.D. Va. 2002). As another court phrased the principle, "[a] Plaintiff must provide actual evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory allegations." *Prizmic v. Armour, Inc.*, No. 05-CV-2503 (DLI) (MDG), 2006 U.S. Dist. LEXIS 42627, at *7 (E.D.N.Y. June 12, 2006); *Guillen*, 2012 U.S. Dist. LEXIS 4364, at *11-12.

3.    **The Two-Step Analysis Plaintiffs Endorse Is Inappropriate And Inconsistent With The Supreme Court's Insistence On "Common Questions With Common Answers"**

13.

Plaintiffs here ask the Court to apply a two-step approach to their request for an order conditionally certifying this action and the "notice" that comes with it.[67]  In so doing, Plaintiffs suggest that the Court is bound to apply a "lenient" standard in assessing the sufficiency of their motion, noting that such a standard generally leads to conditional certification.  *Id.*  Though Plaintiffs are correct that some courts have applied such a two-step approach in appropriate cases, Plaintiffs are incorrect in several other material respects.

First, Plaintiffs' reliance on *Mooney v. Aramco Serv. Co.*, 4 F. 3d 1207, 1213-14 (5th Cir. 1995) (rev'd on other grounds), in support of the application of a two-tiered certification approach flatly contradicts the actual language of the case.  What the Fifth Circuit actually states in *Mooney* is: "we specifically *do not* endorse the methodology employed by the district court, and *do not* sanction any particular methodology." *Id.* (emphasis added).  Although the Fifth Circuit did not expound on its reasoning for declining to endorse a particular methodology, the variety of approaches utilized by federal courts across the country demonstrates that one size does not fit all.  Moreover, the fact that the Fifth Circuit has recently taken the highly unusual step of ordering briefing in a mandamus proceeding addressing this very issue demonstrates the reasonable difference of opinion that may exist regarding the proper standard for certification under § 216(b).  *See In re: Wells Fargo Banks, N.A.*, United States Court of Appeals for the 5th Circuit, No. 12-20605 (Docket Entries 3 and 4).[68]

Second, as noted above, even under a so-called "lenient" first-stage standard, Plaintiffs bear the burden of establishing, based on "substantial allegations," that the class they seek to represent is similarly situated and that they "were subject to a single decision, policy or plan that

---

[67] Docket Entry 50, pgs. 9-11.  The two-step approach Plaintiffs endorse here, an *ad hoc* procedure invented by the lower courts for determining the question of certification with regard to collective actions brought pursuant to § 216(b) of the FLSA, seems to have been coined in the case *Lusardi v. Lechner*, 855 F.2d 1062, 1074 (3d Cir. 1988), an action under the Age Discrimination in Employment Act.
[68] Original court proceeding at *In re Wells Fargo Wage and Hour Empl. Practices Litig.*, 4:11-MD-2266 (S.D. Tex.).

14.

violated the law." *Fetrow-Fix*, 2011 U.S. Dist. LEXIS 150116, at *17; *see also Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *5. Third, even at the first stage, this Court must consider whether, as the Supreme Court observed in *Hoffmann-La Roche, Inc.*, the notice Plaintiffs seek will result in the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [. . .] activity." *Hoffmann-La Roche, Inc., supra*, at 170. Fourth, the "first-stage" analysis endorsed by the Plaintiffs still requires that the Court consider manageability concerns raised by conditional certification of the proposed class. *See Bonilla*, 61 F. Supp. 2d at 1138 n.6 (noting, in conducting a "first stage" § 216(b) analysis, that "district court has discretion to determine whether individualized defenses make manageability of class impossible"); *Severtson*, 1991 U.S. Dist. LEXIS 10561, at *7 ("As a matter of sound case management, a court should, before offering [to assist plaintiff in locating additional plaintiffs], make a preliminary inquiry as to whether a manageable class exists."); *see also Hoffmann-La Roche, Inc.*, 493 U.S. at 171 ("One of the most significant insights that skilled trial judges have gained in recent years is the wisdom and necessity for early judicial intervention in the management of litigation. [. . .] A trial court can better manage a major ADEA action if it ascertains the contours of the action at the outset.") (citations omitted). Thus, Plaintiffs' suggestion that the application of a lenient "first stage" standard makes conditional certification an inevitability is badly misplaced. Indeed, although the Eighth Circuit has applied the "first-stage" analysis in appropriate cases, the Eighth Circuit courts, and in particular the courts in the Districts of Arkansas, routinely deny conditional certification—even under the "fairly lenient" first-stage standard advanced by Plaintiffs. *See Madden v. Lumber One Home Ctr. of Stuffgart, Inc.*, Case No. 4:10CV01162 JLH, 2010 U.S. Dist. LEXIS 127558, at *14-15 (E.D. Ark. Dec. 2, 2010); *Salter v. Onyx Corp.*, Case No. 4:10CV00906 JLH, 2011 U.S. Dist. LEXIS 23291, at *5 (E.D. Ark. Feb. 4, 2011); *Beasley v. Lee County School Dist.*, Case No. 2:02CV00112GH (E.D. Ark. Mar. 31, 2003) (Docket Entry 28);

15.

*Mason v. Marion School Dist.*, Case No. 3:02-cv-00277-JMM (E.D. Ark. Mar. 5, 2003) (Docket

Entry 33); *Clark v. West Memphis City School System*, Case No. 3:02-cv-00279-WRW (E.D.

Ark. March. 26, 2003) (Docket Entry 29); *Lotefield v. Earle School System*, Case No. 3:02-cv-

00337-GTE (E.D. Ark. Mar. 28, 2003) (Docket Entry 22); *Freeman*, 256 F. Supp. 2d 941;

*Farnsworth v. Welspun Tubular LLC*, No. 4:11-cv-619-DPM, 2012 U.S. Dist. LEXIS 115398

(E.D. Ark. Aug. 16, 2012).

Lastly, a "two-step" analysis should not apply at all here because such an analysis is

incompatible with the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.

2541 (2011). In particular, the principles reiterated in *Dukes* make clear that the two-step

approach violates two fundamental principles to achieving the overarching goals of efficiency

and due process in all forms of aggregate litigation. The first – commonality – requires the

identification of at least one common question that will generate a common answer "apt to drive

the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551. Second, the *Dukes* Court disapproved

of "[t]rial by [f]ormula," a phrase that encompasses trial plans, specifically those based upon

sampling methodologies, that impair a defendant's right to litigate its statutory defenses to

individual claims. *Id.* at 2561. A two-step approach fails to address whether the litigation raises

common questions *and a common answer* in the sense deemed essential by *Dukes*, or whether a

trial plan could exist that will permit Defendant to raise individualized defenses to the collective

claims. *See id.* at 2551, 2561.[69]

---

[69] Not surprisingly, these deficiencies in the two-step approach far too often lead to erroneous decisions that impose
substantial and needless costs on employers while wasting precious judicial resources. *See, e.g., Proctor v. Allsups
Convenience Stores, Inc.*, No. 2:06-CV-255-J, 2008 U.S. Dist. LEXIS 33707 (N.D. Tex. Apr. 24, 2008) (granting
conditional certification of a class of thousands without analysis of whether the class could be effectively and/or
efficiently managed and later decertifying the class because the court could not "coherently manage the class," but
only after 1,072 opt-in plaintiffs joined the case and 34 depositions had occurred); *Johnson v. Big Lots Stores, Inc.*,
No. 04-3201, 2007 U.S. Dist. LEXIS 96151 (E.D. La. Aug. 21, 2007) (Plaintiffs in that case, which also involved
allegations of misclassification under the FLSA, persuaded the court to assist in notifying other employees of the
litigation. After significant discovery occurred, the employer moved, on three occasions, to decertify the class; the
court, nevertheless, denied those motions. At trial, plaintiffs presented deposition testimony from 20 witnesses, two

16.

While the *Dukes* case dealt with class certification under Fed. R. Civ. P. 23, the analysis and rationale therein deals directly with the issues relevant in the instant matter. As one court noted while considering conditional certification pursuant to § 216(b), "[w]hile this court recognizes that collective actions under the FLSA are 'not subject to the provisions generally associated with class actions under FRCP 23,' [. . .] the Supreme Court's reasoning in a recent Title VII class action, *Wal-Mart Stores, Inc. v. Dukes*, [. . .] is nonetheless illuminating." *MacGregor v. Farmers Ins. Exchange*, No. 2:10-CV-03088, 2011 U.S. Dist. LEXIS 80361, at *13 (D.S.C. July 22, 2011) (internal citations omitted). The Court in *Blaney v. Charlotte-Mecklenburg Hosp. Auth.* also looked to *Dukes* in the context of notice stage § 216(b) certification, noting that decentralized management processes and enforcement decisions of individual supervisors do not equate to company-wide policy and should not result in class treatment. No. 3:10-CV-592-FDW-DSC, 2011 U.S. Dist. LEXIS 105302, at *26 (W.D.N.C. Sep. 6, 2011). Similarly, the court in *Ruiz v. Serco, Inc.*, No. 10-CV-394-bbc, 2011 U.S. Dist. LEXIS 91215 (W.D. Wis. Aug. 5, 2011), held that, with regard to the burden Plaintiffs bear in seeking notice stage certification under section 216(b), "[t]he Supreme Court's recent decision in [*Dukes*] is instructive." *Id.* at *18-19 ("[a]lthough collective actions under the FLSA are not subject to the provisions generally associated with class actions under Fed. R. Civ. P. 23 [. . .], the Court's discussion of the propriety of class actions generally provides guidance in deciding when certification of a collection action under the FLSA is appropriate"). Defendant does not ask the Court to import Rule 23 analysis here with its several facets; however, the Supreme Court in *Dukes* has provided relevant guidance with regard to questions at issue in the instant matter.

---

corporate representatives, and two expert witnesses, and submitted more than 1,000 exhibits. In response to post-trial motions, the court found that there was no common question that could be decided by a jury or the court because the asserted exemptions may apply to some, but perhaps not all, of the class members for some, but perhaps not all, of the relevant time period).

Specifically, the *Dukes* Court held that there was no cohesive nature to the varied claims plaintiffs' class would present; that, while there was a common question, there was no way to generate a common answer to that question for the entire proposed class. *Dukes*, 131 S. Ct. at 2556. The decision was based in large part on the fact that, though plaintiffs had proposed a common question, because the claims hinged on individual supervisor discretion, there could be no common answers. *Id.* at 2554. The *Dukes* Court has made it clear that, before breaking from traditional litigation for the exception of a class action, the reviewing court must satisfy itself that such a departure will ensure a common answer to the critical questions of the proposed class. *Id.* at 2550-54. Where it is clear that litigation will not result in common answers to the claims plaintiffs seek to represent, class certification is wholly improper. In such a case, there is no reason to depart from traditional litigation because, either individual litigation will nevertheless be required, or else binding decision will resolve claims which have not been properly addressed.[70]

Thus, while Rule 23 analysis may present a different level of inquiry than that traditionally adopted for § 216(b) certification, directly instructive parallels exist.[71] Accordingly, where such universal class action issues are addressed, courts have used instances of Rule 23 analysis to inform their decision regarding class certification pursuant to § 216(b). *See, e.g., Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 928 (D. Ariz. 2010) (finding that two Ninth Circuit cases brought pursuant to Rule 23 and analyzing the individual nature of claims, were instructive

[70] The *Dukes* Court also provides guidance with regard to the insufficiency of the type of anecdotal evidence on which Plaintiffs attempt to rely. With regard to the *Dukes* plaintiffs' use of evidence from a few employees taken from approximately one fifteenth of defendant's locations (235 out of 3,400 stores), the Court held that such evidence "falls well short" and is "too weak" to establish the necessary common policy or practice. *Id.* at 2555-2556. Similar to the *Dukes* case, the instant matter involves the anecdotal evidence of three former employees only, a showing even lighter than the one fifteenth indication made in *Dukes*. Accordingly, Plaintiffs' evidence represents a similarly weak showing to that made in *Dukes* and falls well short of establishing a common policy or practice.

[71] This is certainly underscored by the Supreme Court's earlier admonition in *Hoffmann-La Roche, Inc.* that, even in the § 216(b) context, it is critical that there be an "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [. . .] activity." *Hoffmann-La Roche, Inc., supra,* at 170.

for the *Avnet* Court's § 216(b) analysis regarding similarly situated potential plaintiffs). The *Dukes* decision squarely confronts issues fundamental to any class action and is instructive with regard to the certification question in this instance.

Accordingly, this Court should refuse to apply the lenient "first stage" standard urged by Plaintiffs. In a case such as this, where the pleadings create an inherently individualized inquiry into whether particular defenses apply to each of numerous putative class members, deferral of the certification question inexorably leads to inefficiency and waste in the resolution of this case. *See Guillen*, 2012 U.S. Dist. LEXIS 4364, at *18 ("[I]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.") (quoting *Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 U.S. Dist. LEXIS 68942 at *9 (E.D. Wis. Sept. 11, 2008)). These considerations further support the reasons this Court should dispense with the two-step approach endorsed by the Plaintiffs.[72]

**B.     Plaintiffs Cannot Establish That They And The Putative Class Members Are Similarly Situated**

---

[72] Moreover, the two-step approach endorsed by Plaintiffs finds no judicial purchase in either the FLSA or Supreme Court precedent. In *Hoffmann-La Roche, Inc.*, the Supreme Court recognized that a collective action under the FLSA presented similar difficulties to those addressed by the principles of Rule 23. 493 U.S. at 171. Additionally, what is commonly referred to as the "abrogation clause" in the Rules Enabling Act ("REA"), enacted in 1934, established the procedural supremacy of the Federal Rules of Civil Procedure. 28 U.S.C. §2072(b). The REA demonstrates the clear intent of Congress that the Federal Rules should be the predominant and default procedural rules to govern such things as class certification. There is nothing whatsoever in the FLSA that would permit the procedure set forth in Rule 23, explicitly for the certification of a class action, to be jettisoned and replaced with a *sui generis* and *ad hoc* court contrived two-step procedure heavily favoring plaintiffs and forcing unjustified costs on defendants and the judicial system. Based on the REA, and in accordance with congressional intent and Supreme Court precedent, Rule 23's certification requirements must be applied to questions of class certification unless the rule is in conflict with an express statutory directive which was enacted after Rule 23. In *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, the Supreme Court held that, "like the rest of the Federal Rules of Civil Procedure, Rule 23 automatically applies 'in *all* civil actions and proceedings in the United States district courts.'" 130 S. Ct. 1431, 1438 (2010) (emphasis added). The Court also held that "[t]he fact that Congress has created specific exceptions to Rule 23 hardly proves that the Rule does not apply generally. In fact, it proves the opposite. If Rule 23 did not authorize class actions across the board, the statutory exceptions would be unnecessary." *Id.* Accordingly, the Rule 23 standard as established in the Federal Rules of Civil Procedure is technically the correct standard to apply to Plaintiffs' Motion. Also, as previously noted, the fact that the Fifth Circuit has recently taken the highly unusual step of ordering briefing in a mandamus proceeding addressing this very issue demonstrates the reasonable difference of opinion that may exist regarding the proper standard for certification under Section 216(b). *See In re: Wells Fargo Banks, N.A.*, United States Court of Appeals for the 5th Circuit, No. 12-20605 (Docket Entries 3 and 4).

19.

1.    The Evidence Plaintiffs Have Submitted is Insufficient to Satisfy
      Their Burden of Demonstrating That They And The Putative Class
      Members Are Similarly Situated

Regardless of the standard applied to Plaintiffs' Motion, Plaintiffs bear the burden of establishing "'similarity among the individual situations' and 'a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice.'" *Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *5; *Smith v. Frac Tech Servs., LTD*, No. 4:09CV000679 JLH, 2009 U.S. Dist. LEXIS 109930, at *13-*14 (E.D. Ark. Nov. 24, 2009). Even under a lenient standard, "unsupported assertions of widespread violations *are not sufficient* to meet Plaintiff's burden." *Fetrow-Fix*, 2011 U.S. Dist. LEXIS 150116, at *18 (emphasis added). That is, with regard to Plaintiffs' burden of showing they are similarly situated to other employees, "mere allegations will not suffice; some factual evidence is necessary." *Id.* (citation omitted). "A Plaintiff must provide *actual* evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory allegations." *Prizmic*, 2006 U.S. Dist. LEXIS 42627, at *7; *see also Bonilla*, 61 F. Supp.2d at 1139 n.6; *Guillen*, 2012 U.S. Dist. LEXIS 4364, at *11-12.

Here, the evidence offered by Plaintiffs in an attempt to meet their burden consists of three declarations signed by Plaintiff Chad Lochridge, Plaintiff Patsy Pickel, and former Regional Supervisor Ray Danforth, which purport, among other things, to provide sworn testimony regarding: (1) the duties and responsibilities of all current and former Community Directors, Resident Managers, and Assistant Managers who worked in over 150 Communities over eight different states, and (2) the alleged impact of the Company's Nuts & Bolts guide on the duties and responsibilities of what Plaintiffs expect to total nearly 500 putative class members.[73] These declarations, however, are insufficient to satisfy Plaintiffs' burden because the allegations regarding other employees of the Company consist of conclusory and unsupported allegations, not based on any personal knowledge, and lack any "actual evidence" to show that

_____
[73] Docket Entries 49-3, 49-4 and 49-5.

20.

the Plaintiffs and all other Community Directors, Resident Managers, and Assistant Managers
are similarly situated and victims of the same common, unlawful policy.

When faced with similarly unsupported allegations regarding other employees that were
not based on any personal knowledge, courts have routinely denied motions for conditional
certification.    *See, e.g., Madden*, 2010 U.S. Dist. LEXIS 127558, at *14-*15 (denying
conditional certification where the plaintiffs offered only two affidavits to support their similarly
situated claims); *Stiles v. FFE Transp. Servs.*, Case No. 3:09-CV-1535-B, 2010 U.S. Dist.
LEXIS 24250 (N.D. Tex. Mar. 15, 2010) (holding that conclusory allegations contained in
affidavits submitted by plaintiffs were insufficient to warrant conditional certification); *Hinojos*,
2006 U.S. Dist. LEXIS 95434, at *3 (denying plaintiffs' motion for conditional certification of
nationwide FLSA class where plaintiffs relied on their own declarations but admitted at
deposition that they had "little personal knowledge of defendant's FLSA violations outside of
Las Vegas"); *Banks v. Robinson*, No. 2:11-cv-00441-RLH-PAL, 2011 U.S. Dist. LEXIS 83939,
at *17-18 (D. Nev. July 28, 2011) (denying motion for conditional certification supported by
plaintiff's declaration which "simply does not provide sufficient factual evidence that others who
worked for the Defendants were similarly situated"); *Dewitt v. Securitas Sec. Servs. USA, Inc.*,
No. 4:11-cv-873-DPM, 2012 U.S. Dist. LEXIS 71590 (E.D. Ark. May 23, 2012) (denying
motion for conditional certification because supporting evidence was "just too thin and
conclusory" and single declarant could not testify about others' pay); *Songer*, 569 F. Supp. 2d
703 (denying certification and acknowledging the Court's duty to avoid stirring up litigation and
unduly burdening employers by permitting frivolous fishing expeditions); *Davis v. Westgate
Planet Hollywood Las Vegas, LLC*, No. 2:08-cv-00722-RCJ-PAL, 2009 U.S. Dist. LEXIS 5941,
at *30-33 (D. Nev. Jan. 12, 2009) (denying plaintiffs' motion to conditionally certify a
nationwide class, where "[t]he [plaintiffs'] declarations supporting the plaintiffs' motion to
circulate simply do not provide any factual evidence that defendants' timeshare sales personnel
outside of Nevada, Florida or Tennessee are similarly situated for purposes of circulation of
notice of a collective action."); *Silva v. Gordon Gaming Corp.*, No. 2:06-cv-00696-JCM-PAL,

2006 U.S. Dist. LEXIS 71847 (D. Nev. Sept. 27, 2006) (denying conditional certification of FLSA class where statements in the plaintiff's declaration in support of the motion regarding the treatment of other employees was merely based on his "information and belief" and, as such, was insufficient); *see also Tice v. AOC Senior Home Health Corp.*, No. 4:10-CV-400, 2011 U.S. Dist. LEXIS 113509, at *10 (E.D. Tex. Sept. 30, 2011) ("preliminary factual showing [relating to conditional certification] must be based on a personal knowledge of the facts") (citations omitted); *Trinh v. JP Morgan Chase & Co.*, No. 07-cv-1666, 2008 U.S. Dist. LEXIS 33016, at *10 (S.D. Cal. Apr. 22, 2008) (affiants' "speculative beliefs" that other workers were similarly situated are insufficient); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 355-56 (E.D.N.Y. 2008) (denying class certification for Brooklyn-area stores where plaintiffs' factual support regarding the situation of the employees is reduced to hearsay. "Although plaintiffs' burden at this stage of the proceeding is modest, a court cannot justify certifying a class of plaintiffs, likely numbering in the hundreds, on the basis of such thin factual support."); *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865-66 (S.D. Ohio 2005) (holding that affidavits in support of conditional certification must constitute admissible evidence).

Because the statements in Plaintiffs' declarations here relating to alleged similarly situated Community Directors, Resident Managers, and Assistant Managers are not based on any personal knowledge, and are unsupported and conclusory, they do not rise to the level of "*actual evidence of a factual nexus between [their] situation and those that [they] claim[] are similarly situated*" required as a predicate to certification of collective action. *Prizmic*, 2006 U.S. Dist. LEXIS 42627, at *7. In the end, the evidence offered by the Company, and the lack of evidence offered by Plaintiffs, demonstrates that Plaintiffs have utterly failed to carry their burden of showing that they are similarly situated to other Community Directors, Resident Managers, and Assistant Managers.

       2.    **Plaintiffs Are Not Similarly Situated Because Individualized Inquiries Germane To The Exemption Analysis Preclude Certification**

22.

It follows logically, consistent with the principles discussed above, that before notice is authorized, Plaintiffs must at least present a plausible theory that their overtime claim (and perhaps those of hundreds of other Community Directors, Resident Managers, and Assistant Managers in the more than 150 Communities located in 8 states who will be allowed to join this litigation simply by signing a form) can be adjudicated based upon evidence or testimony. Both courts and the U.S. Department of Labor find that "[d]etermining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing [managerial] duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'" *Diaz v. Elec. Boutique of Am., Inc.*, No. 04-CV-0840E (Sr), 2005 U.S. Dist. LEXIS 30382, at *8 (W.D.N.Y. Oct. 17, 2005) (quoting *Safeco Ins. Co. of Am.*, 274 F. Supp. 2d at 220); 29 C.F.R. § 541.2 ("[t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations"). Critically, the Regulations provide that, where an employee performs concurrent duties[77], "[w]hether an employee meets the requirements" of the exemption "is determined on a case-by-case basis." *29 C.F.R. § 541.106(a)*. Against this legal backdrop, Plaintiffs must show that their claim that the Company misclassified Community Directors presents common questions of fact and law that may be answered – conceivably –

---

whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a). The regulations list a variety of management responsibilities which satisfy the primary duty test, such as: interviewing, selecting, and training of employees; setting and adjusting rates of pay and work hour; directing the work of subordinate employees; maintaining and using production or sales records; appraising employees' productivity and efficiency; addressing employee grievances; disciplining employees; planning and apportioning work among the employees; determining the techniques and the type of materials, supplies, machinery, equipment or tools to be used; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; and ensuring legal compliance. 29 C.F.R. § 541.102.

[75] Employees who meet the requirements for the administrative exemption are those (1) who are compensated on a salary basis of not less than $455 per week; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer, (3) which includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a).

[76] The FLSA regulations establish that employees who perform a combination of exempt duties under the administrative and executive exemptions may qualify for the exemption, if their primary duty includes a combination of exempt administrative and exempt executive work. 29 C.F.R. § 541.708.

[77] The regulations recognize that, since exempt managers remain responsible for success or failure of business operations under their management even while performing nonexempt work, such managers may need to perform nonexempt work concurrently with their management duties. 29 C.F.R. § 541.106. As result, concurrent performance of both exempt and nonexempt work, such as simultaneously directing the work of employees while stocking shelves, does not disqualify an individual from the executive exemption. *Id.*

24.

through representational proof. Plaintiffs have not done so, as is abundantly clear by the record, which demonstrates the need for an individualized factual inquiry.

### 3.   Individualized Inquiries Into The Actual Duties Performed Further Render Collective Action Treatment Inappropriate

Courts refuse to permit FLSA suits to proceed as collective actions if the individualized inquiries required would eliminate "the economy of scale envisioned by the FLSA collective action procedure." *See, e.g., Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1275 (M. D. Ala. 2004). Here, the need for individualized inquiries to determine the exempt status of salaried putative class members is a certainty given: (1) legal authority mandating that an inquiry into the applicability of an exemption in a misclassification case must include an examination of the duties a plaintiff *actually* performs; and (2) the disparate evidence presented by the parties with respect to the duties performed by the putative class members. Thus, the myriad individualized inquiries necessary to determine whether each putative class member was, in fact, performing exempt tasks render collective action treatment ineffective and inappropriate.

That these sorts of individualized inquiries are crippling to the certification of a collective action is more than mere speculation – courts routinely decline to certify collective actions, even under a first stage analysis, where the necessity of individualized inquiries becomes apparent.[78] Indeed, disparate job duties and responsibilities – like those attested to by the Plaintiffs and non-Plaintiff declarants here – are fatal to the conditional certification determination when the differences require individualized analysis to determine exempt status. *See Aguirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2007 U.S. Dist. LEXIS 17259, at *43 (S.D. Tex. Mar. 12, 2007) ("[g]iven the fact-intensive nature of the exemption analysis, the plaintiffs have not shown

---

[78] *See Reich v. Homier Distrib. Co., Inc.*, 362 F. Supp. 2d 1009, 1013-15 (N.D. Ind. 2005) (denying motion for conditional certification because plaintiff and potential collective action members were not similarly situated, as application of FLSA exemption would depend on each employee's specific duties); *Safeco Ins. Co. of Am.*, 274 F. Supp. 2d at 220-21 (holding plaintiff failed to make adequate showing that "questions common to a potential group of plaintiffs would predominate a determination of the merits in the case," because merits of plaintiffs' claim would require factual analysis of their individual day-to-day work functions); *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. 1053, 1067 (D. Colo. 1996) (court decertified class under § 216(b) where case was "fraught with questions requiring distinct proof as to individual plaintiffs, and defenses could not be addressed on a class-wide basis").

that they are similarly situated so as to make collective treatment of their claims proper under section 216(b) of the FLSA"); *Donihoo v. Dallas Airmotive, Inc.*, No. 3:97-CV-0109-P, 1998 U.S. Dist. LEXIS 2318, at *4-5 (N.D. Tex. Feb. 20, 1998) ("In deciding whether an employee fits into one of the many exempt categories delineated in the FLSA, the Court must conduct an inquiry into the employee's specific job tasks. Such an inquiry is not appropriate in a class lawsuit under Section 216(b)."). Potential collective action members, thus, are not "similarly situated" as to FLSA status when their exempt status may differ depending on their job responsibilities and duties. *Clausman v. Nortel Networks, Inc.*, No. 02-0400-C-M/S, 2003 U.S. Dist. LEXIS 11501, at *10-13 (S.D. Ind. May 1, 2003).

This is all the more true in an FLSA misclassification case where the ultimate inquiry is whether the employee is exempt, and requires an examination of the duties that they actually performed. *See In re Wells Fargo Home Mortg.*, 571 F.3d 953, 959 (9th Cir. 2009). Likewise, the resolution of Plaintiffs' classification claims here "depends on the specific employment conditions in each [Community] and department in which each class member worked." *Hinojos*, 2006 U.S. Dist. LEXIS 95434, at *8; *Brooks v. BellSouth Telecomm., Inc.*, 164 F.R.D. 561, 569 (N.D. Ala. 1995) (finding employees in nine states, working in separate departments and under separate supervisors, among other differences, did not meet the "similarly situated" standard due to "disparate factual and employment settings"). Similarly, an individualized examination into the hours worked and reported by the hourly non-exempt putative class members is also required in this case, as some individuals reported working few to no overtime hours, while some regularly worked 10-15 or more overtime hours per work week. For all these reasons, certification of a collective action in this case is inappropriate. *See MacGregor*, 2011 U.S. Dist. LEXIS 80361, at *7 ("[i]f individualized determinations are likely to predominate, collective action will hinder, rather than promote efficient case management, and thus notice should not be granted"); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (finding conditional certification inappropriate where adjudication of a collective action would have required factual inquiries into employment relationships involving different managers at

26.

different locations throughout the country, and where the court concluded that a finding of liability at one location would not necessarily lead to a finding of liability at another location).

    **4.**    **Plaintiffs Are Not Similarly Situated and Individualized Inquiries Germane to Plaintiffs' Off-The-Clock Claims Cannot be Ignored**

        **a.**    **No Similar Employment Setting Unites All Plaintiffs**

Among the factors frequently examined in analyzing whether putative class members are similarly situated is whether a similar employment setting united all Plaintiffs. "This first factor assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary to determine if the Plaintiffs are similarly situated." *Reyes v. Tex. EZPawn, LP*, No. V-03-128, 2007 U.S. Dist. LEXIS 1461, at *8 (S.D. Tex. Jan. 8, 2007).

Here, Plaintiffs' claims arise from dissimilar employment settings. The putative nonexempt class consists of individuals who have different job titles, are assigned to different communities, and report to different Regional Managers. Putative class members have testified that the factual and employment settings for non-exempt individuals vary widely from community to community and even within their own experiences.[79] In addition, the job duties of the putative nonexempt class vary according to position.[80] The dissimilarities between the putative class members do not stop there. Plaintiffs Patsy Pickel and Chad Lochridge claim they were "required to work many hours over and above the hours in which I was clocked in," while

---

[79] Def. App. 108, 114, 117 ~ [A. Crow Decl. ¶ 4 (For instance, Assistant Manager Ashley Crow typically works nine hours per day from Monday, Tuesdays, Thursdays and Fridays, and has every Wednesday off. She also has every other weekend off (working approximately eight to nine hours on Saturday and 4 hours on Sundays during the weekends in which she works). Declaration of Kevin Crow ("K. Crow Decl.") ¶ 2, 4 (On the other hand, Assistant Manager Kevin Crow works between 8:30 a.m. to 5:30 p.m. and takes one hour lunch break each day, for which he clocks out. He usually works two weekends per month and, at times, is not required to work on a regularly scheduled Sunday if doing so will incur overtime pay); Carlat Decl. ¶ 9 (Also with a different work schedule, when Mary Carlat worked as an Assistant Manager she usually worked from 9:00 a.m. to 6:00 p.m. during five days per week (if she worked on Sundays, it was from 1:00 p.m. until 5:00 p.m.), and typically had two full days off per week.)]

[80] Def. App. 204 [J. Branch Decl. ¶ 25].

27.

other putative class members testified they reported, and were paid, for all hours worked.[81] Former Regional Manager Ray Danforth testified, ". . . my people that I supervised, and in my own experience as a former Community Director, they get near the end of their week and they still have more work to be done, you just have to keep doing it though it's beyond the hours you're allowed to report."[82] In stark contrast, putative class members reporting to other Regional Managers testified that they have never been instructed, or in any way prevented or discouraged from reporting all hours actually worked.[83]   Some putative class members said they reviewed their time records and had the opportunity to notify managers or correct about any mistakes.[84] Additionally, putative class members have testified that some, but not all, time entries were corrected if employees reported errors.[85]

That Plaintiffs' FLSA claims involve different communities, different Regional Managers, different job duties, and different managerial pay practices readily shows divergent employment settings. *See Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 284 (N.D. Tex. 2008) (granting decertification because plaintiffs "worked in settings that var[ied] from store to store, manager to manager, and day to day"); *Gatewood v. Koch Foods of Miss., LLC*, No. 07-82, 2009 U.S. Dist. LEXIS 113896, at *53 (S.D. Miss. Oct. 20, 2009) ("It is readily apparent that the named plaintiffs have worked in divergent employment settings and have varying claims as a result of their work in different plants, in different departments, in different jobs, and under different pay practices."); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184 Section

---

[81] Docket Entries 49-4 ¶ 15 and 49-5 ¶ 15; Def. App. 108-110, 112, 114-115, 121-122, 125-126, 133. [Compare to: M. Carlat Decl.¶ 14-19; A. Crow Decl. ¶ 6-10; J. Carter Decl. ¶ 10 , 13-14; J. Willcutt Decl. ¶ 8-11; L. Porter Decl. ¶ 12-14; C. Tucker Decl. ¶ 6-13].
[82] Docket Entry 49-3, ¶ 16.
[83] Def. App. 109-110, 112-113, 115-116, 122, 126, 133 [M. Carlat Decl. ¶ 16-19; A. Crow Decl. ¶ 11-12; J. Carter Decl. ¶ 15-17; J. Willcutt Decl. ¶ 12-13; L. Porter Decl. ¶ 15-16; C. Tucker Decl. ¶14-15].
[84] Def. App.109, 112, 121, 126 [M. Carlat Decl. ¶ 17; J. Carter Decl. ¶ 13-14; L. Porter Decl. ¶ 11; C. Tucker Decl. ¶ 12]..
[85] Def. App. 109, 112, 121, 126 [M. Carlat Decl. ¶ 17; J. Carter Decl. ¶ 13-14; L. Porter Decl. ¶ 11; C. Tucker Decl. ¶ 12].

28.

"K" (4), 2004 U.S. Dist. LEXIS 12441 at *26 (E.D. La. Jul. 1, 2004) (denying certification of proposed class because, *inter alia*, plaintiffs came from different departments, groups, and organizations within the employer, and potential plaintiffs "performed different jobs at different geographic locations and were subject to different managerial requirements which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis"); *cf. Douglas v. First Student, Inc.*, No. 4:09CV00652 BSM, 2012 U.S. Dist. LEXIS 125219, at *10-11 (E.D. Ark. Aug. 23, 2012) (decertifying class because, despite the fact that all plaintiffs "worked for the same employer, in the same locations, and during the same time-frame" a determination of liability required "a highly individualized inquiry as to each class member's circumstances every day of every week").

That putative class members might share "some general similarities to one another" does not suffice when the evidence shows Plaintiffs work in different positions under different managers on different shifts with different schedules, have different amounts of allegedly uncompensated time and allege different methods for avoiding overtime compensation. *See Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 304 (E.D. Pa. 2010). Any liability determination necessarily will require the Court, and eventually a jury, to determine whether each individual Plaintiff actually worked off the clock, the frequency and duration of such work, whether each Plaintiff's supervisor advised the employee not to report off the clock work, whether the employee did in fact report the work and how much of this work was compensated. *See First Student, Inc.*, 2012 U.S. Dist. LEXIS 125219, at *10-11 ("The problem with granting FLSA class status . . . is that each plaintiff must individually prove that she worked more than forty hours in any given week for which she claims damages. Therefore, a determination of . . . liability under the FLSA would require a highly individualized inquiry as to each class member's circumstances every day of every week. Indeed, individualized inquiries would also have to be

29.

conducted to determine whether any of the class members worked off-the-clock during any given week, and if so, how many hours were worked.").

"The necessity for independent inquiries into each alleged violation makes collective action likely to hinder rather than promote judicial economy." *MacGregor*, 2011 U.S. Dist. LEXIS 80361 at *16. Therefore, conditional certification should not be granted.

### b.   Individualized Defenses Dominate Any Liability Determination

Another factor in the similarly situated analysis assesses "whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual plaintiff." *Reyes*, 2007 U.S. Dist. LEXIS 1461 at *25. This second factor correlates with the first. *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("[T]he first two factors are like two sides of the same coin."). "Individualized inquiries into work practices and supervisor management decisions . . . cannot be addressed on a class-wide basis." *Gatewood*, 2009 U.S. Dist. LEXIS 113896 at *67.

Here, the complexity, inefficiency, and unfairness of trying this case as a collective action is readily apparent. As the District Court held in *Proctor*,

> The evidence shows a large factual variety among the individual Plaintiffs' claims and the times they allege they worked off the clock. These differences in the Plaintiffs' claims mean that the Defendant's defenses would also vary. Defenses to claims that individuals did not work off the clock but were not paid correctly will be distinct from the Plaintiffs alleging they were asked to work off the clock by management.

250 F.R.D. at 283. Defenses available to Defendants include, but certainly are not limited to: (1) a Plaintiff did not in fact work in excess of 40 hours in a particular week; (2) a Plaintiff never worked in excess of 40 hours in any week of his or her employment (3) if a Plaintiff did work off the clock, Defendants subsequently corrected it; (4) any instructions received to work off-the-clock were outside the scope of authority and contrary to Defendants' policies; (5) even if a Plaintiff did work off-the-clock, the employee unreasonably failed to avail himself of curative

30.

steps provided by Defendants; (6) a Plaintiff who had an actual and/or constructive knowledge of Defendants' policies banning off-the-clock work chose to violate that policy; (7) any off-the-clock work falls within the *de minimus* exception to the FLSA; (8) a Plaintiff's claims are barred by statute of limitations or technical defaults and (9) Plaintiffs are exempt from the FLSA's overtime requirements under the administrative exemption. *See Proctor,* 250 F.R.D. at 283; *Basco,* 2004 U.S. Dist. LEXIS 12441 at *25-26; *First Student, Inc.* 2012 U.S. Dist. LEXIS 125219 (discussing that individualized defenses warrants decertification). Imagine adding jury interrogatories for each of these defenses. Because Defendants "cannot be expected to come up with 'representative proof' when the plaintiffs cannot reasonably be said to be representative of each other," conditional certification should not be granted. *Johnson,* 561 F. Supp. 2d at 587.

**C.    Plaintiffs Cannot Demonstrate That The Putative Class Was Subjected To A Common Policy That Violated The Law**

Even at the initial notice stage, Plaintiffs cannot prevail unless they make "substantial allegations that the putative class members were subject to *a single decision, policy or plan that violated the law.*" *Fetrow-Fix,* 2011 U.S. Dist. LEXIS 150116, at *17 (emphasis added); *see also Frac Tech Servs.,* 2009 U.S. Dist. LEXIS 109930, at *13. Indeed, Plaintiffs must establish "'similarity among the individual situations' and 'a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice.'" *Hinojos,* 2006 U.S. Dist. LEXIS 95434, at *5 (citing *Bonilla,* 61 F. Supp. 2d at 1139 n.6).

**1.    Plaintiffs' Argument That The Common Policy That Binds The Putative Exempt Class Together Is Exempt Classification Has been Uniformly Rejected**

Regarding the Putative Exempt Class, Plaintiffs "[a]ll alleged that Defendant engaged in a common practice, policy, or plan of misclassifying 'salary' Plaintiffs." Such an argument, however, has been rejected by numerous courts. *See Avnet, Inc.,* 687 F. Supp.2d at 927 ("[T]he

31.

mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes."); *see also In re Wells Fargo Home Mortg.*, 571 F.3d 953, at 959 (9th Cir. 2009); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, at 946 (9th Cir. 2009); *Bramble*, 2011 U.S. Dist. LEXIS 39457, at *19 ("the mere classification of a group of employees ... as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common plan, policy, or practice that renders all putative class members as 'similarly situated' for §216(b) purposes."); *Harriel v. Wal-Mart Stores, Inc.*, 11-2510 (MLC), 2012 U.S. Dist. LEXIS 97527 (D.N.J. July 13, 2012); *Tahir v. Avis Budget Group, Inc.*, 09-3495 (SRC), 2011 U.S. Dist. LEXIS 37279 (D.N.J. Apr. 6, 2011); *Vasquez v. Vitamin Shoppe Indus., Inc.*, 10 Civ. 8820 (LTS) (THK), 2011 U.S. Dist. LEXIS 74376, at *9 (S.D.N.Y. July 11, 2011). Indeed, courts in Arkansas have found that "a collective action certifying into the same class all salaried ... employees regardless of job duties and position title would be inappropriate [even] at this [notice] stage." *Frac Tech Servs. Ltd.*, 2009 U.S. Dist. LEXIS 109930 at *21; *see also Freeman*, 256 F. Supp. 2d at 945 (rejecting plaintiff's view that employees were similarly situated simply because they claimed violations of the law by the same employer and noting that adopting plaintiff's position would require conclusion that if an employer has two or more employees who allegedly are not being paid overtime as required by the FLSA, then a collective action would be appropriate).

2.   **Plaintiffs Cannot Rely On Conclusory And Unsupported Allegations Regarding "Off-The-Clock" Work To Establish The Existence Of A Common Policy, Plan or Practice**

Similarly, Plaintiffs cannot establish an unlawful common policy, plan or scheme with respect to the hourly employees because Defendants widely disseminate and publicize policies and materials that specifically prohibit the unlawful pay practices Plaintiffs claim to have been subjected to. Plaintiffs allege that the Company "refus[ed] to pay hourly Plaintiffs regular wages

and overtime wages in violation of the FLSA."[86]  The Company's policies, however, specifically prohibit off-the-clock work and require employees to report and be compensated for all hours worked.  Therefore, far from maintaining an unlawful common policy, the Company maintains common policies that expressly refute Plaintiffs' claims. *See Basco*,  2004 U.S. Dist. LEXIS 12441 at *22 (where the plaintiffs essentially asked the court to deem "a corporate policy to keep employee wage costs low" as "*sufficient proof to justify the creation of a class of all Wal-Mart employees that ha[d] not been properly paid over-time . . .*," the court refused to certify a class of plaintiffs based merely on "anecdotal" allegations of off-the-clock work and time card manipulation because it was "obvious from the discovery presented that this 'policy' and its effects [were] neither homogeneous nor len[t] themselves to collective inquiry.").

Clearly, even if the hourly Plaintiffs could establish that they were owed overtime compensation as they allege, at most, Plaintiffs only establish that they were paid in a manner that was:  (i) in violation of Lindsey Management's policies and practices, and (ii) inconsistent with the way other Community Directors, Resident Managers, and Assistant Managers within the putative class were paid.  Consequently, they cannot establish that they are similarly situated to all the Community Directors, Resident Managers, and Assistant Managers that they seek to represent. *See Hinojos v. Home Depot, Inc.*, No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434, at **7-8 (D. Nev. Dec. 1, 2006) (where employer's policy and declarations of other employees contradict named plaintiffs' testimony, individualized determinations would require "separate mini-trials to resolve each individual's claim.  Such a result is the antithesis of collective action treatment").

　　　　　3.　　　**Plaintiffs Cannot Rely On The Nuts & Bolts Guide To Bind The Putative Class Together**

---

[86] Docket Entry 50.

...ating, that the
...ss together.[87]
...nt Managers,
...w because the
...& Bolts guide
...ble evidence
...ors, Resident
...e other hand,
...For example,
...& Bolts guide

...factual nexus
...victims of a
...'5, Plaintiffs'

...rtification Is

...y conditional
...laintiff cites,

...rk. Mar. 10,
...llegations of

...26; E. Smith

geographic locations, but denying motion as to two other positions for which only two and one affidavits were submitted, respectively); *Resendiz-Ramirez v. P&H Forestry, LLC*, 515 F. Supp. 2d 937, 940 (W.D. Ark. 2007) (granting motion for conditional certification of claim alleging *de facto* wage deductions from six employees who worked at Defendant's farm, based on their submission of a copy of a Department of Labor investigation secured through a Freedom of Information request and two declarations attaching paystubs); *Perez-Benites v. Candy Brand, LLC*, 2008 WL 4809105 (W.D. Ark. Oct. 31, 2008) (defendant did not oppose conditional certification).[91]

In sum, Plaintiffs' own papers demonstrate that this motion is devoid of legal as well as evidentiary support and that it should be denied under the overwhelming weight of authority. Accordingly, Plaintiffs' Motion should be denied. *See Gomez v. United Forming, Inc.*, No. 6:09-cv-576-Orl-31GJK, 2009 U.S. Dist. LEXIS 101804 (M.D. Fla. Oct. 15, 2009) (denying plaintiffs' motion to conditionally certify a class of hourly employees under the FLSA where the conclusory allegations in the affidavits submitted by three other putatively similarly situated employees did not support certification, and the plaintiffs' claims were generally inappropriate for collective treatment because defendants' time keeping practices were not uniform and required an individualized inquiry into each employee's day-to-day activities).

IV.   **CONCLUSION**

For all of the foregoing reasons, Defendants Lindsey Management Co., Inc. and James E. Lindsey respectfully request that this Court deny Plaintiffs' Amended Motion for Certification of Collective Action and for Disclosure of Contact Information for Potential Opt-In Plaintiffs. Furthermore, Defendants submit that the Court should not order Court-supervised notice as

---

[91] Plaintiff's citation to *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) is inapposite, as in that case the court reversed an order at the second stage, decertifying an ADEA class where the district court had failed to recognize the pattern-or-practice nature of the class claim.

36.

conditional certification is unwarranted, and any argument regarding the terms of such notice should be moot and is certainly premature.  However, in the event the Court orders conditional certification, Defendants reserve the right to file objections to Plaintiffs' proposed Notice.

37.

Dated: December 5, 2012

/s/ Kimberly Rives Miers
Eva C. Madison (98183)
Kim Flanery Coats (96267)
LITTLER MENDELSON, P.C.
3739 Steele Blvd., Suite 300
Fayetteville, Arkansas 72703
Telephone: 479.582.6100
Facsimile: 479.581.6111
emadison@littler.com
kcoats@littler.com

Kimberly Rives Miers (Texas Bar No. 24041482)
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, Texas 75201.2931
Telephone: 214.880.8100
Facsimile: 214.880.0181
kmiers@littler.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Josh Sanford – josh@sanfordlawfirm.com
Anne Milligan – anne@sanfordlawfirm.com
Sanford Law Firm, PLLC
One Financial Center
650 S. Shackleford, Suite 400
Little Rock, AR 72211

David Hughes – dhughes@hardinhughes.com
Hughes Hardin, LLP
2121 14th Street
Tuscaloosa, AL 35401

/s/ Kimberly Rives Miers

Firmwide:115869775.6 054984.1002

38.